UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BARBARA ACETO and JOAN GUARINO on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>        v.<br><br>INTERNATIONAL PAPER CO;<br>NORSKE SKOGINDUSTRIER ASA;<br>NORSKE SKOG NORTH AMERICA<br>LLC; NORSKE SKOG (USA), INC.;<br>NORSKE SKOG CANADA LIMITED;<br>NORSKE SKOG CANADA (USA), INC.;<br>STORA ENSO OYJ; STORA ENSO<br>NORTH AMERICA CORPORATION;<br>SAPPI LIMITED; S.D. WARREN<br>COMPANY; M-REAL CORPORATION;<br>M-REAL USA CORP; UPM-KYMMENE<br>CORPORATION; UPM-KYMMENE<br>INC.; MYLLYKOSKI CORPORATION;<br>MADISON INTERNATIONAL SALES<br>COMPANY and MEADWESTVACO<br>CORP.<br><br>        Defendants. | Civil Action No. **05 - 1 1 1 2 7 GAO**<br><br>RECEIPT # _____<br>AMOUNT $ ___ 250.00 ___<br>SUMMONS ISSUED ___ N/A ___<br>LOCAL RULE 4.1 ___ - ___<br>WAIVER FORM ___ - ___<br>MCF ISSUED ___ - ___<br>BY DPTY. CLK. ___ MP ___<br>DATE ___ 5/31/2005 ___<br><br>**MAGISTRATE JUDGE** ___ |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that Defendants MeadWestvaco Corporation, S.D. Warren

Company, and UPM-Kymenne Inc. (henceforth "Removing Defendants") hereby remove the

above-referenced action from the Middlesex County Superior Court for the State of

Massachussetts to the United States District Court for the District of Massachussetts pursuant to

28 U.S.C. §§ 1332 and 1441.[1]

## SUMMARY OF THE PENDING LITIGATION

1.      On February 15, 2005, an action was filed in the Middlesex County Superior

Court entitled *Barbara Aceto, on behalf of itself* [sic] *and all others similarly situated v.*

*International Paper Co. et al.*, No. 05-0539. That complaint alleged "per se violations of the

Massachussetts Consumer Protection Act, G.L. c. 93A §§ *et seq.*" (Feb. 15 Compl. ¶ 5),

purported to be an action "pursuant to Chapter 93A" (*Id*. ¶¶ 6, 58), and named only Barbara

Aceto as the plaintiff. (Ex. A.) None of the Removing Defendants was served with this

complaint.

2.      On February 24, 2005, S.D. Warren received a "Demand for Relief Pursuant to

G.L. c. 93A § 9" dated February 16, 2005 on behalf of claimants Joan Guarino and Trisha

Morrissey. (Ex. B.)

3.      On May 9, 2005, a "First Amended Complaint" was filed in Middlesex County

Superior Court alleging per se violations of Chapter 93A on behalf of Barbara Aceto and Joan

Guarino and naming as additional parties MeadWestvaco Corporation and UPM-Kymmene Inc.

(henceforth "Complaint").[2]

4.      On May 12, 2005, MeadWestvaco Corporation was served with the Complaint.

5.      On May 12, 2005, S.D. Warren Company received a copy of the Complaint.

6.      On May 13, 2005, UPM-Kymmene Inc. was served with the Complaint.

---

[1] By filing this Notice of Removal, Removing Defendants *do not intend to waive any rights or defenses and expressly preserve all rights and defenses, including lack of personal jurisdiction and insufficiency of service of process*.

[2] A copy of the Complaint and of all process received in this action by the Removing Defendants are attached as Ex. C.

2

7.     The Class Action Fairness Act of 2005 ("CAFA" or "the Act") was enacted on February 18, 2005. Pub. L. 109-2, 118 Stat. 5 (2005) (codified in scattered sections of 28 U.S.C.) (Ex. D). CAFA applies to all civil actions commenced on or after its date of enactment. CAFA § 9.

8.     This action was commenced on May 9, 2005 as to the Removing Defendants. UPM-Kymmene Inc. and Meadwestvaco Corporation were not named as defendants in the original complaint filed on February 15, 2005, and so no action was commenced as to those defendants until the First Amended Complaint was filed on May 9, 2005 – well after CAFA's effective date.

9.     In addition, the original complaint was ineffective as to S.D. Warren. Section 9(3) of Chapter 93A requires that a plaintiff alleging an action for damages under Chapter 93A serve a demand letter on any Massachussetts parties prior to filing. *See Labowitz v. Feinberg*, 713 N.E.2d 379, 307 n.5 (Mass. App. Ct. 1999) (upholding dismissal of 93A count for failure of plaintiff to make required written demand) (citation omitted); *Entrialgo v. Twin City Dodge, Inc.*, 333 N.E.2d 202, 204 (Mass. 1975) (noting that a demand letter is a prerequisite to filing suit) (citation omitted). Here, plaintiff Barbara Aceto failed to serve a demand letter on S.D. Warren, a Massachussetts resident (Compl. ¶ 34), before filing suit. Therefore the filing of the original complaint was ineffective as to S.D. Warren, and the "First Amended Complaint" controls for purposes of determining the commencement of this action under CAFA.

10.     CAFA eliminates the requirement that all previously served defendants consent to removal in a diversity case to which it applies. *See* CAFA § 5(a), 28 U.S.C. § 1453(b). Therefore this action is removable on notice by any one of the three Removing Defendants.

11.     This Notice is timely filed under 28 U.S.C. § 1446(b) because it is filed within thirty days of May 12, 2005, the earliest date that a Removing Defendant received the pleading setting forth the claim for relief upon which this removal is based.

12.     This matter is a civil action within this Court's original jurisdiction pursuant to 28 U.S.C. § 1332 because it is a class action between citizens of different states and involves an aggregated amount in controversy in excess of $5,000,000, exclusive of interest and costs. CAFA § 4(a)(2), 28 U.S.C. §§ 1332(d)(2), 1332(d)(6).

## THE PARTIES ARE SUFFICIENTLY DIVERSE

13.     CAFA amended 28 U.S.C. § 1332 by redesignating the old subsection (d) as subsection (e), and inserting a new subsection (d). CAFA § 4(a)(1). The new section 1332(d) confers federal jurisdiction over any class action if at least one plaintiff is diverse from at least one defendant. CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(2)(A).

14.     Plaintiffs Barbara Aceto and Joan Guarino are alleged to be Massachussetts citizens resident in Middlesex County. (Compl. ¶¶ 11, 12.)

15.     Defendant MeadWestvaco Corporation is alleged to be incorporated in Delaware and have its principal place of business in the State of Connecticut. (*Id.* ¶ 52.) Accordingly, at the time Plaintiffs commenced this action and at the time of filing this Notice of Removal, Defendant MeadWestvaco Corporation was a citizen of Delaware and Connecticut. *See* CAFA § 4(a)(2), 28 U.S.C. §§ 1332(d)(2)(A), 1332(d)(7).

16.     Defendant UPM-Kymmene, Inc. is alleged to be incorporated in Illinois and have its principal place of business in the State of Illinois. (Complaint ¶ 44.) Accordingly, at the time Plaintiffs commenced this action and at the time of filing this Notice of Removal, Defendant

4

UPM-Kymmene Inc. was a citizen of Illinois. *See* CAFA § 4(a)(2), 28 U.S.C. §§ 1332(d)(2)(A), 1332(d)(7).

17.     Therefore, because Plaintiffs allege that they are citizens of Massachussetts, that MeadWestvaco Corporation is a citizen of Delaware and Connecticut, and that UPM-Kymenne, Inc. is a citizen of Illinois, this action satisfies CAFA's requirement that any member of the plaintiff class be a citizen of a State "different from any defendant." CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(2)(A).

18.     In addition and in the alternative, this action satisfies a separate basis for federal jurisdiction. Numerous defendants are alleged to be foreign citizens. (Compl. ¶¶ 16, 22, 27, 32, 37, 42, 47.) Therefore, this action also satisfies CAFA's alternative requirement for jurisdiction because "any defendant is a foreign state or a citizen or subject of a foreign state." CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(2)(C).

19.     Diversity is therefore satisfied for purposes of 28 U.S.C. §§ 1332(d)(2)(A) and 28 U.S.C. § 1441(a).

## THE PUTATIVE CLASS SIZE EXCEEDS ONE HUNDRED MEMBERS

20.     CAFA also requires that the putative class number more than one hundred members for removal to take place. CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(5)(B).

21.     Plaintiffs "believe that the total number of class members is in the millions." (Compl. ¶ 60.)

22.     Thus the allegations in the Complaint satisfy CAFA's requirement that there be at least one hundred putative class members. *See* CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(5)(B).

## THE AMOUNT IN CONTROVERSY IS MET

23.     The amount in controversy in this action more likely than not exceeds the sum or value of $5,000,000. CAFA § 4(a)(2), 28 U.S.C. §§ 1332(d)(2), 1332(d)(6).

24.     The putative class upon whose behalf the action is alleged to be brought is defined as "[a]ll similarly situated consumer purchasers residing in the Commonwealth of Massachussetts (excluding governmental entities, defendants, and subsidiaries and affiliates of defendants) who indirectly purchased from the defendants, for their own use and not for resale, Magazine Paper products between January 1, 1993 and the present . . . ." (Compl. ¶ 58.)

25.     The amount in controversy more likely than not exceeds CAFA's threshold of $5,000,000 for federal jurisdiction. Plaintiffs' complaint is silent on the amount of damages that the putative class seeks, other than stating that it will not exceed $75,000 for each individual class member, which has no bearing on the aggregate total. (Compl. ¶ 10 ("Neither the Plaintiffs nor any member of the Class has damages exceeding $75,000 each even when trebled. Attorneys' fees on a pro-rata basis will not exceed $75,000 for each class member").) The jurisdictional amount in this case is met based on a clear reading of Plaintiffs' claims. Section 9(3) of Chapter 93A provides for statutory damages of $25 per person.[3] Mass. Gen. Laws. ch. 93A, § 9(3). Plaintiffs allege that the "total number of class members is in the millions," and propose a twelve-year class period, from "January 1, 1993 through the present." (Compl.¶ 58, 60). Even assuming a class of only one million, rather than the "millions" alleged, claimed damages of $25,000,000 clearly exceed $5,000,000 – setting aside the possibility of trebling or

---

[3] Defendants do not concede that Plaintiffs are entitled to any relief under Chapter 93A; that if entitled to relief, they would be entitled to statutory damages of $25 per person; that they have a cause of action under that statute; or for that matter that Plaintiffs' proposed class definition and class period are proper. Nevertheless, Plaintiffs purport to bring their claims under Chapter 93A and in calculating the amount in controversy, the Court must consider the full amount that Plaintiffs will seek to recover based on the remedies they request under that Act.

attorneys' fees, which are provided for under Section 9. To the extent plaintiffs seek to recover actual damages, it is more likely than not that the damages sought would also exceed $5,000,000, given a proposed class alleged to number in the "millions."

26.     Accordingly, the amount in controversy for purposes of 28 U.S.C. § 1332(d)(2) and § 1332(d)(6), when aggregated to include trebled damages and attorneys' fees, more likely than not exceeds CAFA's threshold of $5,000,000 exclusive of costs and interests for federal jurisdiction. CAFA § 4(a)(2), 28 U.S.C § 1332(d)(2).

27.     None of the discretionary bases for a federal court to decline jurisdiction over this action under CAFA is met here. CAFA permits a court to decline jurisdiction at its discretion "in the interest of justice and looking at the totality of the circumstances" only if, inter alia, "greater than one third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of [Massachussetts]." CAFA § 4(a)(2), 28 U.S.C. §§ 1332(d)(3). In this case, the entire class is defined as individuals and entities "in the Commonwealth of Massachussetts," thus exceeding the two-thirds member threshold. (Compl. ¶ 58.)

28.     Neither does the provision of the Act requiring a federal court to decline jurisdiction under certain circumstances apply here. CAFA § 4(a)(2), 28 U.S.C § 1332(d)(4)(A)(i)(II). Although S.D. Warren is a citizen of Massachussetts, and thus at least one defendant is "a citizen of the State in which the action was originally filed," CAFA §4(a)(2), 28 U.S.C. § 1332(d)(4)(A)(i)(II)(cc), more than thirty other class actions, including cases now consolidated in *In re Publication Paper Litigation*, 3:04 MD 1631 (SRU) (D. Conn.), have previously been filed asserting similar claims against the defendants named here. Consequently, jurisdiction must be retained because other class actions "have been filed asserting the same or

7

similar factual allegations against any of the defendants on behalf of the same or other persons."
CAFA § 4(a)(2), 28 U.S.C. § 1332(d)(4) (4)(A)(ii).

29.     The Removing Defendants are therefore entitled to remove this case, having
satisfied the amount in controversy requirement for diversity jurisdiction through aggregation of
the class members' damages, as required by 28 U.S.C. § 1332(d)(2), and there being no
mandatory or discretionary bases for this Court to decline to extend jurisdiction.

30.     A copy of this Notice of Removal will be served promptly on Plaintiffs and filed
with the Clerk of the Superior Court of Middlesex County, pursuant to 28 U.S.C. § 1446(d).

31.     Numerous other cases are pending in federal courts arising out of the same facts
and circumstances that are alleged by Plaintiffs in this case. On November 12, 2004, the Judicial
Panel on Multidistrict Litigation ("JPML") ordered the cases transferred to the District of
Connecticut for consolidated pretrial proceedings. (Ex. E.) Defendants will notify the JPML
promptly of the removal of this case to this Court.

**WHEREFORE**, Defendants give notice that the action pending against it in the

Middlesex Superior Court has been removed from that Court to the United States District Court

for the District of Massachussetts.

*Respectfully submitted*,

MEADWESTVACO CORPORATION
S.D. WARREN COMPANY
UPM-KYMMENE INC.

Jane E. Willis (BBO# 568024)
Ryan M. DiSantis (BBO# 654513)
ROPES & GRAY LLP
One International Place
Boston, MA 02110-2624
(617) 951-7000
(617) 951-7050 (facsimile)

Dated:  May 31, 2005

*Of Counsel:*

Alan M. Wiseman
Joseph A. Ostoyich
HOWREY LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2402
Phone: (202) 783-0800
Fax: (202) 383-6610

*Counsel for MeadWestvaco Corporation*

Mark R. Merley
Julie B. Rottenberg
ARNOLD & PORTER LLP
555 Twelfth St. N.W.
Washington, D.C. 20004-1206
Phone: (202) 942-5000
Fax: (202) 942-5999

*Counsel for S.D. Warren Company*

Peter G. McAllen
Erich R. Luschei (BBO #558180)
JONES DAY
555 W. Fifth St., Suite 4600
Los Angeles, CA 90013
Phone: (213) 489-3939
Fax: (213) 243-2539

Melissa J. Nandi
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Tel: (216) 586-3939
Fax: (216) 579-0212

*Counsel for UPM-Kymmene Inc.*

## CERTIFICATE OF SERVICE

I, Ryan M. DiSantis, hereby certify that a true copy of the foregoing was served this 31st day of May, 2005, by First Class Mail, postage prepaid, and addressed to:

Robert J. Bonsignore, Esq.
Bonsignore & Brewer
23 Forest Street
Medford, MA 02155
(781) 391-9400
*Counsel for Plaintiffs Barbara Aceto & Joan Guarino*

Daniel Nelson, Esq.
Gibson Dunn and Crutcher LLP
1050 Connecticut Ave., NW
Washington, DC 20036
(202) 955-8500
(202) 467-0539 (facsimile)
*Counsel for Defendant International Paper Co.*

Kenneth W. Ritt, Esq.
Jonathan B. Tropp
Day, Berry & Howard LLP
One Canterbury Green
Stamford, CT 06901
(203) 977-7300
(203) 977-7301 (facsimile)
*Counsel for Defendant Madison International Sales Company*

Mark G. Cunha, Esq.
Simpson Thatcher & Bartlett, LLP
425 Lexington Avenue
New York, NY 10017-3954
(212) 455-3382
(212) 455-2502 (facsimile)
*Counsel for Defendant M-Real USA Corporation*

M-Real Corporation
P.O.B. 10, FIN-02020
METSA
FINLAND

Joseph A. Ostoyich, Esq.
Howrey Simon Arnold and White, LLP
1299 Pennsylvania Ave., NW
Washington, DC 20004-2402
(202) 383-7241
(202) 383-6610 (facsimile)
*Counsel for Defendant MeadWestvaco Corporation*

Myllykoski Corporation
Etelaesplanadi 20, FIN-00130
Helsinki
FINLAND

Kenneth M. Kramer, Esq.
Shearman and Sterling, LLP
599 Lexington Ave.
New York, NY 10022-6069
(212) 848-4000
(212) 848-7279 (facsimile)
*Counsel for Defendant Norske Skog (USA), Inc.*

Jesse W. Markham, Jr., Esq.
Morrison and Forester LLP
425 Market Street
San Francisco, CA 94105-2482
(415) 268-7000
(415) 268-7522 (facsimile)
*Counsel for Defendant Norske Skog Canada (USA) Inc.*

Hugh F. Bangasser, Esq.
Preston, Gates & Ellis, LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(415) 268-7000
(415) 268-7522 (facsimile)
*Counsel for Defendant Norske Skog NA, LLC*

Norske Skogindustrier ASA
Okenoyveien 80
1326 Lysaker
NORWAY

Norske Skog Canada Limited
250 Howe Street, 16th Floor
Vancouver, BC V6C 3R8
CANADA

Sappi Limited
40 Amewshoff Street
Braamfontein
Johannesburg 2001
REPUBLIC OF SOUTH AFRICA

Adam J. Cohen, Esq.
Lee D. Hoffman, Esq.
Katherine A. Scanlon
Diane W. Whitney
Pullman & Comley, LLC
90 State House Square
Hartford, CT 06103-3702
(860) 424-4300
(860) 424-4370 (facsimile)
*Counsel for Defendant Stora Enso North America Corporation*

Stora Enso Oyj, Esq.
Kanavaranta 1
FIN-00160, Helsinki
FINLAND

Erich R. Luschei, Esq.
Jones Day
555 W. Fifth St., Suite 4600
Los Angeles, CA 90013
*Counsel for UPM-Kymmene Corporation &*
*UPM-Kymmene Inc.*

Ryan M. DiSantis

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS
*North*

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

05-0539

|  |  |
|---|---|
| BARBARA ACETO, on behalf of itself and all others similarly situated. | ) ) ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| INTERNATIONAL PAPER CO; NORSKE SKOGINDUSTRIER ASA; NORSKE SKOG NORTH AMERICA LLC; NORSKE SKOG (USA), INC.; NORSKE SKOG (USA) HOLDINGS, INC.; NORSKE SKOG CANADA LIMITED; NORSKE SKOG CANADA (USA), INC.; STORA ENSO OYJ; STORA ENSO NORTH AMERICA CORPORATION; SAPPI LIMITED; S.D. WARREN COMPANY; METSALITTO GROUP; METSALITTO COOPERATIVE; M-REAL CORPORATION; M-REAL USA CORP.; UPM-KYMMENE CORPORATION; MYLLYKOSKI CORPORATION; and MADISON INTERNATIONAL SALES COMPANY | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) ) |

CIVIL ACTION NO.



4600E000002/15/05CIVIL          240.00
4600E000002/15/05SUR CHARGE      15.00
4600E000002/15/05SUMMONS         50.00
4600E000002/15/05SECC            20.00

## CLASS ACTION COMPLAINT

## INTRODUCTION

Individual and class representative Plaintiff Barbara Aceto, on behalf of herself and all others similarly situated, alleges as follows:

## NATURE OF THIS ACTION

1.      This case arises out of a massive international conspiracy beginning in or around January 1, 1990 and continuing through to the present among all Defendants and their co-conspirators with the purpose and effect of fixing prices, eliminating and suppressing competition, and committing other unlawful practices designed to inflate and stabilize the prices of uncoated and coated magazine paper ("Magazine Paper") sold to or distributed to the Plaintiff and other purchasers in Massachusetts and throughout the United States of America.

2.      Defendants are the leading manufacturers of Magazine Paper and control a majority of the Magazine Paper industry. Throughout the Class Period, Defendants have sold Magazine Paper used in consumer products in the Commonwealth of Massachusetts.

3.      Defendants' conspiracy has involved illegal conduct by an international cartel that has targeted consumers and other indirect purchasers in Massachusetts and throughout the United States. The conspiracy has affected millions of dollars of commerce in Magazine Paper products found in virtually every household in Massachusetts.

4.      The conspiracy has included covert communications and meetings in which Defendants expressly agreed to eliminate competition and fix prices of Magazine Paper sold in and/or distributed to Massachusetts.

5.      Defendants' acts constitute per se violations of the Massachusetts Consumer Protection Act, G.L. c.93A §§ 1, et seq. ("Chapter 93A"), prohibiting unfair and deceptive acts or practices and unfair methods of competition.

2

6.     Plaintiff brings this action pursuant to Chapter 93A to obtain injunctive relief and
to recover damages and the costs of suit, including reasonable attorneys' fees, from Defendants
for the injuries sustained by the Plaintiff and the Class (as defined herein) by reason of
Defendants' egregious violations of Massachusetts law.

## JURISDICTION AND VENUE

7.     Each of the Defendants transact business in the Commonwealth of Massachusetts.

8.     Without limiting the generality of the foregoing, each of the Defendants (directly
or through agents who at the time were acting with actual and/or apparent authority and within
the scope of such authority) have:

- a.   Transacted business in this Commonwealth;

- b.   Contracted to supply and/or obtain services and/or goods in this
       Commonwealth;

- c.   Intentionally availed themselves of the benefits of doing business in this
       Commonwealth;

- d.   Produced, promoted, sold, marketed and/or distributed their products
       and/or services in this Commonwealth and, thereby, have purposefully
       profited from their access to this Commonwealth's markets;

- e.   Caused tortuous damage by act or omission in this Commonwealth;

- f.   Caused tortuous damage in this Commonwealth by act or omission
       committed outside this Commonwealth while: (i) regularly doing or
       soliciting business in this Commonwealth; and/or, (ii) engaging in other
       persistent courses of conduct within this Commonwealth; and/or, (iii)

3

deriving substantial revenue from goods used or consumed or services
rendered in this Commonwealth;

g.    Committed acts and omissions which Defendants knew would cause
injury (and, in fact, did cause injury) in this Commonwealth to Plaintiff
and members of the Class (as defined herein) while: (i) regularly doing or
soliciting business in this Commonwealth; and/or, (ii) engaging in other
persistent courses of conduct within this Commonwealth; and/or (iii)
deriving substantial revenue from goods used or services rendered in this
Commonwealth;

h.    Conspired with others who did have the requisite minimum contacts with
this Commonwealth;

i.    Perpetrated a massive fraud upon the consumer markets in the
Commonwealth of Massachusetts, by engaging in intentional and criminal
conduct, including as set forth below; and/or,

j.    Otherwise had the requisite minimum contacts with this Commonwealth,
such that under the circumstances it is fair and reasonable to require
Defendants to come to this Court to defend this action.

9.    Plaintiff brings this claim exclusively under Massachusetts state law and not
under sections 4 or 6 of the Clayton Act (15 U.S.C. §§15, 26), or section 1 of the Sherman Act
(15 U.S.C. §1). Neither the Plaintiff nor any member of the Class has damages exceeding
$75,000 each even when trebled. Attorneys' fees on a pro-rata basis will not exceed $75,000 for
each class member.

4

## PARTIES

10.      Plaintiff Barbara Aceto, is a resident of Middlesex County North, in the

Commonwealth of Massachusetts. During the time period covered in this Complaint, Plaintiff

purchased products for personal use which contained Magazine Paper, sold by one or more of the

Defendants, their subsidiaries, divisions, units or affiliates within the Commonwealth of

Massachusetts. As a result, Plaintiff has been injured by reason of the deceptive acts or practices

alleged herein. Plaintiff brings this action in his individual and representative capacity on behalf

of the Plaintiff Class alleged herein in paragraph 58.

11.      Defendant International Paper Co. ("IP") is a New York corporation with its

headquarters located at 400 Atlantic Street, Stamford, CT 06921. During the Class Period, IP,

directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed

Magazine Paper in the United States.

12.      During the Class Period, IP directly or indirectly and through affiliates that it

dominated and controlled, conspired with others named as Defendants herein to, and did, set prices

pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in

and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or

commerce in Massachusetts and were designed to have, and did in fact have, a substantial and

adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

13.      During the Class Period, and as a direct and intended consequence of its

involvement in the horizontal price-fixing conspiracy alleged herein, IP controlled, directly or

indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

14.      Defendant Norske Skogindustrier ASA ("Norske Skog") is a Norwegian company

with its headquarters located at Oksenoyveien 80, 1326 Lysaker, Norway. During the Class

5

Period, Norske Skog, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

15.    During the Class Period, Norske Skog directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

16.    Defendant Norske Skog North America LLC ("Norske Skog North America") is a Delaware limited liability company with its principal place of business located at 1011 Western Avenue, Suite 700, Seattle, WA 98104. Norske Skog North America was formed on July 1, 2002, and is jointly owned by Defendants Norske Canada and Norske Skog. During the Class Period, Norske Skog North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

17.    During the Class Period, Norske Skog North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

18.    Defendant Norske Skog (USA), Inc. ("Norske Skog USA") is a Delaware corporation with its principal place of business located at 2507 Post Road, Southport, CT 06890.

6

Norske Skog USA is a wholly-owned subsidiary of Defendant Norske Skog. During the Class Period, Norske Skog USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

19.    During the Class Period, Norske Skog USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

20.    Defendant Norske Skog (USA) Holdings, Inc. ("Norske Skog USA Holdings") is a Delaware corporation with its principal place of business located at 2507 Post Road, Southport, CT 06890. Norske Skog USA Holdings, is a wholly-owned subsidiary of Defendant Norske Skog. During the Class Period, Norske Skog USA Holdings, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

21.    During the Class Period, Norske Skog USA Holdings directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

7

22. Defendant Norske Skog Canada Limited ("Norske Canada") is a Canadian company with its principal place of business located at 250 Howe Street, 16th Floor, Vancouver, Canada V6C 3R8. According to its 2003 Annual Report, Defendant Norske Skog owns approximately 30% of Norske Canada. During the Class Period, Norske Canada, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

23. During the Class Period, Norske Canada directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

24. Defendant Norske Skog Canada (USA), Inc. is a California corporation with its principal place of business located at Suite 700, 1011 Western Avenue, Seattle, WA 98101. During the Class Period, Norske Skog Canada (USA), Inc., directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

25. During the Class Period, Norske Skog Canada (USA) directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

8

26. During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Norske Skog, Norske Skog North America, Norske Skog USA, Norske Skog USA Holdings, Norske Canada, and Norske Skog Canada (USA) controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

27. Defendant Stora Enso Oyj ("Stora Enso") is a Finnish corporation with its principal place of business located at Kanavaranta 1, FIN-00160, Helsinki, Finland. During the Class Period, Stora Enso, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

28. During the Class Period, Stora Enso directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

29. Defendant Stora Enso North America Corporation ("Stora Enso North America") is a Wisconsin corporation with its principal place of business located at 231 First Avenue North, Wisconsin Rapids, WI 54495. During the Class Period, Stora Enso North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

30. During the Class Period, Stora Enso North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices

9

of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

31.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Stora Enso and Stora Enso North America controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

32.     Defendant Sappi Limited ("Sappi") is a South African corporation with its principal place of business located at Sappi House, 48 Ameshoff Street, Braamfontein, Johannesburg 2001, Republic of South Africa. In 1994, Sappi acquired Defendant S.D. Warren Company. The S.D. Warren Company now does business as Sappi Fine Paper North America. During the Class Period, Sappi, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

33.     During the Class Period, Sappi directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

34.     Defendant S.D. Warren Company ("S.D. Warren"), doing business as Sappi Fine Paper North America, is a Pennsylvania corporation with its principal place of business located at 225 Franklin Street, Boston, Massachusetts, 02110. In 1994, Defendant Sappi acquired

10

S.D. Warren Company. S.D. Warren now does business as Sappi Fine Paper North America. During the Class Period, S.D. Warren, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

35.     During the Class Period, S.D. Warren directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

36.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Sappi and S.D. Warren controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

37.     Defendant Metsalitto Group is organized under the laws of the Republic of Finland with its principal place of business located at P.O.B. 10, FIN-02020 METSA, Finland. During the Class Period, Metsalitto Group, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

38.     During the Class Period, Metsalitto Group directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a

11

substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

39.    Defendant Metsalitto Cooperative is organized under the laws of the Republic of Finland with its principal place of business located at Revontulentie 6, FIN- 02100 ESPOO, Finland. Metsalitto Cooperative is the parent company of Defendant Metsalitto Group, and is a cooperative organization for Finnish forest owners that has approximately 130,000 members. During the Class Period, Metsalitto Cooperative, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

40.    During the Class Period, Metsalitto Cooperative directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

41.    During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Metsalitto Group and Metsalitto Cooperative controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

42.    Defendant M-real Corporation ("M-real") is a Finnish corporation with its principal place of business located at FIN-02020 METSA, Finland. During the Class Period, M-real, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

12

43. During the Class Period, M-real directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

44. Defendant M-real USA Corp. ("M-real USA") is a New York corporation with its principal place of business located at 301 Merritt 7, Norwalk, CT 06851. During the Class Period, M-real USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

45. During the Class Period, M-real USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

46. During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, M-real and M-real USA controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

47. Defendant UPM-Kymmene Corporation ("UPM") is a Finnish corporation with its principal place of business located at Etelaesplanadi 2, FIN-00101 Helsinki, Finland. During the

Class Period, UPM, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

48. During the Class Period, UPM directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

49. During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, UPM controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

50. Defendant Myllykoski Corporation ("Myllykoski") is a Finnish corporation with its principal place of business located at Etelaesplanadi 20, FIN-00130 Helsinki, Finland. During the Class Period, Myllykoski, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

51. During the Class Period, Myllykoski directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

52. Defendant Madison International Sales Company ("Madison") is Delaware corporation with its principal place of business located at 101 Merritt 7, Norwalk, CT 06851.

14

Madison is the U.S. sales company for the Myllykoski Group of paper mills. During the Class Period, Madison, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

53.     During the Class Period, Madison directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiff and the Class in Massachusetts.

54.     During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Myllykoski and Madison controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

55.     The Defendants named in the Complaint are collectively referred to as the "Defendants." The acts charged in this Complaint as having been done by Defendants were authorized, ordered or done by their officers, directors, agents, employees or representatives while they have actively engaged in the management, direction, control, or transaction of the Defendant's business or affairs. Whenever any reference is made in this Complaint to any corporate Defendant, such reference shall be deemed to include predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation. The Defendants have exclusive possession and control over the documents further evidencing their acts as set forth.

56.     Each of the Defendants acted in concert and/or as authorized agents of each other during the Class Period. Each Defendant conspired with each other to commit the unlawful,

15

unfair or deceptive acts or practices referenced herein. Each Defendant so transacted business in

the Commonwealth of Massachusetts, benefited from Massachusetts laws, and/or caused loss or

damage though its acts or omissions. Each Defendant conducts business in Massachusetts on a

regular basis and derives substantial revenues from services rendered or goods used or

consumed.

57.    Various other individuals, partnerships, corporations, and other business entities,

unknown to the Plaintiff, have participated in the violations alleged herein and have performed

acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

58.    Plaintiff brings this action on her own behalf and as a class action pursuant to

G.L. c. 93A, §9(2) and Rule 23 of the Massachusetts Rules of Civil Procedure on behalf of all

members of the following class:

> All natural persons who, within the Commonwealth of Massachusetts purchased products
> containing Magazine Paper manufactured or sold by any of the Defendants or any
> subsidiary or affiliate thereof, or any co-conspirator, at any time during the period from
> January 1, 1990 through the present (the "Class Period") and also are current residents of
> the Commonwealth of Massachusetts.

59.    This action seeks equitable relief and recovery for economic injuries suffered by

the Plaintiff and all indirect purchasers of Magazine Paper.

60.    Plaintiff does not know the exact size of the Class. However, based upon the

nature of trade and commerce involved, Plaintiff believes that the total number of class members

is in the millions, and that members of the Class are geographically dispersed throughout the

Commonwealth of Massachusetts. Therefore, joinder of all members of the Class is not

practicable.

16

61.     There are questions of law and fact common to the Class, including, but not

limited to:

a.      whether the Defendants engaged in an unlawful contract,
        combination or conspiracy among themselves, express or implied,
        to fix, raise, maintain, or stabilize prices of Magazine Paper sold in
        and/or distributed in Massachusetts and/or used in consumer
        products sold in and/or distributed in Massachusetts;

b.      whether the purpose and/or effect of the acts and omissions alleged
        herein was to restrain trade, or to affect, fix, control and/or
        maintain the prices of Magazine Paper sold in and/or distributed in
        Massachusetts and/or used in consumer products sold in and/or
        distributed in Massachusetts;

c.      the existence and duration of the horizontal agreements alleged
        herein to fix, raise, maintain and/or stabilize the prices for
        Magazine Paper sold in and/or distributed in Massachusetts and/or
        used in consumer products sold in and/or distributed in
        Massachusetts;

d.      whether the Defendants concealed the contract, combination or
        conspiracy from Plaintiff and the other members of the Class;

e.      whether Defendants' agents, officers, employees or representatives
        participated in communications and meetings in furtherance of the
        illegal conspiracy alleged herein, and, if so, whether such agents,
        officers, employees, or representatives were acting within the

17

scope of their authority and in furtherance of Defendants' business interests;

f.   whether the Defendants engaged in unfair or deceptive acts or practices in the conduct of trade or commerce;

g.   whether the Defendants' conduct artificially inflated the prices of Magazine Paper sold in and/or distributed in Massachusetts and/or used in consumer products sold in and/or distributed in Massachusetts;

h.   whether the Plaintiff and the other members of the Class were injured by Defendants' conduct and, if so, the appropriate class-wide measure of damages;

i.   whether the Plaintiff and the other members of the Class are entitled to declaratory and/or injunctive relief; and

j.   whether Defendants' violation of Chapter 93A as alleged herein was knowing and/or willful, entitling the Plaintiff and members of the Class to double or treble damages.

62.   These and other questions of law and fact are common to the Class and predominate over any question affecting only individual members of the Class.

63.   Plaintiff's claims are typical of the claims of all members of the Class in that Plaintiff was an indirect purchaser of Magazine Paper, the Plaintiff and all Class members were injured by the same anti-competitive and unlawful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

18

64.     Plaintiff is a member of the Class and will fairly and adequately represent the interests of the Class, in that the Plaintiff is a typical indirect-purchaser of Magazine Paper and has no conflicts with, or interests antagonistic to, other members of the Class. Furthermore, Plaintiff has retained competent counsel experienced in class action and consumer protection litigation.

65.     This Class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

> a.     it will avoid a multiplicity of suits and consequent burden on the courts and Defendants;
>
> b.     it would be virtually impossible for all Class members to intervene as parties-plaintiff in this action;
>
> c.     it will allow numerous individuals or entities with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;
>
> d.     as a class action it is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and
>
> e.     it will provide court oversight of the claims process, once Defendants' liability is adjudicated.

## FACTS

66.     Plaintiff realleges and incorporates the preceding paragraphs as alleged herein.

67.     The term "Magazine Paper" includes both uncoated magazine paper and coated magazine paper. As Defendant Stora Enso states on its website, uncoated magazine paper "is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable

19

for mass circulation TV magazines and catalogues." With respect to coated magazine paper, Defendant Stora Enso states on its website that it is available "in various matt, silk and glossy grades [and] is used for special interest and general interest magazines. Other end-uses include supplements, upmarket and home-shopping catalogues, and magazine covers."

68.    Each of the Defendants are engaged in the manufacture, sale and/or distribution of Magazine Paper used in consumer products sold in and/or distributed to Massachusetts.

69.    The unlawful business activities of the Defendants that are subject of this Complaint were within the flow of and substantially affected trade and commerce directly or indirectly injuring and affecting Plaintiff and the Class.

70.    Defendants Stora Enso, UPM, Sappi and Norske Skog are among Europe's largest paper manufacturing groups. Defendant Stora Enso is the world's largest paper producer. Its primary markets are Europe, North America and Asia.

71.    Defendant UPM dominates the magazine paper market as the world's largest Magazine Paper maker, and is one of the top three paper makers in the world. UPM has 22 paper mills in eight countries, including the U.S., and 3,200 customers in 120 countries.

72.    Defendant Sappi is the largest producer of coated fine paper used for glossy magazines. Sappi sells 43% of its products in Europe and 30% in North America.

73.    Defendant Norske Skog ranks in the top three of Europe's paper business and is the world's largest producer of newspaper. Although Norway is not a part of the European Union, Norske Skog is subject to EU antitrust regulations through a treaty linking the Norwegian and EU markets.

74.    Defendant IP is the number one producer of uncoated papers worldwide and coated papers in North America. It is the top paper producer in the United States.

20

## MAGAZINE PAPER CRIMINAL INVESTIGATION

75.     In the spring of 2003, Defendant UPM initiated an internal investigation of competitive practices in all of its business units.  At the conclusion of its internal investigation, on January 15, 2004, Defendant UPM contacted the competition authorities in the European Union, the United States and Canada.

76.     On January 30, 2004, two weeks after approaching the competition authorities, UPM's CEO, Juha Niemela, resigned.

77.     On May 25, 2004, the United States, Canadian and European authorities launched an investigation into alleged collusion among the world's top forestry firms.  Raids were carried out by local or European antitrust authorities at UPM, Stora Enso, Metsalitto, M-real, Sappi and Norske Skog.

78.     On May 25, 2004, the Reuters news agency reported the following:

> A swathe of leading global forestry firms were raided by competition enforcers on Tuesday as part of antitrust operations on both sides of the Atlantic regarding price-fixing and manipulation of markets for various paper products.
>
> Raids were carried out by local or European Union antitrust authorities at Finland's UPM-Kymmene, Stora Enso, Metsalitto and M-real and Norway's Norske Skog. U.S. and Canadian authorities cooperated.
>
> International Paper Co., the top North American forest products company, said it had been contacted by U.S. officials in connection with the probe.
>
> Later on Tuesday, the U.S. Justice Department confirmed it is investigating possible anti-competitive practices in the market for magazine paper. A department spokeswoman said the probe covers the sale of magazine paper in the United States and elsewhere.
>
> The investigation also reached South Africa, where pulp and paper maker Sappi said its European head office had been raided. The company, the largest producer

21

of fine paper used for glossy magazines, said it had agreed to cooperate with EU officials.

79.    On May 25, 2004, the United States Department of Justice issued a subpoena for

documents to Defendant Stora Enso North America.

80.    On May 25, 2004, Defendant IP disclosed that it had been contacted by the United

States Department of Justice in connection with the probe into price-fixing in the Magazine Paper

market.

81.    Following the raids, the European Commission issued the following press release

regarding the investigation:

> Following press inquiries, the European Commission's spokesperson for Competition has confirmed that, on 25 May 2004, Commission inspectors, assisted by officials from the national competition authorities of the Member States concerned, launched simultaneous unannounced inspections at the premises of some of the major European producers of paper and forestry products.
>
> The purpose of these inspections is to ascertain whether there is evidence of cartel agreements and related illegal practices concerning price fixing, fixing of other commercial terms, and/or allocation of customers. Several product markets in the European paper and forestry products sector would be affected by the alleged arrangements.
>
> The Commission's spokesperson has also confirmed that the inspections have been carried out in close coordination with competition authorities in a number of EU countries, as well as the US and Canada. The EFTA Surveillance Authority, at the request of the Commission, participated in the inspections at premises of undertakings in the EFTA Member States.
>
> Surprise inspections are a preliminary step in investigations into suspected cartels.

82.    Commenting on the investigation, a spokeswoman for the United States

Department of Justice stated that the investigation involves "anticompetitive practices in the sale of

Magazine Paper in the U.S. and elsewhere."

83.    Canada's Competition Bureau has also confirmed that it was investigating alleged

price-fixing and cartel arrangements in the paper and forest products industry.

84.    On May 25, 2004, the EFTA Surveillance Authority, an organization charged with

enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and

Norway, issued a press release stating:

> Following inquiries from journalists, the EFTA Surveillance Authority confirms
> that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by
> officials from the Norwegian Competition Authority, carried out an unannounced
> inspection at the premises of a producer of publication paper in Norway. The
> purposes of the inspection is to ascertain whether there is evidence of cartel
> agreements and related illegal practices among EEA producers of publication paper
> and amongst acquirers of recovered paper.

85.    On May 25, 2004, UPM's General Counsel, Reko Aalto-Setaelae, stated that the

investigation concerns "many" of the company's products and that "unfortunately many of our

employees have been involved." Aalto-Setaelae also added that the practices under investigation

may date back to the early 20th century.

86.    On May 25, 2004, Defendant Stora Enso issued a press release in which it stated the

following:

> European Commission competition investigators have today visited Stora Enso's
> premises in London, Stockholm, and Dusseldorf.
>
> Representatives of the Finnish Competition Authority visited Stora Enso Forest's
> office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in
> Finland.
>
> In addition, the Company's North American division has received a subpoena for
> documents from the Antitrust Division of the US Department of Justice.

87.    On May 28, 2004, it was reported that Jukka Harmala, CEO of Defendant Stora

Enso, told a forest industry seminar that "[t]he time span (of the investigation)...is likely not

focusing on the past few years, but can go back as far as (the) late eighties."

88.    On May 28, 2004, it was reported that Stora Enso's CEO stated that the

investigation may lead back to the late 1980s.

23

89.    On May 28, 2004, it was also reported that Carl Bjornherg, CEO of Defendant

Myllykoski, stated at the same seminar that the industry had been "very much cartelized" during

at least a portion of the Class Period.

90.    On May 28, 2004, Defendant UPM issued a press release and stated the following:

> European Commission investigators have today visited various UPM premises in
> connection with a Commission investigation of alleged antitrust activities.
>
> In spring 2003, UPM initiated an internal investigation of competitive practices in
> all its units. At the same time the company also implemented additional
> competition law compliance programs for its employees clearly signaling zero
> tolerance for any antitrust activity.
>
> On January 15, 2004, after the internal investigation and to follow sound principles
> of corporate governance UPM decided to approach competition authorities in the
> European Union, the United States and Canada.
>
> The EU, several of its member states, and Canadian authorities have informed [sic]
> that UPM has received conditional full immunity with respect to certain conduct
> disclosed to the authorities. In the United States, where a grand jury investigation
> was already pending with respect to [sic] pressure sensitive labelstock business,
> UPM continues to cooperate with the US Department of Justice in its investigation.

## VIOLATIONS AND EFFECTS

91.    Plaintiff realleges and incorporates the preceding paragraphs as alleged herein.

92.    Beginning on or about January 1, 1990, the exact date being unknown to Plaintiff,

Defendants, by and through their officers, directors, employees, agents, or other representatives

entered into a continuing contract, combination or conspiracy to unreasonably restrain trade and

commerce.

93.    Defendants' contract, combination or conspiracy consisted of a continuing

agreement, understanding and concert of action among the Defendants and their co-conspirators,

the substantial terms of which were to fix, raise, maintain or stabilize the price of Magazine

Paper in the Commonwealth of Massachusetts.

24

94.    Defendants have exclusive possession, custody and control of all documents detailing the inherently self-concealing price-fixing conspiracy.

95.    Upon information and belief, for the purpose of formulating and effectuating the aforesaid contract, combination or conspiracy, Defendants did contract, combine and conspire to fix, raise, maintain or stabilize the prices for Magazine Paper, by among other things:

> a.    participating in a meeting and conversations to discuss the prices and/or allocate the market for Magazine Paper sold in the United States and in the Commonwealth of Massachusetts;
>
> b.    agreeing, during the meeting and conversations to manipulate prices and supply to boost sagging Magazine Paper sales in the United States and in the Commonwealth of Massachusetts;
>
> c.    issuing price announcements and price quotations in accordance with the agreements reached;
>
> d.    selling Magazine Paper to customers in the United States and Commonwealth of Massachusetts at non-competitive prices; and
>
> e.    agreeing to conceal and keep secret their illegal agreement.

96.    Upon information and belief, for purposes of forming, carrying out, policing, monitoring and enforcing the aforesaid contract, combination or conspiracy, Defendants have exchanged, communicated and signaled through themselves confidential information and have thereby fixed, raised, stabilized and maintained Magazine Paper price levels at supra-competitive levels from 1990 through to the present.

97.    The aforesaid contract, combination or conspiracy has had the following effects, among others:

25

a. price competition in the sale of Magazine Paper by Defendants and their co-conspirators has been restrained, suppressed and eliminated;

b. prices for Magazine Paper sold by Defendants and their co-conspirators have been raised, fixed, maintained or stabilized at artificially high and noncompetitive levels; and

c. Plaintiff and the Class have been deprived of the benefit of free and open competition.

98. By reason of the alleged conspiracy, Plaintiff and each member of the Class paid more for products containing Magazine Paper than they would have paid in the absence of the illegal, contract, combination or conspiracy. Plaintiff and the Class have been injured in their business and property and have suffered monetary damages in an amount to be proven at trial.

99. As a direct result of their unlawful conduct, each of the Defendants generates substantial profits and were unjustly enriched at the expense of the Class of Massachusetts consumers.

## FRAUDULENT CONCEALMENT

100. Throughout the Class Period set forth in this Complaint, Defendants effectively, affirmatively and fraudulently concealed their unlawful contract, combination or conspiracy from Plaintiff and the Class.

101. Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

Plaintiff and other Class members have as a result of the unlawful contract, combination and conspiracy alleged in this Complaint.

## COUNT I

## FOR RESTITUTION, DISGORGEMENT AND CONSTRUCTIVE TRUST FOR UNJUST ENRICHMENT BE DEFENDANTS

108.    Individual and Representative Plaintiff, on behalf of himself and the Class, realleges, as if fully set forth, each and every prior allegation contained hereinabove, and further allege, as follows, against all Defendants:

109.    Defendants have benefited from the monopoly profits of their sale of Magazine Paper resulting from their unlawful and inequitable acts alleged in this Complaint.

110.    Defendants' financial benefits resulting from their unlawful and inequitable conduct are traceable to Plaintiff's and the Class' overpayments for Magazine Paper products.

111.    Plaintiff and the Class have conferred upon Defendants an economic benefit, in the nature of profits resulting from unlawful overcharges and monopoly profits, to the economic detriment of Plaintiff and the Class.

112.    The economic benefit of overcharges and monopoly profits derived by Defendants by charging supra-competitive and artificially high prices for Magazine Paper is a direct and proximate cause of Defendants' unlawful practices.

113.    The financial benefits derived by Defendants rightfully belong to Plaintiff and the Class, as Plaintiff and the Class paid anti-competitive and monopolistic prices during the Class Period, inuring to the benefit of Defendants.

114.    It would be inequitable for Defendants to be permitted to retain any of the unlawful proceeds resulting from the price-fixing conspiracy.

28

DATED: February 5, 2005

Robert J. Bonsignore, BBO #547880
BONSIGNORE & BREWER
23 Forest Street
Medford, MA 02155
Telephone: 781-391-9400

# BONSIGNORE & BREWER

TRIAL LAWYERS
www.bandblaw.net
23 FOREST STREET
MEDFORD, MASSACHUSETTS 02155-3820

VOICE: (781) 391-9400

FAX: (781) 391-9496

February 16, 2005

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8863**
International Paper Co.
400 Atlantic Street
Stamford, CT 06921

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8429**
M-real USA Corp.
301 Merritt 7
Norwalk, CT 06851

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8382**
Norske Skog North America LLC
1011 Western Avenue, Suite 700
Seattle, WA 98104

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8436**
S.D. Warren Company
225 Franklin Street
Boston, MA 02110

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8399**
Norske Skog (USA) Holdings, Inc.
2507 Post Road
Southport, CT 06890

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8443**
Norske Skog (USA), Inc.
2507 Post Road
Southport, CT 06890

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8405**
Norske Skog Canada (USA), Inc.
1011 Western Avenue, Suite 700
Seattle, WA 98101

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8450**
Madison International Sales Company
101 Merritt 7
Norwalk, CT 06851

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8412**
Stora Enso North America Corporation
231 First Avenue North
Wisconsin Rapids, WI 54495

**VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**
Norske Skogindustrier ASA
Oksenoyveien 80
1326 Lysaker, Norway

February 16, 2005
Page 2

## VIA INTERNATIONAL REGISTERED  VIA INTERNATIONAL REGISTERED
## RETURN RECEIPT REQUESTED      RETURN RECEIPT REQUESTED

Norske Skog Canada Limited       Stora Enso Ojy
250 Howe Street, 16th Floor      Kanavaranta 1
Vancouver, Canada V6C 3R8        FIN-00160
                                 Helsinki, Finland

## VIA INTERNATIONAL REGISTERED  VIA INTERNATIONAL REGISTERED
## RETURN RECEIPT REQUESTED      RETURN RECEIPT REQUESTED

Myllykoski Corporation           Metsalitto Cooperative
Etelaesplanadi 20                Revontullentie 6
FIN-00130                        FIN-02100
Helsinki, Finland                ESPOO, Finland

## VIA INTERNATIONAL REGISTERED  VIA INTERNATIONAL REGISTERED
## RETURN RECEIPT REQUESTED      RETURN RECEIPT REQUESTED

Sappi Limited                    Metsalitto Group
Sappi House                      P.O.B. 10
48 Ameshoff Street               FIN-02020
Braamfontein, Johannesburg 2001  METSA, Finland
Republic of South Africa

## VIA INTERNATIONAL REGISTERED  VIA INTERNATIONAL REGISTERED
## RETURN RECEIPT REQUESTED      RETURN RECEIPT REQUESTED

M-real Corporation               UPM-Kymmene Corporation
FIN-02020                        Etelaesplanadi 2
METSA, Finland                   FIN-00101
                                 Helsinki, Finland

Re   **Massachusetts Magazine Paper**
     **Demand for Relief Pursuant to G.L. c. 93A §9**

Dear Sir or Madam:

This office represents Claimants and putative class representatives Joan Guarino and
Trisha Morrissey (hereinafter referred to as "Claimants") and other similarly situated
Massachusetts consumer purchasers of products containing Magazine Paper in their claim for
economic damages and equitable relief. This is a written demand for relief pursuant to

February 16, 2005
Page 3

Massachusetts General Laws Chapter 93A, §9(3). Claimants and each member of the putative class purchased Magazine Paper from you indirectly.

## SUMMARY DEMAND

During the period from January 1, 1990 through the present ("Class Period"), International Paper Co., Norske Skogindustrier ASA, Norske Skog North America LLC, Norske Skog (USA), Inc., Norske Skog (USA) Holdings, Inc., Norske Skog Canada Limited, Norske Skog Canada (USA), Inc., Stora Enso Oyj, Stora Enso North America Corporation, Sappi Limited, S.D. Warren Company, Metsalitto Group, Metsalitto Cooperative, M-real Corporation, M-real USA Corp., UPM-Kymmene Corporation, Myllykoski Corporation, and Madison International Sales Company (hereinafter referred to individually as "Respondent" or "you" and/or collectively as "Respondents") willfully and knowingly engaged in unfair or deceptive acts or practices (inclusively hereinafter referred to as "wrongful", "unlawful" and/or "unfair") in violation of M.G.L. 93A, including but not limited to those referenced in this demand.

Claimants have only recently obtained information supporting this claim that you engaged in a self-concealing conspiracy violative of M.G.L. c. 93A(2) and (9) and caused Claimants and this class to suffer related economic loss. Many facts necessary to calculate the exact economic loss suffered by Claimants and the class remains in your exclusive possession and control. Unless and until you provide us with sales information, profit margins and product pricing information for your sale of Magazine Paper in Massachusetts and the United States sufficient to allow us to calculate the exact economic loss suffered by each Claimant, or until you provide your calculation as to the increase resultant from your practices as described herein, we are limited to demanding the statutory minimum of $25 per Claimant.

In sum, the willful and knowing purpose and effect of your unfair or deceptive conduct was to raise, fix, and maintain the prices of Magazine Paper with the result that claimants and each member of the proposed Class of consumers suffered similar economic injury. The bottom line is that your unfair or deceptive acts and practices caused each class member to suffer an economic loss that can be determined from your exclusive records. At this time and based on the information we possess, our best estimate is that each class member suffered loss and each loss is less than $25 per violation. Each class member suffered under $75,000 in damages.

The Claimants and each similarly situated Massachusetts consumer was economically harmed when they purchased products containing Magazine Paper at an unfairly or deceptively created and/or maintained supra-competitive price created by you during the period January 1, 1990 through the present. This correspondence is tendered as a demand for class wide relief. Please respond accordingly.

The Claimants on behalf of themselves and all other similarly situated Massachusetts consumers demand that Respondents pay restitution or refunds for sums paid to purchase products containing Magazine Paper at a price that exceeded equivalent competitive and fair

February 16, 2005
Page 4

market price for such products, or in the alternative the statutory minimum of $25, whichever is greater. *See* G.L c.93A §9(3).

Take note that Claimants demand that each Respondent refrain from continuing or reinstituting the unfair or deceptive acts or practices described herein. We further demand that you provide written documentation of the date that you stopped the unfair acts and practices described herein. In the alternative, we demand you now agree to this settlement term in writing.

Our position should be clear. While demand has been made on behalf of the Claimants and similarly situated Massachusetts consumers for their actual damages, the information and raw data required to calculate the exact amount of the overcharge remains exclusively in your and the other Respondent's exclusive possession and control. Likewise, the information that would allow Claimants' counsel to determine at this time the exact amount of the overcharge resulting from each Respondent's unfair or deceptive acts or practices, remains in your exclusive possession and control and the exclusive possession and control of the other Respondents. At this point we are requesting that you accept liability and cooperate by providing the data described herein that you have in your possession and control.

In the event that you refuse or claim you are unable to tender an offer to this demand, Claimants request, at a minimum, that you provide factual data supporting your position and refusal to tender an offer. We also request that you provide all sales, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States during the class period. As an aside, it is unnecessary for the Claimants' demand letter to state the nature of any injury that is already known to the defendant. See York v Sullivan et al., 369 Mass. 157, 163 (1975) (holding that plaintiff's demand letter was sufficient to give defendants an opportunity to review the facts and law involved where defendants' response showed that they understood the nature of the grievance).

## THE MAGAZINE PAPER INDUSTRY

Magazine Paper includes both uncoated magazine paper and coated magazine paper. Uncoated magazine paper is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable for mass circulation TV magazines and catalogues. With respect to coated magazine paper, it is available in various matt, silk and glossy grades and is used for special interest and general interest magazines. Other end-uses include supplements, upmarket and home-shopping catalogues, and magazine covers. Each of the Respondents unfairly and deceptively engaged in the manufacture, sale and/or distribution of Magazine Paper throughout the United States and Commonwealth of Massachusetts during the class period.

Respondents Stora Enso Oyj, UPM-Kymmene Corporation, Sappi Limited and Norske Skogindustries ASA are among Europe's largest paper manufacturing groups. Respondent Stora Enso Oyj is the world's largest paper producer. Its primary markets are Europe, North America and Asia.

February 16, 2005
Page 5

Respondent UPM-Kymmene Corporation dominates the magazine paper market as the world's largest Magazine Paper maker, and is one of the top three makers in the world. UPM-Kymmene has 22 paper mills in eight countries, including the U.S., and 3,200 customers in 120 countries.

Respondent Sappi Limited is the largest producer of coated fine paper used for glossy magazines. Sappi Limited sells 43% of its products in Europe and 30% in North America.

Respondent Norske Skogindustries ASA ranks in the top three of Europe's paper business and is the world's larges producer of newspaper. Although Norway is not a part of the European Union, Norske Skogindustries ASA is subject to EU antitrust regulations through a treaty linking the Norwegian and EU markets.

Respondent International Paper Co. is the number one producer of uncoated papers worldwide and coated papers in North America. It is the top paper producer in the United States.

The acts charged in this demand letter as having been done by you and the other Respondents were authorized, ordered or done by officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of your and the other Respondents' business or affairs. All references to any corporate Respondent is intended to also include predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation.

Each Respondent acted in concert and/or as authorized agents of each other from January 1, 1990 to the present. Each Respondent conspired with each other to commit the unlawful, unfair or deceptive acts or practices referenced herein. Each Respondent so transacted business in the Commonwealth of Massachusetts, benefited from Massachusetts laws, and/or caused loss or damage though its acts or omissions.

## CLAIMANTS AND THE PUTATIVE CLASS

All Claimants are residents of the Commonwealth of Massachusetts who purchased and paid artificially inflated prices on products containing Magazine Paper, including but not limited to magazines and other printed paper. Claimants have suffered actual damages and economic harm because the Magazine Paper they indirectly purchased was artificially priced at a wrongfully increased cost as a result of your knowing and willful unfair or deceptive acts and practices. Claimants have also been economically injured because your unfair or deceptive acts and practices denied them their right to purchase consumer products containing Magazine Paper on the basis of and within a free market and open competition. Be clear that within this demand Claimants assert the claims exclusively under G.L. c. 93A, § 2 and §9(2), individually and on behalf the following putative Class:

All resident consumers who purchased for their own use and not for resale in the Commonwealth of Massachusetts, any product containing Magazine Paper

February 16, 2005
Page 6

> manufactured or sold by the Respondents between January 1, 1990 and the
> present.

## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

### Respondents' Unfair or Deceptive Acts or Practices Were Willful and Knowing:

At or before the beginning of the Class Period, you and the other Respondents
participated in secret meetings and engaged in secret conversations to discuss the supply and sale
of Magazine Paper. The focus of the conversations were acts or practices intended to unfairly
and deceptively increase proposed profits. At the meetings and during those conversations,
unfair or deceptive agreements or understandings were entered into by you and other
Respondents to unfairly or deceptively artificially fix, raise, maintain and stabilize the prices of
Magazine Paper and unfairly or deceptively allocate the market of Magazine Paper.

For the purpose of formulating and effectuating your unfair or deceptive conspiracy, you
and each Respondent did those things you and other Respondents combined or conspired to do,
including but not limited to:

a.    participating in meetings and conversations to discuss and further carry out unfair
      or deceptive pricing schemes and/or allocate the market for Magazine Paper to be
      sold in the Commonwealth of Massachusetts;

b.    agreeing during the meetings and conversations, to unfairly or deceptively cut
      production and charge prices of the Magazine Paper at certain levels in the
      Commonwealth of Massachusetts;

c.    issuing price announcements and price quotations in accordance with unfair or
      deceptive agreements reached;

d.    selling Magazine Paper to customers in the United States and Commonwealth of
      Massachusetts at unfair or deceptive non-competitive levels; and

e.    unfairly or deceptively agreeing to conceal and keep secret your illegal
      agreements.

### Concealment of Magazine Paper Conspiracy:

In willfully and knowingly carrying out unfair or deceptive acts or practices, you and the
other Respondents fraudulently, effectively and affirmatively concealed your conspiracy from
the putative class representatives and the putative Class. Until recently, you and the other
Respondents successfully kept hidden the unfair or deceptive price-fixing conspiracy that was by
nature inherently self-concealing.

The wrongful conduct in issue was carried out in part though means and methods that
were designed and intended to avoid detection. In fact, you and other Respondents did
successfully avoid and preclude detection.

Although the Claimants exercised due diligence, they had no knowledge or reasonable
basis for obtaining knowledge of each Respondent's unfair or deceptive acts or practices until at

February 16, 2005
Page 7

the earliest May 24, 2004. On or about that date, announcements were made that the United States Department of Justice was investigating anti-competitive practices in the sale of Magazine Paper in the United States and elsewhere.

## Magazine Paper Criminal Investigations:

Claimants' allegations of unfair or deceptive acts or practices are meritorious and you and each other Respondent have knowledge of the unfair or deceptive acts or practices for which the Claimants lodge complaint and demand compensation.

In the spring of 2003, Respondent UPM-Kymmene Corporation initiated an internal investigation of competitive practices in all of its business units. At the conclusion of its internal investigation, on January 15, 2004, Respondent UPM-Kymmene Corporation contacted the competition authorities in the European Union, the United States and Canada. It did so because the unfair or deceptive acts forming the basis for our claim were brought to light.

On January 30, 2004, two weeks after approaching the competition authorities, UPM-Kymmene Corporation's CEO, Juha Niemela, resigned. He did so because the unfair or deceptive acts forming the basis for our claim were becoming clearer.

On May 25, 2004, the United States, Canadian and European authorities launched an investigation into alleged collusion among the world's top forestry firms. Raids were carried out by local or European antitrust authorities at UPM-Kymmene Corporation, Stora Enso Oyj, Metsalitto Group, M-real Corporation, Sappi Limited and Norske Skogindustrier ASA. The unfair or deceptive acts and practices prompting the raids also support our claim.

On May 25, 2004, the Reuters news agency reported the following:

> A swathe of leading global forestry firms were raided by competition enforcers on Tuesday as part of antitrust operations on both sides of the Atlantic regarding price-fixing and manipulation of markets for various paper products.
>
> Raids were carried out by local or European Union antitrust authorities at Finland's UPM-Kymmene, Stora Enso, Metsalitto and M-real and Norway's Norske Skog. U.S. and Canadian authorities cooperated.
>
> International Paper Co., the top North American forest products company, said it had been contacted by U.S. officials in connection with the probe.
>
> Later on Tuesday, the U.S. Justice Department confirmed it is investigating possible anti-competitive practices in the market for magazine paper. A department spokeswoman said the probe covers the sale of magazine paper in the United States and elsewhere.
>
> The investigation also reached South Africa, where pulp and paper maker Sappi said its European head office had been raided. The company, the largest producer

February 16, 2005
Page 8

> of fine paper used for glossy magazines, said it had agreed to cooperate with EU
> officials. The reports of the raids by competition enforcers were true. The raids by
> the competition enforcers were justified and resulted in the forced production of
> evidence by you. The evidence that was forcibly produced during these raids
> remains in your exclusive possession and control and is not available to us. The
> unfair or deceptive acts and practices prompting the raids support our claim.

On May 25, 2004, the United States Department of Justice issued a subpoena for
documents to Respondent Stora Enso North America Corporation. The documents that you
produced to the United States Department of Justice are unavailable to us. We ask that you
produce them. We also ask that you produce all of the documents that were seized in raids by
competition authorities or that you otherwise produced pursuant to subpoena. We will, of course,
pay the costs for such a production if you offer them to us at this time. We will also agree to enter
into a confidentiality arrangement. We have no interest in publicizing your trade secrets or
otherwise violating business confidences. We seek to be in a position to present you with an exact
determination of the amount of money the Class is due.

On May 25, 2004, Respondent International Paper Co. disclosed that it had been contacted
by the United States Department of Justice in connection with the probe into price-fixing in the
Magazine Paper market. The acts or practices which are related to this probe support our claim.

Following the raids, the European Commission issued the following press release regarding
the investigation:

> Following press inquiries, the European Commission's spokesperson for
> Competition has confirmed that, on 25 May 2004, Commission inspectors, assisted
> by officials from the national competition authorities of the Member States
> concerned, launched simultaneous unannounced inspections at the premises of some
> of the major European producers of paper and forestry products.
>
> The purpose of these inspections is to ascertain whether there is evidence of cartel
> agreements and related illegal practices concerning price fixing, fixing of other
> commercial terms, and/or allocation of customers. Several product markets in the
> European paper and forestry products sector would be affected by the alleged
> arrangements.
>
> The Commission's spokesperson has also confirmed that the inspections have been
> carried out in close coordination with competition authorities in a number of EU
> countries, as well as the US and Canada. The EFTA Surveillance Authority, at the
> request of the Commission, participated in the inspections at premises of
> undertakings in the EFTA Member States.

February 16, 2005
Page 9

Surprise inspections are a preliminary step in investigations into suspected cartels. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

Commenting on the investigation, a spokeswoman for the United States Department of Justice stated that the investigation involves "anticompetitive practices in the sale of Magazine Paper in the U.S. and elsewhere."

Canada's Competition Bureau has also confirmed that it was investigating alleged price-fixing and cartel arrangements in the paper and forest products industry.

On May 25, 2004, the EFTA Surveillance Authority, an organization charged with enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and Norway, issued a press release stating:

> Following inquiries from journalists, the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices among EEA producers of publication paper and amongst acquirers of recovered paper.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices underlying that probe support our claim.

On May 25, 2004, UPM-Kymmene Corporation's General Counsel, Reko Aalto-Setaelae, admitted that the investigation concerns "many" of the company's products and that "unfortunately many of our employees have been involved." Aalto-Setaelae also added that the practices under investigation may date back to the early 20th century. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 25, 2004, Respondent Stora Enso Oyj issued a press release in which it stated the following:

> European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.
>
> Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.
>
> In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices related to those visits support our claim.

On May 28, 2004, it was reported that Jukka Harmala, CEO of Respondent Stora Enso Oyj, told a forest industry seminar that "[t]he time span (of the investigation)...is likely not focusing on the past few years, but can go back as far as (the) late eighties."

On May 28, 2004, it was reported that Stora Enso Oyj's CEO stated that the investigation may lead back to the late 1980s.

On May 28, 2004, it was also reported that Carl Bjomherg, CEO of Respondent Myllykoski Corporation, admitted at the same seminar that the industry had been "very much cartelized" during at least a portion of the Class Period. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 28, 2004, Respondent UPM issued a press release and stated the following:

> European Commission investigators have today visited various UPM premises in connection with a Commission investigation of alleged antitrust activities.
>
> In spring 2003, UPM initiated an internal investigation of competitive practices in all its units. At the same time the company also implemented additional competition law compliance programs for its employees clearly signaling zero tolerance for any antitrust activity.
>
> On January 15, 2004, after the internal investigation and to follow sound principles of corporate governance UPM decided to approach competition authorities in the European Union, the United States and Canada.
>
> The EU, several of its member states, and Canadian authorities have informed [sic] that UPM has received conditional full immunity with respect to certain conduct disclosed to the authorities. In the United States, where a grand jury investigation was already pending with respect to [sic] pressure sensitive labelstock business, UPM continues to cooperate with the US Department of Justice in its investigation.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

**Effects of Magazine Paper Conspiracy:**

As a result of Respondents' willful and knowing unfair or deceptive acts or practices:

February 16, 2005
Page 11

     a.    price competition in the sale of Magazine Paper in Massachusetts (and elsewhere) was unfairly or deceptively restrained, suppressed and eliminated;

     b.    prices for Magazine Paper sold by Respondents and their co-conspirators were unfairly or deceptively raised, fixed, maintained or stabilized at artificially high and noncompetitive levels in Massachusetts (and elsewhere); and

     c.    consumers in Massachusetts were economically harmed because they were deprived of the benefit of free and open competition. The exact economic harm is susceptible to proof. At this time, however, you remain in exclusive possession and control of the data required to reach that proof. Again, we request that you voluntarily provide it to us.

## SIMILAR INJURY SUFFERED BY ALL CLASS MEMBERS UNDER G.L. C. 93A

Respondents' willful and knowing, unfair or deceptive acts or practices described herein have caused similar economic injury and damages to Claimants. Each member of the putative Class paid higher out-of-pocket costs because the Respondents' unfair or deceptive acts or practices increased the price they paid for Magazine Paper products above supra-competitive levels. Respondents' unfair or deceptive acts or practices also caused them ascertainable economic loss because the questioned conduct denied them a free choice in a competitive market. Moreover, Claimants and the Class have been injured because their right to purchase consumer products untainted by price-fixing has been invaded.

In addition, Respondents have economically benefited in the nature of revenues from the overcharges they have been able to levy for Magazine Paper, resulting from acts alleged herein and the overpayments by Claimants and the Class for products containing Magazine Paper. Claimants demand that you and the other Respondents disgorge this unfairly or deceptively gained profit and agree in writing never to engage in such conduct again.

Claimants believe Respondents have been unjustly enriched at the expense of Massachusetts consumers and have retained monopoly profits that will also be in the tens of millions of dollars. Claimants and each member of the putative Class are entitled to their actual damages or twenty-five dollars per violation, whichever is greater, plus attorney fees and costs. *See* G.L. c. 93A, §§2 & 9(3). Each Claimant's and each Class member's individual damages do not equal or exceed $75,000. The named Claimants expressly disclaim any individual recovery equal to or in excess of $75,000.

## DEMAND FOR RELIEF

Claimants, on behalf of themselves and all others similarly situated and similarly injured, make the following demands upon each Respondent exclusively under M.G.L. c.93A §§(2) and (9)(2):

February 16, 2005
Page 12

- a. provide Claimants with sales information, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and the United States;

- b. pay restitution and refunds to Claimants and members of the putative Class for all sums paid by them to purchase products containing Magazine Paper at a price which exceeds the equivalent competitive market price for such products; or

- c. pay restitution and refunds to Claimants in the amount of twenty-five dollars a person; or

- d. discharge the unjust profits made from the unfair or deceptive practices described herein; and

- e. cease and desist all agreements to raise, fix, maintain or stabilize the prices of Magazine Paper and/or to allocate markets for Magazine Paper.

Demand is also further made that as part of your reasonable offer of settlement, you respond directly to the following inquiries. Please state:

- a. Whether you have engaged in communications with other Respondents concerning the fixing, raising, maintaining or stabilizing of prices for Magazine Paper;

- b. Whether you have combined with other Respondents to enter into agreements to fix, raise, maintain or stabilize the prices of Magazine Paper;

- c. Whether you engaged in, and/or have combined with others to engage in conduct that violates G.L. c. 93A;

- d. Whether you admit your unfair or deceptive acts or practices have caused the alleged legally cognizable injury to the Claimants and putative Class, by increasing the prices they have paid for Magazine Paper products above the prices that would have prevailed in a competitive market or by limiting product choice to consumers in the Commonwealth;

- e. Whether you admit that you have been unjustly enriched at the expense of Massachusetts consumers as a result of your unfair or deceptive acts or practices;

- f. The nature of and duration of the unfair or deceptive acts and practices alleged herein;

- g. The nature of and extent of damages you calculate were sustained by the putative Class; and

February 16, 2005
Page 13


      b.    The appropriate measure of damages for those injuries you are willing to offer.

Claimants are willing to enter into a protective order and request that each Respondent agree to produce sales information, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States. This information, which is in each Respondent's exclusive possession, will allow Claimants' counsel to determine a more precise dollar figure on the amount of overcharge per purchase in the Commonwealth as well as the unjust profits made by each Respondent. In the alternative, each Respondent is under a statutory obligation to tender a good faith offer of class wide relief based upon the requested information that remains in your exclusive possession and control.

Please be advised that if you fail to make a reasonable offer of settlement within thirty (30) days of the receipt of this letter, Claimants shall initiate litigation exclusively under G.L. c. 93A, which permits recovery of damages, attorney's fees, and costs. Further, if the Court determines that your conduct was willfully or knowingly unfair or deceptive, the Court must award the Claimants and the Class up to three times, but not less than two times, their actual damages.

Sincerely,

Robert J. Bonsignore

RJB/jl

Exhibit C



## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT
DEPARTMENT OF THE
TRIAL COURT

)
BARBARA ACETO and JOAN )
GUARINO on behalf of themselves )
and all others similarly situated. )
)
       Plaintiffs, )
)
v. )
)
INTERNATIONAL PAPER CO; NORSKE )
SKOGINDUSTRIER ASA; NORSKE )
SKOG NORTH AMERICA LLC; NORSKE )
 SKOG (USA), INC.; NORSKE SKOG )
CANADA LIMITED; NORSKE SKOG )
CANADA (USA), INC.; STORA ENSO )
OYJ; STORA ENSO NORTH AMERICA )
CORPORATION; SAPPI LIMITED; S.D. )
WARREN COMPANY; M-REAL )
CORPORATION; M-REAL USA CORP.; )
UPM-KYMMENE CORPORATION; )
UPM-KYMMENE INC.; MYLLYKOSKI )
CORPORATION; MADISON )
INTERNATIONAL SALES )
COMPANY and MEADWESTVACO )
CORP. )
)
       Defendants. )
)

CIVIL ACTION NO. 05-0539-L



MAY 09 2005

CLERK

## FIRST AMENDED CLASS ACTION COMPLAINT

## INTRODUCTION

Individual and putative class representatives Barbara Aceto and Joan Guarino (hereinafter "Plaintiffs"), bring this action on behalf of themselves and all others similarly situated, for compensatory, statutory and exemplary damages under the laws of Massachusetts against the above-named Defendants. All federal claims are expressly waived.

## NATURE OF THIS ACTION

1.      This case arises out of a massive international conspiracy beginning in or around January 1, 1993 and continuing through to the present among all Defendants and their co-conspirators with the purpose and effect of fixing prices, eliminating and suppressing competition, allocating markets and committing other unfair or deceptive practices designed to inflate and stabilize the prices of Supercalendared and Coated paper ("Magazine Paper" or "Publication Paper") sold to or distributed to the Plaintiffs and the putative Class of consumer purchasers in Massachusetts.

2.      Defendants are the leading manufacturers of Magazine Paper and control the Magazine Paper industry. Throughout the Class Period, Defendants have sold Magazine Paper used in consumer products in the Commonwealth of Massachusetts.

3.      Defendants' conspiracy has involved unfair and deceptive conduct by an international cartel that has economically harmed consumers and other indirect purchasers in Massachusetts and throughout the United States. The conspiracy has affected millions of dollars of commerce in Magazine Paper products found in virtually every household in Massachusetts and caused related economic loss to each member of the putative Class.

2

4.      The conspiracy has included covert communications and meetings in which Defendants expressly agreed to unfairly and deceptively allocate the market for and eliminate competition and fix prices of Magazine Paper sold in and/or distributed to Massachusetts.

5.      Defendants' acts constitute per se violations of the Massachusetts Consumer Protection Act, G.L. c. 93A, §§ 1, et seq. ("Chapter 93A"), prohibiting unfair and deceptive acts or practices.

6.      Plaintiffs bring this action pursuant to Chapter 93A to recover damages and the costs of suit, including reasonable attorneys' fees from Defendants for the injuries sustained by Plaintiffs and the Class (as defined herein) by reason of Defendants' and their co-conspirators' egregious violations of Massachusetts law.

### JURISDICTION AND VENUE

7.      Each of the Defendants transact business in the Commonwealth of Massachusetts.

8.      Without limiting the generality of the foregoing, each of the Defendants (directly or through agents who at the time were acting with actual and/or apparent authority and within the scope of such authority) have:

    a.      Transacted business in this Commonwealth;

    b.      Contracted to supply and/or obtain services and/or goods in this Commonwealth;

    c.      Intentionally availed themselves of the benefits of doing business in this Commonwealth;

3

d.  Produced, promoted, sold, marketed and/or distributed their products and/or services in this Commonwealth and, thereby, have purposefully profited from their access to this Commonwealth's markets;

e.  Caused tortuous damage by act or omission in this Commonwealth;

f.  Caused tortuous damage in this Commonwealth by act or omission committed outside this Commonwealth while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or, (iii) deriving substantial revenue from goods used or consumed or services rendered in this Commonwealth;

g.  Committed acts and omissions which Defendants knew would cause injury (and, in fact, did cause injury) in this Commonwealth to Plaintiffs and members of the Class while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or (iii) deriving substantial revenue from goods used or services rendered in this Commonwealth;

h.  Conspired with others who did have the requisite minimum contacts with this Commonwealth;

i.  Willfully and knowingly perpetrated a massive fraud upon the consumer markets in the Commonwealth of Massachusetts, by engaging in intentional and criminal conduct and/or unfair and deceptive acts or practices, including but not limited to those set forth herein; and/or,

4

     j.     Otherwise had the requisite minimum contacts with this Commonwealth,

such that under the circumstances it is fair and reasonable to require

Defendants to come to this Court to defend this action.

9.     Plaintiffs brings this claim exclusively under Massachusetts state law and

specifically deny any attempt to state a cause of action under the laws of the United States of

America, including without limitation, sections 4 or 6 of the Clayton Act (15 U.S.C. §§15, 26),

or section 1 of the Sherman Act (15 U.S.C. §1). Each putative class member waives any

recovery in excess of $75,000.

10.     Neither the Plaintiffs nor any member of the Class has damages exceeding

$75,000 each even when trebled. Attorneys' fees on a pro-rata basis will not exceed $75,000 for

each class member.

### PARTIES

11.     Plaintiff Barbara Aceto, is a resident of Middlesex County, in the Commonwealth

of Massachusetts. During the time period covered in this Complaint, Plaintiff purchased

products for personal use which contained Magazine Paper, sold by one or more of the

Defendants, their subsidiaries, divisions, units or affiliates within the Commonwealth of

Massachusetts. As a result, Plaintiff has suffered economic injury by reason of the deceptive

acts or practices alleged herein. Plaintiff brings this action in her individual and representative

capacity on behalf of the Plaintiff Class alleged herein.

12.     Plaintiff Joan Guarino, is a resident of Middlesex County, in the Commonwealth

of Massachusetts. During the time period covered in this Complaint, Plaintiff purchased

products for personal use which contained Magazine Paper, sold by one or more of the

Defendants, their subsidiaries, divisions, units or affiliates within the Commonwealth of

Massachusetts. As a result, Plaintiff has suffered economic injury by reason of the deceptive acts or practices alleged herein. Plaintiff brings this action in her individual and representative capacity on behalf of the Plaintiff Class alleged herein.

13.    Defendant International Paper Co. ("IP") is a New York corporation with its headquarters located at 400 Atlantic Street, Stamford, CT 06921. During the Class Period, IP, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts. Such sales occurred, inter alia, through xpedx, its North American distribution operation.

14.    During the Class Period, IP directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

15.    During the Class Period, and as a direct and intended consequence of its involvement in the horizontal price-fixing conspiracy alleged herein, IP controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

16.    Defendant Norske Skogindustrier ASA ("Norske Skog") is a Norwegian company with its headquarters located at Oksenoyveien 80, 1326 Lysaker, Norway. During the Class Period, Norske Skog, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

6

17.    During the Class Period, Norske Skog directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

18.    Defendant Norske Skog North America LLC ("Norske Skog North America") is a Delaware limited liability company with its principal place of business located at 1011 Western Avenue, Suite 700, Seattle, WA 98104. Norske Skog North America was formed on July 1, 2002, and is jointly owned by Defendants Norske Canada and Norske Skog. During the Class Period, Norske Skog North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

19.    During the Class Period, Norske Skog North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

20.    Defendant Norske Skog (USA), Inc. ("Norske Skog USA") is a Delaware corporation with its principal place of business located at 2507 Post Road, Southport, CT 06890.

7

Norske Skog USA is a wholly-owned subsidiary of Defendant Norske Skog and is the successor in interest to Norske Skog (USA) Holdings, Inc. During the Class Period, Norske Skog USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

21.    During the Class Period, Norske Skog USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

22.    Defendant Norske Skog Canada Limited ("Norske Canada") is a Canadian company with its principal place of business located at 250 Howe Street, 16th Floor, Vancouver, Canada V6C 3R8. According to its 2003 Annual Report, Defendant Norske Skog owns approximately 30% of Norske Canada. During the Class Period, Norske Canada, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

23.    During the Class Period, Norske Canada directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully

8

and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

24.    Defendant Norske Skog Canada (USA), Inc. is a California corporation with its principal place of business located at Suite 700, 1011 Western Avenue, Seattle, WA 98101. During the Class Period, Norske Skog Canada (USA), Inc., directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

25.    During the Class Period, Norske Skog Canada (USA) directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

26.    During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Norske Skog, Norske Skog North America, Norske Skog USA, Norske Canada, and Norske Skog Canada (USA) controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

27.    Defendant Stora Enso Oyj ("Stora Enso") is a Finnish corporation with its principal place of business located at Kanavaranta 1, FIN-00160, Helsinki, Finland. During the Class Period, Stora Enso, directly or through its subsidiaries and/or affiliates, manufactured,

9

marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

28.    During the Class Period, Stora Enso directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

29.    Defendant Stora Enso North America Corporation ("Stora Enso North America") is a Wisconsin corporation with its principal place of business located at 231 First Avenue North, Wisconsin Rapids, WI 54495.  During the Class Period, Stora Enso North America, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

30.    During the Class Period, Stora Enso North America directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

31.    During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, Stora Enso and Stora Enso

10

North America controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

32.    Defendant Sappi Limited ("Sappi") is a South African corporation with its principal place of business located at Sappi House, 48 Ameshoff Street, Braamfontein, Johannesburg 2001, Republic of South Africa. In 1994, Sappi acquired Defendant S.D. Warren Company. The S.D. Warren Company now does business as Sappi Fine Paper North America. During the Class Period, Sappi, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

33.    During the Class Period, Sappi directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

34.    Defendant S.D. Warren Company ("S.D. Warren"), doing business as Sappi Fine Paper North America, is a Pennsylvania corporation with its principal place of business located at 225 Franklin Street, Boston, Massachusetts, 02110. In 1994, Defendant Sappi acquired S.D. Warren Company. S.D. Warren now does business as Sappi Fine Paper North America. During the Class Period, S.D. Warren, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States.

11

35.    During the Class Period, S.D. Warren directly or indirectly and through affiliates

that it dominated and controlled, conspired with others named as Defendants herein to, and did,

unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or

stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These

horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully

and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices

for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

36.    During the Class Period, and as a direct and intended consequence of their

involvement in the horizontal price-fixing conspiracy alleged herein, Sappi and S.D. Warren

controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed

in Massachusetts.

37.    Defendant M-real Corporation ("M-real") is a Finnish corporation with its

principal place of business located at FIN-02020 METSA, Finland. During the Class period, M-

real directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or

distributed Magazine paper in the United States and Commonwealth of Massachusetts.

38.    During the Class Period, M-real directly or indirectly and through affiliates that it

dominated and controlled, conspired with others named as Defendants herein to, and did,

unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or

stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These

horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully

and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices

for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

12

39.     Defendant M-real USA Corp. ("M-real USA") is a New York corporation with its principal place of business located at 301 Merritt 7, Norwalk, CT 06851. During the Class Period, M-real USA, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

40.     During the Class Period, M-real USA directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

41.     During the Class Period; and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, M-real and M-real USA controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

42.     Defendant UPM-Kymmene Corporation ("UPM") is a Finnish corporation with its principal place of business located at Etelaesplanadi 2, FIN-00101 Helsinki, Finland. During the Class Period, UPM, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

43.     During the Class Period, UPM directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did,

13

unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

44.    Defendant UPM-Kymmene Inc. ("UPM Inc.") is an Illinois corporation with its principal place of business located at 999 Oakmont Plaza Drive, Suite 200, Westmont, Illinois. UPM Inc. is a 100%-owned subsidiary of UPM and is the North American operation of UPM. During the Class Period, UPM Inc., directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

45.    During the Class Period, UPM Inc. directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

46.    During the Class Period, and as a direct and intended consequence of their involvement in the horizontal price-fixing conspiracy alleged herein, UPM and UPM Inc. controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in Massachusetts.

14

47.    Defendant Myllykoski Corporation ("Myllykoski") is a Finnish corporation with its principal place of business located at Etelaesplanadi 20, FIN-00130 Helsinki, Finland. During the Class Period, Myllykoski, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

48.    During the Class Period, Myllykoski directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

49.    Defendant Madison International Sales Company ("Madison") is Delaware corporation with its principal place of business located at 101 Merritt 7, Norwalk, CT 06851. Madison is the U.S. sales company for the Myllykoski Group of paper mills. Madison's website states that "when you think of us, you can think Myllykoski." During the Class Period, Madison, directly or through its subsidiaries and/or affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and Commonwealth of Massachusetts.

50.    During the Class Period, Madison directly or indirectly and through affiliates that it dominated and controlled, conspired with others named as Defendants herein to, and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully

15

and knowingly designed to have, and did in fact have, a substantial and adverse impact on prices

for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

51.    During the Class Period, and as a direct and intended consequence of their

involvement in the horizontal price-fixing conspiracy alleged herein, Myllykoski and Madison

controlled, directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed

in Massachusetts.

52.    Defendant MeadWestvaco Corporation ("MeadWestvaco") is a Delaware

corporation with its principal place of business located at One Highridge Park, Stamford, CT

06905. During the Class Period, MeadWestvaco, directly or through its subsidiaries and/or

affiliates, manufactured, marketed, sold or distributed Magazine Paper in the United States and

Commonwealth of Massachusetts.

53.    During the Class Period, MeadWestvaco directly or indirectly and through

affiliates that it dominated and controlled, conspired with others named as Defendants herein to,

and did, unfairly and deceptively set prices pursuant to illegal agreements to fix, raise, maintain

or stabilize prices of Magazine Paper sold in and/or distributed to Massachusetts. These

horizontal-pricing practices restrained trade or commerce in Massachusetts and were willfully

and intentionally designed to have, and did in fact have, a substantial and adverse impact on

prices for Magazine Paper sold to Plaintiffs and the Class in Massachusetts.

54.    During the Class Period, and as a direct and intended consequence of its

involvement in the horizontal price-fixing conspiracy alleged herein, MeadWestvaco controlled,

directly or indirectly, the price or cost of Magazine Paper sold in and/or distributed in

Massachusetts.

16

55.     The Defendants named in the Complaint are collectively referred to as the
"Defendants." The acts charged in this Complaint as having been done by Defendants were
willfully and knowingly authorized, ordered or done by their officers, directors, agents,
employees or representatives while they have actively engaged in the management, direction,
control, or transaction of the Defendant's business or affairs. Whenever any reference is made
in this Complaint to any corporate Defendant, such reference shall be deemed to include
predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation. The
Defendants have exclusive possession and control over the documents further evidencing their
acts as set forth.

56.     Each of the Defendants willfully and knowingly acted in concert and/or as
authorized agents of each other during the Class Period. Each Defendant conspired with each
other to commit the unfair or deceptive acts or practices referenced herein. Each Defendant so
transacted business in the Commonwealth of Massachusetts, benefited from Massachusetts laws,
and/or caused loss or damage though its acts or omissions. Each Defendant conducts business
in Massachusetts on a regular basis and derives substantial revenues from services rendered or
goods used or consumed.

57.     Various other individuals, partnerships, corporations, and other business entities,
unknown to the Plaintiffs, have participated in the violations alleged herein and have performed
acts and made statements in furtherance thereof.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action on their own behalf and as a class action pursuant to
G.L. c. 93A, §9(2) and Rule 23 of the Massachusetts Rules of Civil Procedure on behalf of all
members of the following class:

17

All similarly situated consumer purchasers residing in the Commonwealth of
Massachusetts (excluding governmental entities, defendants, and subsidiaries and
affiliates of defendants) who indirectly purchased from the defendants, for their own use
and not for resale, Magazine Paper products between January 1, 1993 and the present
(the "Class Period") and were overcharged or otherwise suffered similar injury as a
result of the defendants' unfair and deceptive acts and practices.

59.     This action seeks recovery for similar economic injuries suffered by the Plaintiffs

and the similarly situated members of the Class.

60.     Plaintiffs do not know the exact size of the Class. However, based upon the

nature of trade and commerce involved, Plaintiffs believe that the total number of class members

is in the millions, and that members of the Class are geographically dispersed throughout the

Commonwealth of Massachusetts. Therefore, joinder of all members of the Class is not

practicable.

61.     There are questions of law and fact common to the Class, including, but not

limited to:

        a.      whether the Defendants engaged in an unfair and deceptive

                contract, combination or conspiracy among themselves, express or

                implied, to fix, raise, maintain, or stabilize prices of Magazine

                Paper sold in and/or distributed in Massachusetts and/or used in

                consumer products sold in and/or distributed in Massachusetts;

        b.      whether the purpose and/or effect of the acts and omissions

                alleged herein was to unfairly and deceptively restrain trade, or to

                affect, fix, control and/or maintain the prices of Magazine Paper

                sold in and/or distributed in Massachusetts and/or used in

                consumer products sold in and/or distributed in Massachusetts;

18

c.    the existence and duration of the horizontal agreements alleged
      herein to unfairly and deceptively fix, raise, maintain and/or
      stabilize the prices for Magazine Paper sold in and/or distributed
      in Massachusetts and/or used in consumer products sold in and/or
      distributed in Massachusetts;

d.    whether the Defendants concealed the contract, combination or
      conspiracy from Plaintiffs and the other members of the Class;

e.    whether the aforementioned conduct was willful and knowing;

f.    whether Defendants' agents, officers, employees or
      representatives participated in communications and meetings in
      furtherance of the unfair and deceptive conspiracy alleged herein,
      and, if so, whether such agents, officers, employees, or
      representatives were acting within the scope of their authority and
      in furtherance of Defendants' business interests;

g.    the extent to which Defendants engaged in unfair or deceptive acts
      or practices in the conduct of trade or commerce;

h.    whether the Defendants' conduct unfairly and deceptively
      artificially inflated the prices of Magazine Paper sold in and/or
      distributed in Massachusetts and/or used in consumer products
      sold in and/or distributed in Massachusetts;

i.    whether the Plaintiffs and the other members of the Class were
      injured by Defendants' unfair and deceptive conduct and, if so, the
      appropriate class-wide measure of damages;

19

j.    whether Plaintiffs and the other members of the Class were

injured by Defendants' violations of Chapter 93A; and

k.    whether Defendants' violation of Chapter 93A as alleged herein

was knowing and/or willful, entitling the Plaintiffs and members

of the Class to double or treble damages.

62.    These and other questions of law and fact are common to the Class and
predominate over any question affecting only individual members of the Class.

63.    Plaintiffs' claims are typical of the claims of all members of the Class in that
Plaintiffs were similarly situated indirect purchasers of Magazine Paper, the Plaintiffs and all
Class members were similarly injured by the same anti-competitive conduct of Defendants as
alleged herein, and the relief sought is common to the Class.

64.    The relief sought is common to each member of the Class.

65.    Plaintiffs and each member of the Class are Massachusetts consumers who
purchased Magazine Paper for their own use during the Class Period.

66.    Plaintiffs will fairly and adequately represent the interests of the Class, in that the
Plaintiffs are typical consumer indirect-purchasers of Magazine Paper and have no conflicts
with, or interests antagonistic to, other members of the Class.

67.    Plaintiffs have retained competent counsel experienced in class action and
consumer protection litigation.

68.    This Class action is superior to any alternatives for the fair and efficient
adjudication of this controversy because:

a.    it will avoid a multiplicity of suits and consequent burden on the
courts and Defendants;

20

b.  it would be virtually impossible for all Class members to intervene
    as parties-plaintiff in this action;

c.  it will allow numerous individuals with claims too small to
    adjudicate on an individual basis because of the prohibitive cost of
    this litigation, to obtain redress for their economic injuries;

d.  as a class action it is appropriate for treatment on a fluid recovery
    basis, which will obviate any manageability problems; and

e.  it will provide court oversight of the claims process, once
    Defendants' liability is adjudicated.

## FACTS

69.  Plaintiffs reallege and incorporate the preceding paragraphs as alleged herein.

70.  The term "Supercalendared Paper(s)," as used herein, refers to uncoated
mechanical printing paper that has been highly calendared in a supercalendar machine in order
to obtain a smoother surface and higher gloss than regular machine-finished paper. Calendaring
refers to the use of a particular type of processing equipment located at the dry end of a paper
machine, consisting typically of a set of rolls through which paper is passed for smoothing,
leveling and gloss improvement. A supercalendar is an auxiliary piece of papermaking
equipment used on some paper machines to obtain a denser paper with higher finish than paper
obtained on a simple calendar. It uses typically paper or cotton-covered rolls arranged
alternately with metal rolls through which paper is passed. Supercalendared (also known as
"SC") paper is classified in various gradations of quality (SC-C, SC-B, SC-A and SC-A+).
Supercalendared paper has a variety of uses, including uses in retail inserts and flyers, Sunday
magazine supplements, catalogs, magazines, coupons and workbooks and manuals.

21

71.    The term "Coated Paper(s)," as used herein, refers to papers that contain a layer

of coating material, such as (for example) kaolin, calcium carbonate, titanium dioxide, latex

and/or other materials, in combination with an adhesive, on one or both surface(s) of the paper.

Coated Papers are divided into two main categories, as determined by both the manufacturing

process and the chemical components utilized: (a) coated groundwood or coated mechanical

papers and (B) coated freesheet or coated woodfree papers. Coated groundwood paper is made

from a mechanical process typically involving one stage of bleaching and containing 30-75%

groundwood pulp (slurry typically produced by mechanically abrading fibers from debarked

logs through forced contact with the surface of a revolving grindstone or other type of abrader).

It is most commonly used in magazines, Sunday supplements for newspapers, and catalogs that

have relatively short shelf lives. Also found in this category are coated mechanical papers,

which typically contain more than 100% mechanical pulp (pulp produced by reducing pulpwood

logs and chips into their fiber components by the use of mechanical energy). The second major

category of Coated Papers includes coated freesheet paper, which is typically made from a

mechanical process having four to six stages of bleaching, and is thus significantly brighter than

groundwood. Coated freesheet typically contains no more than 10% groundwood or mechanical

pulp. It is commonly used in upscale magazines, advertising inserts, upscale catalogs, annual

reports and brochures. Coated Papers are further classified into five grades based on brightness,

with Grade No. 5 being the least bright (and least expensive) and Grade No. 1 being the

brightest (and most expensive). Grades Nos. 4 and 5 are typically made with groundwood,

Grade No. 3 is typically made with some groundwood mixed with freesheet, and Grades Nos. 1

and 2 are typically made only with freesheet. In 2003, it was estimated that Grades Nos. 3

through 5 accounted for approximately 79% of total shipments of Coated Paper.

22

72.    The term "Magazine Paper" includes both Supercalendared Paper and Coated paper.

73.    It is estimated that Europe in 2003 exported 684,000 tons of coated groundwood and 601,000 tons of coated freesheet to the United States. Finland in 2003 was the largest European groundwood exporter to the United States of both coated groundwood (427,000 tons) and coated freesheet (183,000 tons). In 2003, the import shares of the total United States coated groundwood and United States coated freesheet markets were, respectively, 26.5% and 27.6%.

74.    The worldwide market for Magazine Paper is a multi-billion dollar-a-year industry. For example, in 2002, net sales of paper and allied products in the United States alone totaled $152.5 billion, according to data from the Untied States Department of Commerce. Magazine Paper made up a significant portion of these sales. In 2003, U.S. shipments of uncoated mechanical paper were 1.443 million tons, having an estimated average price of $715 per ton. In the same year, U.S. shipments of coated freesheet were 4.135 million tons, having an estimated average price of $790 per ton. Also in 2003, U.S. shipments for coated groundwood were 4.5 million tons, having an estimated average price of $707 per ton.

75.    Each of the Defendants are engaged in the manufacture, sale and/or distribution of Magazine Paper used in consumer products sold in and/or distributed to Massachusetts.

76.    The unfair and deceptive business activities of the Defendants that are subject of this Complaint were within the flow of and substantially affected trade and commerce directly or indirectly injuring and affecting Plaintiffs and the Class.

77.    During the Class Period, Defendants and their co-conspirators dominated the market for Magazine Paper and exercised market power in Magazine Paper pricing. In 2003, for example, Sappi, MeadWestvaco, Stora Enso North America and IP together controlled 77.7% of

23

the production capacity for North American coated freesheet. Similarly, in 2003, IP, Stora Enso North America, UPM and MeadWestvaco controlled approximately 60.3% of the production capacity for North American coated groundwood.

78.    The Magazine Paper industry in the Untied States is characterized by economic conditions that are consistent with and conducive to the conspiracy alleged herein. There are a relatively small number of producers of Magazine Paper and high barriers to entry resulting from the capital-intensive nature of paper manufacturing.

79.    This high degree of concentration is reflected by statistical evidence. The top five producers accounted for 71.2% of the North American market for uncoated mechanical papers in 2003, while the top ten accounted for 91.9%. The top five producers accounted for 73.5% of the coated North American groundwood market in 2003 (with IP having 19.2%, Stora Enso's North American operation having 14.6%, UPM having 14.0%, and MeadWestvaco having 12.5%), while the top ten accounted for 95.4%. Finally, the top five producers accounted for 95.4%. Finally, the top five producers accounted for 84.1% of the North American coated freesheet market in 2003 (with Sappi's North American operation having 23.8%, MeadWestvaco having 23.6%, Stora Enso's North American operation having 17.2%, and IP having 13.1%) while the top ten accounted for 98.1%.

80.    As a result, the Magazine Paper industry in the Untied States is an oligopoly: a few firms producing a commodity product which, in combination or by agreement, had the power to and did set prices in the market. The coordinated unfair and deceptive conduct of Defendants and their co-conspirators in their pricing decisions during the Class Period was the product of collusion.

81.    As noted above, this oligopoly has a strong European component.  Over the last

decade, European Publication Paper producers have increased steadily their presence in United

States markets by acquiring domestic entities and, in more recent years, by increasing exports.

For example, Sappi acquired Warren in 1994 from Scott Paper Co.; Stora Enso acquired

Consolidated Papers, Inc. in 2000; and UPM acquired the Blandin Paper Mill in Grand Rapids,

Minnesota in 1997 from Fletcher Challenge Canada Ltd.  It is estimated that Stora Enso, UPM,

Sappi, Norske Skog and Myllykoski now collectively control 40% of the North American

Coated Paper market.

## MAGAZINE PAPER CRIMINAL INVESTIGATION

### A.    UPM's Investigation of Unfair and Deceptive Acts and Practices

82.    In August of 2003, UPM received a grand jury subpoena in connection with the

Untied States Department of Justice's ("DOJ") ongoing investigation into the United States

labelstock industry.  UPM at or about this time commenced an internal investigation into

competitive practices at its various business units.

83.    On January 15, 2004, UPM decided to approach competition authorities in the

European Union ("EU"), the United States and Canada about the results of that investigation,

which, according to its report in its Form 20-F, involved "conduct that has not comported with

applicable competition laws."

84.    The EU, several of its member states, and Canadian authorities advised UPM that

it would receive conditional full immunity with respect to the conduct that it disclosed.  Reko

Alto-Seppala, a lawyer for UPM, was quoted in a May 25, 2004 article that appeared on

http://www.findbcwood.com/forestproducts/404526-forestry-prob.asp?Ticket= as saying that

"[a]fter lengthy consideration, the company decided that this would be the profitable solution."

25

The DOJ, which is investigating that conduct, has not disclosed whether it is granting any immunity to UPM.

85.    In a press release dated May 25, 2004, in its interim report for the period from January 1 through June 30, 2004, and in its Form 20-F filed with the SEC on June 21, 2004, UPM has revealed both an internal investigation of its unfair and deceptive conduct, the unfair and deceptive conduct of others in the Magazine Paper industry, and its disclosure of that conduct to governmental agencies.

86.    In its report in its Form 20-F, UPM indicated that it has expanded its original internal audit to include "competition law issues" and has since "made organization and personnel changes."

87.    On January 30, 2004, two weeks after approaching the competition authorities, UPM's CEO, Juha Niemela, resigned.

88.    In a May 6, 2004 article, the Finnish newspaper of record, *Helsingin Sanomat*, gave a further explanation of Mr. Niemelä's departure, saying that UPM's board forced him to resign after the company's internal investigation revealed the existence of a cartel. It was noted that "Niemelä and his closest colleagues at work joined the industry at a time when cartels were legal in Finland. Until quite recently, products of the forest industry were sold through common sales organizations, such as Finnpap. The sales organizations were banned when legislation outlawing cartels came into effect in Finland in 1992, but their spirit lives on. The management of UPM apparently did not take anti-trust legislation seriously enough."
<http://www.helsinginsanomat.fi/english/article/107615294-7297.>

**B.    UPM's Disclosures of Unfair and Deceptive Acts and Practices**

89.    UPM's disclosures were clearly not limited to its own unfair and deceptive

conduct, but implicated others in the Magazine Paper industry in a wide-ranging, long-lived

scheme to fix prices and allocate markets.  UPM's disclosures led antitrust authorities to conduct

antitrust investigations of many of its competitors.

90.    On May 25, 2004, raids were carried out by European antitrust authorities at

UPM, Stora Enso, Metsäliitto, M-real, Norske Skog and Sappi.

91.    On May 25, 2004, Defendant IP disclosed that it had been contacted by the

United States Department of Justice in connection with the probe into price-fixing in the

Magazine Paper market.

92.    At least two other defendants in addition to UPM – Stora Enso North America

and Madison – are producing documents to the DOJ in connection with its investigation.

93.    The news releases of the various antitrust enforcement authorities described

further these investigations.  Thus, the EU stated:

> "Following press inquiries, the European Commission's spokesperson
> for competition has confirmed that, on 25 May 2004, Commission
> inspectors, assisted by officials from the national competition authorities
> of the Member States concerned, launched simultaneous unannounced
> inspections at the premises of some of the major European producers of
> paper and forestry products."
>
> "The purpose of these inspections is to ascertain whether there is evidence
> of cartel agreements and related illegal practices concerning price-fixing,
> fixing of other commercials terms, and/or allocation of customers. Several
> product markets in the European paper and forestry products sector would
> be affected the alleged arrangements.
>
> "The Commission's spokesperson has also confirmed that the inspections
> have been carried out in close coordination with competition authorities in
> a number of EU countries, as well as the US and Canada. The EFTA
> Surveillance Authority, at the request of the Commission, participated in
> the inspections at premises of undertakings in the EFTA Member States.

27

"Surprise inspections are a preliminary step in investigations into suspected cartels."

94.    Likewise, on May 25, 2004, the European Free Trade Association ("EFTA")

Surveillance Authority, an organization charged with enforcing competition laws with respect to

EFTA member states of Iceland, Liechtenstein and Norway, issued a press release that stated:

> "Following inquiries from journalists, the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices amongst EEA producers of publication paper and amongst acquirers of recovered paper.

> \*\*\*\*

> "Surprise inspections are a preliminary step in investigations into suspected cartels."

95.    A Reuters report dated May 25, 2004 stated that the "U.S. Justice

Department confirmed it is investigating possible anti-competitive practices in the market for

magazine paper. A department spokeswoman said the probe covers the sale of magazine paper in

the United States and elsewhere."

96.    Other news reports provided additional details about these investigations.  A June

18, 2004 article stated that:

> "'High leaders have agreed on prices, capacity and exchanged confidential information during joint meetings, dinners or before official conferences,' Helsingin Sanomat said, quoting an EU Commission's subpoena in connection with raids on several of the firms' offices last month.

> "In the document the EU competition watchdog asks the firms for all relevant information or evidence in the case, and threatens fines or sanctions if it is not forthcoming, Finland's paper-of-record wrote." (<http://www.eubusiness.com/afp/040618081920.v90mfqyy>.)

97.    On May 27, 2004, the Reuters news agency reported that Stora Enso's

28

CEO Jukka Härmälä "told a forest industry seminar arranged by banking group Nordea that

'[t]he time span (of the investigation)... is likely not focusing on the past few years, but can go

back as far as (the) late eighties." <http://money.excite.com/jsp/riwdt_rt.jsp?news_id=

retumm760167&feed=reu&date=2004057>.

98.    The Bloomberg News Agency also reported on May 28, 2004 that Stora Enso's

CEO said that the investigation may lead back to the late 1980s.

99.    Reuters also reported on May 27, 2004 that Myllykoski Corporation's CEO Carl

Bjomberg stated at the same seminar that the industry had been "very much cartelized" during at

least a portion of the Class Period. <http://forests.org/articles/print.asp?linkid=32131>.

100.    On May 25, 2004, various of the Defendants confirmed both the fact and the wide-

ranging nature of the investigations in their own press releases. For example, UPM stated:

> "European Commission investigators have today visited various UPM
> premises in connection with a Commission investigation of alleged -
> antitrust activities."

101.    Similarly, on May 25, 2004, Norske Skog issued a press release in which it stated

the following:

> "EFTA's Surveillance Authority, assisted by the Norwegian Competition
> Authority, today began an investigation of possible price co-operation within
> i) the area of publication paper. ..."

102.    On May 24, 2004, M-real issued a press release in which it stated the

following:

> "European Commission investigators have today visited M-real
> Corporation's premises. The investigation is related to the claimed
> cooperation between the competitors in fine paper."

103.    On May 25, 2004, Sappi issued a press release in which it stated the

following:

> "A team of officials from the European Commission and the Belgian Competition Authority have today visited Sappi Fine Paper's European Head Office in Brussels as part of a wide-spread antitrust investigation into a number of paper manufacturers and appears to involve a wide range of products."

104.    On May 25, 2004, Stora Enso issued a press release in which it stated the

following:

> "European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.
>
> "Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.
>
> "In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice."

105.    A statement similar to that quoted in the preceding paragraph was contained

in Stora Enso's "Interim Review" for the period from January through June of 2004.

106.    In the wake of the raids, there were actual or suggested changes in the top

management of some of the Defendants.

107.    M-real announced that its CEO, Jouko M. Jaakkola, would step down on

January 1, 2005, to be replaced by Hannu Anttila. That personnel change has now occurred.

108.    Stora Enso also announced on July 8, 2004 the replacement of its Senior

Vice-President for Business Strategy.

## C.    The Unfair And Deceptive Pricing Practices Of The Defendants

109.    During the Class Period, the Defendants engaged in clandestine, lockstep price increases despite stable or declining demand and input costs, increases that are not explained by ordinary market forces absent collusion. Defendants also made contemporaneous statements that were willfully and knowingly intended to signal price increases to rivals.

110.    As an example of these pricing practices, for several years prior to the Class Period (1989 to 1992), the United States prices of wood pulp — the principal ingredient used to make Publication Paper — declined significantly. Thus, for example, the United States domestic price of Northern bleached softwood kraft ("NBSK") declined from $830 per ton in 1989 to $570 per ton in 1992. As economic theory would suggest, prices for Publication Paper also declined in this period. Thus, United States East Coast prices for SC-A and SC-B from North American sources declined from $830 per ton in 1989 to $690 per ton in 1992. Similarly, United States average transaction prices for Grade No. 4 Coated Paper in 50-lb. rolls declined from $916 per ton to $823 per ton and Grade No. 5 Coated Paper in 40-lb. rolls declined from $858 per ton to $714 per ton.

111.    In or about late 1992 to early 1993, input costs continued to decline and demand stabilized. NBSK prices in the United States declined to $415 per ton in 1993. Under these economic conditions, absent collusion, prices should have continued to decline, or at the very least, remained stable. However, in or about late 1992 to early 1993, Defendants and their co-conspirators covertly commenced their collusive behavior by agreeing to limit supply and to increase prices in lockstep, and in fact doing so.

112.    At that point in time and up to the autumn of 1995, Defendants and their co-

conspirators were able to increase prices for Publication Paper by approximately 30%, despite the fact that prevailing economic conditions should have resulted in declining or stable prices. Such dramatic, lockstep price increases could not have occurred under these market conditions absent collusion.

113.    Another example is provided by the recent increases in Coated Paper prices in the United States. In June of 2004 and again in September-October of 2004, major Coated Paper manufacturers implemented $60/ton price increases, even though pulp costs were declining during much of that period.

114.    During the Class Period, Defendants facilitated their secret, collusive, lockstep price increases by jointly restricting domestic supply, particularly by commencing a program of restricting capacity growth and development, as described further below.

115.    Defendants also facilitated their collusive, unfair and deceptive, lockstep price increases by agreeing with their co-conspirators to limit the growth in imports of Magazine Paper during the early portion of the Class Period.

116.    Defendants also utilized willful and knowing contemporaneous pronouncements to signal the various coordinated efforts to raise prices in lockstep.

### D.    Unfair And Deceptive Agreements To Limit Production Capacity

130.    Defendants have acted in furtherance of the alleged unfair and deceptive conspiracy by means other than the direct fixing of prices for Magazine Paper. In recent years, they have also agreed to unfairly and deceptively eliminate, limit and/or alter production capacity of Magazine Paper in the United States for the purpose and with the intention of fixing, raising, maintaining and/or stabilizing the prices of such paper.

32

118.    Thus, for example, with respect to coated freesheet capacity, IP closed a paper machine at its Corinth, New York facility in the third quarter of 2001, thus eliminating 60,000 tons of capacity. In the fourth quarter of 2002, it closed the Corinth mill, eliminating another 28,000 tons. Sappi eliminated 100,000 tons of production capacity at its Mobile, Alabama plant in the third quarter of 2001 and eliminated another 85,000 tons at its Westbrook, Maine facility in the first quarter of 2004. MeadWestvaco (or one of its predecessor companies, Westvaco) eliminated a total of 305,000 tons of production capacity at its facilities in Tyrone, Pennsylvania, Chillicothe, Ohio and Luke, Maryland in 2001-02, and Stora Enso eliminated 123,000 tons of production capacity at two of its facilities in Wisconsin during the fourth quarter of 2002. United States coated freesheet production capacity declined by 2.4% in 2003, 7.0% in 2002 and 1.4% in 2001.

119.    With respect to coated groundwood capacity, Stora Enso eliminated a total of 296,000 tons at three Wisconsin facilities in 2001 and 2003-04, converting only some of this newly-freed capacity over to coated freesheet. IP eliminated 72,000 tons of production capacity when it closed its Corinth mill and UPM eliminated 172,000 tons in 2003 by shutting down paper machines at its Grand Rapids, Minnesota facility. United States coated groundwood production capacity declined by 4.3% in 2003.

120.    Uncoated groundwood production capacity in the United States declined a further 1% in 2003, capping reductions of production capacity in six out of seven years, with the result that such capacity was 21% below its peak of 2.31 million tons in 1996.

121.    These capacity limitations and reductions were part of a concerted, conspiratorial plan. Jan Reinås, the CEO of Norske Skog, noted in 2001 that with the mergers and acquisitions going on in the paper industry, Norske Skog's competitors "should have the

33

incentive to curb supply and help balance the market," something for which Norske Skog could set an example by being "responsible" on production capacity. Mr. Reinås went on to say that "the most important thing about our industry right now" is to prove that consolidation through mergers and acquisitions "has led to better behavior."

122. Similarly, a 2003 Stora Enso document referred to how it is "[c]omitted to both supply and pricing discipline." Jukka Härmälä, its CEO, spoke in 2001 of how the "industry's success" "depends on capacity control in the markets" and stated that Stora Enso is "committed to taking market related downtime." In Mr. Härmälä's view, "the industry has improved its track record as far as capacity management and downtime are concerned over the past few years."

123. John Dillon, IP's CEO, expressed a similar commitment in 2001 about eliminating capacity. MeadWestvaco said to analysts in 2003 that its mill and "machine closures" and "market-related downtime" were part of a "strategic rationalization."

## E. The Operation Of xpedx

124. Another way in which Defendants have acted in furtherance of the alleged unfair and deceptive conspiracy is through xpedx, the name given to IP's distribution operation since January 1, 1998. Xpedx is IP's national distributor of, inter alia, Magazine Paper, with approximately 100 wholesale distribution centers and 154 stores serving retail customers and small printers located in the United States and Mexico. According to its website (http://xpedx.com/util/more_info.asp), xpedx has approximately $6.5 billion in annual sales and $400 million in daily inventory at its distribution locations.

34

125.    Xpedx does not, however, sell only Magazine Paper manufactured by IP. It also sells Magazine Paper manufactured by IP's rivals, including Sappi, MeadWestvaco and Stora Enso, companies whom it describes at its website as being among its "strategic relationships." http://www.xpedx.com/paper/suppliers/default.asp. This highly unusual structure, where one company is acting as marketing agent for its direct rivals, was and is used by IP and the other identified defendants to ensure that Publication Paper prices were fixed, raised, maintained and/or stabilized and to allocate markets and customers.

## VIOLATIONS AND EFFECTS

126.    Plaintiffs reallege and incorporate the preceding paragraphs as alleged herein.

127.    Beginning on or about January 1, 1993, the exact date being unknown to Plaintiffs, Defendants, by and through their officers, directors, employees, agents, or other representatives willfully and knowingly entered into a continuing contract, combination or conspiracy to unfairly and deceptively restrain trade and commerce.

128.    Defendants' contract, combination or conspiracy consisted of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to unfairly and deceptively fix, raise, maintain or stabilize the price of Magazine Paper in the Commonwealth of Massachusetts.

129.    Defendants have exclusive possession, custody and control of all documents detailing the inherently self-concealing price-fixing conspiracy.

130.    For the purpose of formulating and effectuating the aforesaid contract, combination or conspiracy, Defendants did willfully and knowingly contract, combine and conspire to fix, raise, maintain or stabilize the prices for Magazine Paper, by among other things:

35

a.    participating in a meeting and conversations to discuss the prices for and
      production volume of Magazine Paper sold in the United States and in the
      Commonwealth of Massachusetts;

b.    agreeing, during the meeting and conversations to unfairly and
      deceptively manipulate and maintain prices of Magazine Paper in the
      United States and in the Commonwealth of Massachusetts;

c.    unfairly and deceptively agreeing to allocate portions of the relevant
      Magazine Paper markets;

d.    unfairly and deceptively agreeing to restrict the supply of Magazine
      Paper, both at the time of the agreements and in the future;

e.    issuing price announcements and price quotations in accordance with the
      unfair and deceptive agreements reached;

f.    unfairly and deceptively selling Magazine Paper to customers in the
      United States and Commonwealth of Massachusetts at non-competitive
      prices; and

g.    unfairly and deceptively agreeing to conceal and keep secret their illegal
      agreement.

131.    For purposes of forming, carrying out, policing, monitoring and enforcing the
aforesaid contract, combination or conspiracy, Defendants have willfully and knowingly
exchanged, communicated and signaled through themselves confidential information and have
thereby unfairly and deceptively fixed, raised, stabilized and maintained Magazine Paper price
levels at supra-competitive levels from 1993 through to the present.

36

132. The aforesaid contract, combination or conspiracy has had the following effects, among others:

a. price competition in the sale of Magazine Paper by Defendants and their co-conspirators has been unfairly and deceptively restrained, suppressed and eliminated;

b. prices for Magazine Paper sold by Defendants and their co-conspirators have been unfairly and deceptively raised, fixed, maintained or stabilized at artificially high and noncompetitive levels;

c. Plaintiffs and the Class have been economically injured; and

d. Plaintiffs and the Class have been unfairly and deceptively deprived of the benefit of free and open competition.

133. By reason of the alleged conspiracy, Plaintiffs and each member of the Class paid more for products containing Magazine Paper than they would have paid in the absence of the unfair and deceptive contract, combination or conspiracy. Plaintiffs and the Class have been injured and have suffered monetary damages in an amount to be proven at trial.

134. As a direct result of their unfair and deceptive conduct, each of the Defendants generated substantial profits and were unjustly enriched at the expense of the Class of Massachusetts consumers.

## FRAUDULENT CONCEALMENT

135. Throughout the Class Period set forth in this Complaint, Defendants effectively, affirmatively and fraudulently concealed their unfair and deceptive contract, combination or conspiracy from Plaintiffs and the Class.

37

136.    Defendants engaged in a successful, illegal price-fixing conspiracy that by its nature was inherently self-concealing.

137.    Defendants' wrongful conduct as alleged in this Complaint was carried out through means and methods which were willfully and knowingly designed and intended to avoid detection, and which in fact successfully precluded detection for a substantial period of time.

138.    Because the unfair and deceptive contract, combination or conspiracy was intentionally kept secret by Defendants and their co-conspirators, Plaintiffs were unaware of the fact that prices of Magazine Paper were secretly agreed upon as alleged herein until at the earliest May 24, 2004, when announcements were made that the United States Department of Justice was investigating anti-competitive practices in the sale of Magazine Paper in the United States and elsewhere.

139.    Although Plaintiffs exercised due diligence during the Class Period, Plaintiffs could not have discovered the self-concealing, unfair and deceptive contract, combination or conspiracy at an earlier date by the exercise of due diligence because of the deceptive practices and techniques of secrecy employed by Defendants and their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy. These techniques of secrecy included, but were not limited to, secret and surreptitious communications by use of the telephone or in-person meetings at trade association meetings (and elsewhere), covert signals, intentional avoidance of written records and misrepresentations to customers falsely attributing price increases to competitive factors.

140.    Defendants utilized convenient venues such as the European, Canadian and United States trade associations, such as the Pulp & Paper Product Council ("PPPC") and its

38

sub-entity the Printing & Writing Papers Association, CEPIPRINT, the American Forest & Paper Association and the Canadian Pulp & Paper Association to conduct their covert meetings.

141. Defendants also met at private dinners and otherwise official conferences to secretly divide and allocate markets by regions. Such clandestine agreements were then covertly implemented by select executives, employees and agents.

142. Other meetings occurred under the auspicies of Finnpap, the Finnish paper marketing association.

143. Plaintiffs have exercised due diligence by promptly investigating the facts giving rise to the claims asserted herein upon having a reasonable suspicion of the existence of Defendants unfair and deceptive conspiracy alleged herein.

144. Throughout the Class Period, Defendants publicly stated in an unfair and deceptive fashion that Magazine Paper prices were raised and otherwise affected in the Commonwealth of Massachusetts due to facially plausible and legitimate factors unrelated to Defendants illegal and anti-competitive conduct.

145. As a result of the fraudulent concealment of the conspiracy, Plaintiffs assert the tolling of the applicable statute of limitations with respect to any claims and rights of action that Plaintiffs and other Class members have as a result of the contract, combination and conspiracy alleged in this Complaint.

## CONSUMER INJURY UNDER G.L. c. 93A

146. Defendants' unfair or deceptive acts or practices described herein have caused significant economic harm to Plaintiffs and the other putative Massachusetts consumer class members by unfairly and deceptively increasing the prices they had to pay for Magazine Paper

39

manufactured or sold by Defendants above competitive levels, denying them a free choice in a competitive market, and limiting their product choice in the Commonwealth.

147. As a result of Defendants' unfair or deceptive acts or practices, including, but not limited to, those described herein, Defendants have also succeeded in raising and reinforcing barriers to market entry so as to forestall the development of actual competition and innovation for Magazine Paper, and have imposed barriers to competitor's attempts to introduce innovation.

148. The resultant control over prices and supply has enabled Defendants to unfairly and deceptively fix, raise, maintain and stabilize the prices of Magazine Paper sold in the United States and Commonwealth of Massachusetts virtually without regard to the prices of competitors.

149. Distributors and retailers of Magazine Paper manufactured and/or sold by Defendants have passed through the artificially inflated and maintained prices of such products resulting from the Magazine Paper conspiracy onto Plaintiffs and consumers within the Commonwealth of Massachusetts.

150. Defendants' supra-competitive prices and extraordinary profits are not the result of superior products or competition on the merits. On the contrary, Defendants prices on Magazine Paper and profits from sale of Magazine Paper during the Class Period are the result of unfair or deceptive acts or practices.

151. Defendants have been able, at class members' financial expense, to artificially inflate its profits by concertedly engaging in a series of unfair or deceptive acts or practices, with the knowing and willful purpose and effect of unfairly and deceptively restraining and preventing competition and maintaining control over the market for Magazine Paper, controlling

40

and increasing product cost to indirect purchasers, and limiting product choice to consumers in the Commonwealth. This conduct is a per se violation of G.L. c. 93A, §2.

## PLAINTIFFS' DEMANDS PURSUANT TO G.L. c. 93A

152.    On or about February 16, 2005 or March 17, 2005, Plaintiffs together with other putative class representatives, served each Defendant with a demand letter pursuant to G.L. c. 93A, §9(3) that identified the Plaintiffs, the Class and the Defendants, reasonably described the unfair or deceptive acts or practices of Defendants, the acts in furtherance of the conspiracy, the effects of the conspiracy and the injury suffered by the Plaintiffs and the Class, and made a proper class-wide demand for relief. *See* Attachment "A."

153.    Plaintiffs' also requested that Defendants provide certain basic information exclusively in their possessions and control necessary to calculate class-wide damages.

154.    More than thirty days passed since the demand letters were served and each Defendant refused to grant relief upon demand and refused to make a class-wide written offer of relief.

155.    The following Defendants have denied they engaged in the unfair and deceptive conduct set forth in the Complaint: IP, Stora Enso, Stora Enso North America, Sappi, S.D. Warren, Myllykoski, Madison, and Norske Skog North America.

156.    The following Defendants have denied liability: IP, Stora Enso, Stora Enso North America, Sappi, S.D. Warren, Myllykoski, Madison, Norske Skog North America, Norske Skog, Norske Skog USA and UPM.

157.    The following Defendants have denied that Plaintiffs and other Massachusetts indirect purchasers of Magazine Paper suffered economic injury or loss: IP, Stora Enso, Stora

41

Enso North America, Sappi, S.D. Warren, Myllykoski, Madison, Norske Skog North America, Norske Skog, Norske Skog USA and UPM.

158.    Each Defendant also chose not to make a payment of the rejected tender into the Court after receiving notice that an action had commenced.

159.    Defendants failed to tender a reasonable offer despite knowledge of the knowing and willful, unfair or deceptive acts or practices of which Plaintiffs complained.

160.    In fact, no class-wide monetary offer of settlement was extended to Plaintiffs by the Defendants in response to the statutory demands.

## COUNT I

## VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT
### [G.L. c. 93A, §§ 2 and 9]

161.    Individual and Representative Plaintiffs, on behalf of themselves and the Class, reallege, as if fully set forth, each and every prior allegation contained hereinabove, and further allege, as follows, against all Defendants:

162.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

163.    Defendants' conduct and price-fixing and market allocation conspiracy, including but not limited to those referred to herein, constitute violations of G.L. c. 93A, § 2.

164.    Defendants agreed to, and did in fact, act in restraint of trade or commerce in a market which includes Massachusetts, by unfairly and deceptively affecting, fixing, controlling and/or maintaining, at artificial and non-competitive levels, the prices at which Magazine Paper were sold, distributed, or obtained in Massachusetts and elsewhere.

165.    Defendants agreed to, and did in fact, unfairly and deceptively allocate or divide
among themselves customers, markets, or sales volumes for Magazine Paper, sold, distributed,
or obtained in Massachusetts and elsewhere.

166.    The acts committed by Defendants as alleged herein are unfair and deceptive
contracts, combinations, and conspiracies in violation of G.L. c. 93A, § 2, and against public
policy. Specifically, Defendants illegally combined the acts of two or more persons for the
purposes of:

> a.    Creating or carrying out unreasonable restraints of trade or commerce by,
> e.g. setting by agreement the prices which the Defendants charged for
> Magazine Paper sold in and/or distributed to Massachusetts;

> b.    Limiting or reducing the production of Magazine Paper sold in and/or
> distributed to Massachusetts by, e.g., allocating sales volumes among
> Defendants pursuant to an agreement as alleged herein;

> c.    Preventing competition in the manufacture and sale of Magazine Paper
> sold in and/or distributed to Massachusetts by, e.g., agreeing and
> conspiring among themselves not to compete over sales volumes and
> prices;

> d.    Fixing the price of Magazine Paper in such a way as to control or
> establish, or attempt to control or establish the prices paid by consumers
> and the public for Magazine Paper; and

> e.    Entering into, executing, and carrying out contracts, obligations, and
> agreements in which they:  (i) bound themselves not to sell Magazine
> Paper below a fixed price; (ii) agreed to keep the prices of Magazine

43

Paper at a fixed price; and (iii) established and settled the price of

Magazine Paper so as to directly or indirectly preclude a free and

unrestricted competition among themselves.

167.    Further, each of the above acts constitutes the establishment, maintenance, or use

of a monopoly of trade or commerce in a relevant market for the purpose of excluding or

eliminating competition or controlling, fixing, or maintaining prices in violation of G.L. c. 93A,

§2, and is a distinct and independent violation of Massachusetts law.

168.    As a direct and proximate result of Defendants' violations of G.L. c. 93A, §2,

Plaintiffs and all the other similarly situated members of the Class have similarly suffered

economic injury and have been deprived of the benefits of free and fair competition.

169.    Defendants' conduct in engaging in unfair or deceptive acts or practices with

others with the intent, purpose and effect of wrongfully creating and carrying out restrictions in

trade and commerce, increasing of the price and limiting and reducing the supply of Magazine

Paper, and restraining trade and preventing competition for Magazine Paper constitutes willful

and knowing conduct and is unfair or deceptive business acts or practices within the meaning of

G.L. c. 93A.

170.    Defendants' willful and knowing actions were designed to, and had the effect of,

unfairly and deceptively inflating the prices of Magazine Paper and products constituted thereof

sold indirectly to the Plaintiffs and the other members of the Class in the Commonwealth of

Massachusetts.

171.    Defendants' unfair or deceptive acts or practices, ongoing at least during the

period from January 1, 1993 through the present, deliberately targeted and financially burdened

44

consumers in the Commonwealth of Massachusetts, causing them economic harm to be determined at trial.

172.   Each of the Defendants has been served with a demand letter in accordance with G.L. c. 93A, §9, or such service of a demand letter was unnecessary due to the Defendant not maintaining a place of business within the Commonwealth of Massachusetts or not keeping assets within the Commonwealth.

173.   More than thirty days has passed since such demand letters were served, and each Defendant served has failed to make a class-wide settlement offer.

174.   Throughout the Class Period and through this date, Defendants were in exclusive possession and control of information sufficient to allow them to comprehend the nature and extent of the claims of the Class and which information, support and establish Plaintiffs' claims.

175.   Defendants failed to tender a reasonable offer of relief despite exclusive possession and control of information that reasonably established a reason to know that the conduct of which Plaintiffs complained violated G.L. c. 93A, §2.

176.   Defendants' refusal to tender a reasonable offer of settlement to a class of persons that suffered monetary losses and other damages as a result of conduct that they had reason to know violated G.L. c. 93A also supports a claim for treble damages, attorneys' fees, interest, costs and other relief provided for in G.L. c. 93A, §9.

177.   As persons injured directly or indirectly by Defendants' unfair and deceptive conduct, Plaintiffs and the Class are entitled additionally to recover interest on damages, attorneys' fees and costs.

45

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.    Declare that this action is a proper class action pursuant to G.L. c. 93A, § 9(2), on behalf of the Class as defined herein and further order notice of such action to all members of the Class in the most effective practicable manner;

2.    In the alternative, determine that this action be maintained as a class action pursuant to Rule 23 of the Massachusetts Rules of Civil Procedure;

3.    Find that the Defendants, by participating in the contract, combination and conspiracy alleged herein, acted in violation of G.L. c. 93A, § 2;

4.    Award Plaintiffs and members of the Class statutory damages provided under G.L. c. 93A, § 9(3) in an amount deemed fair, reasonable and just under the law;

5.    Allow Plaintiffs and members of the Class to recover their reasonable attorneys' fees and costs as authorized by G.L. c. 93A, §9(4);

6.    Award Plaintiffs and the members of the Class pre-judgment and post-judgment interest on the above sums at the highest rate allowed by law;

7.    Enter an equitable order compelling the Defendants to conduct an accounting of the economic harm they caused Massachusetts consumers; and

8.    Grant such other and further relief as this Court deems to be necessary, proper just and/or equitable under G.L. c. 93A, § 9(3).

DATED:  May 9, 2005

Robert J. Bonsignore, BBO #547880
Robin Brewer, BBO # 639506
Daniel D'Angelo, BBO #630321
BONSIGNORE & BREWER
23 Forest Street
Medford, MA 02155
Telephone:  781-391-9400

47

# BONSIGNORE & BREWER

**TRIAL LAWYERS**
www.bandblaw.net
23 FOREST STREET
MEDFORD, MASSACHUSETTS 02155-3820

VOICE: (781) 391-9400                                                                                    FAX: (781) 391-9496

February 16, 2005

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8863**
International Paper Co.
400 Atlantic Street
Stamford, CT 06921

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8429**
M-real USA Corp.
301 Merritt 7
Norwalk, CT 06851

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8382**
Norske Skog North America LLC
1011 Western Avenue, Suite 700
Seattle, WA 98104

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8436**
S.D. Warren Company
225 Franklin Street
Boston, MA 02110

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8399**
Norske Skog (USA) Holdings, Inc.
2507 Post Road
Southport, CT 06890

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8443**
Norske Skog (USA), Inc.
2507 Post Road
Southport, CT 06890

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8405**
Norske Skog Canada (USA), Inc.
1011 Western Avenue, Suite 700
Seattle, WA 98101

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8450**
Madison International Sales Company
101 Merritt 7
Norwalk, CT 06851

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**7004 1350 0000 3484 8412**
Stora Enso North America Corporation
231 First Avenue North
Wisconsin Rapids, WI 54495

**VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**

Norske Skogindustrier ASA
Oksenoyveien 80
1326 Lysaker, Norway

February 16, 2005
Page 2

**VIA INTERNATIONAL REGISTERED**      **VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**          **RETURN RECEIPT REQUESTED**

Norske Skog Canada Limited            Stora Enso Ojy
250 Howe Street, 16ᵗʰ Floor           Kanavaranta 1
Vancouver, Canada V6C 3R8             FIN-00160
                                      Helsinki, Finland

**VIA INTERNATIONAL REGISTERED**      **VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**          **RETURN RECEIPT REQUESTED**

Myllykoski Corporation                Metsalitto Cooperative
Etelaesplanadi 20                     Revontullentie 6
FIN-00130                             FIN-02100
Helsinki, Finland                     ESPOO, Finland

**VIA INTERNATIONAL REGISTERED**      **VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**          **RETURN RECEIPT REQUESTED**

Sappi Limited                         Metsalitto Group
Sappi House                           P.O.B. 10
48 Ameshoff Street                    FIN-02020
Braamfontein, Johannesburg 2001       METSA, Finland
Republic of South Africa

**VIA INTERNATIONAL REGISTERED**      **VIA INTERNATIONAL REGISTERED**
**RETURN RECEIPT REQUESTED**          **RETURN RECEIPT REQUESTED**

M-real Corporation                    UPM-Kymmene Corporation
FIN-02020                             Etelaesplanadi 2
METSA, Finland                        FIN-00101
                                      Helsinki, Finland

    Re    **Massachusetts Magazine Paper**
              **Demand for Relief Pursuant to G.L. c. 93A §9**

Dear Sir or Madam:

    This office represents Claimants and putative class representatives Joan Guarino and
Trisha Morrissey (hereinafter referred to as "Claimants") and other similarly situated
Massachusetts consumer purchasers of products containing Magazine Paper in their claim for
economic damages and equitable relief. This is a written demand for relief pursuant to

February 16, 2005
Page 3

Massachusetts General Laws Chapter 93A, §9(3). Claimants and each member of the putative class purchased Magazine Paper from you indirectly.

### SUMMARY DEMAND

During the period from January 1, 1990 through the present ("Class Period"), International Paper Co., Norske Skogindustrier ASA, Norske Skog North America LLC, Norske Skog (USA), Inc., Norske Skog (USA) Holdings, Inc., Norske Skog Canada Limited, Norske Skog Canada (USA), Inc., Stora Enso Oyj, Stora Enso North America Corporation, Sappi Limited, S.D. Warren Company, Metsalitto Group, Metsalitto Cooperative, M-real Corporation, M-real USA Corp., UPM-Kymmene Corporation, Myllykoski Corporation, and Madison International Sales Company (hereinafter referred to individually as "Respondent" or "you" and/or collectively as "Respondents") willfully and knowingly engaged in unfair or deceptive acts or practices (inclusively hereinafter referred to as "wrongful", "unlawful" and/or "unfair") in violation of M.G.L. 93A, including but not limited to those referenced in this demand.

Claimants have only recently obtained information supporting this claim that you engaged in a self-concealing conspiracy violative of M.G.L. c. 93A(2) and (9) and caused Claimants and this class to suffer related economic loss. Many facts necessary to calculate the exact economic loss suffered by Claimants and the class remains in your exclusive possession and control. Unless and until you provide us with sales information, profit margins and product pricing information for your sale of Magazine Paper in Massachusetts and the United States sufficient to allow us to calculate the exact economic loss suffered by each Claimant, or until you provide your calculation as to the increase resultant from your practices as described herein, we are limited to demanding the statutory minimum of $25 per Claimant.

In sum, the willful and knowing purpose and effect of your unfair or deceptive conduct was to raise, fix, and maintain the prices of Magazine Paper with the result that claimants and each member of the proposed Class of consumers suffered similar economic injury. The bottom line is that your unfair or deceptive acts and practices caused each class member to suffer an economic loss that can be determined from your exclusive records. At this time and based on the information we possess, our best estimate is that each class member suffered loss and each loss is less than $25 per violation. Each class member suffered under $75,000 in damages.

The Claimants and each similarly situated Massachusetts consumer was economically harmed when they purchased products containing Magazine Paper at an unfairly or deceptively created and/or maintained supra-competitive price created by you during the period January 1, 1990 through the present. This correspondence is tendered as a demand for class wide relief. Please respond accordingly.

The Claimants on behalf of themselves and all other similarly situated Massachusetts consumers demand that Respondents pay restitution or refunds for sums paid to purchase products containing Magazine Paper at a price that exceeded equivalent competitive and fair

February 16, 2005
Page 4

market price for such products, or in the alternative the statutory minimum of $25, whichever is greater. *See* G.L c.93A §9(3).

Take note that Claimants demand that each Respondent refrain from continuing or reinstituting the unfair or deceptive acts or practices described herein. We further demand that you provide written documentation of the date that you stopped the unfair acts and practices described herein. In the alternative, we demand you now agree to this settlement term in writing.

Our position should be clear. While demand has been made on behalf of the Claimants and similarly situated Massachusetts consumers for their actual damages, the information and raw data required to calculate the exact amount of the overcharge remains exclusively in your and the other Respondent's exclusive possession and control. Likewise, the information that would allow Claimants' counsel to determine at this time the exact amount of the overcharge resulting from each Respondent's unfair or deceptive acts or practices, remains in your exclusive possession and control and the exclusive possession and control of the other Respondents. At this point we are requesting that you accept liability and cooperate by providing the data described herein that you have in your possession and control.

In the event that you refuse or claim you are unable to tender an offer to this demand, Claimants request, at a minimum, that you provide factual data supporting your position and refusal to tender an offer. We also request that you provide all sales, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States during the class period. As an aside, it is unnecessary for the Claimants' demand letter to state the nature of any injury that is already known to the defendant. See York v Sullivan et al., 369 Mass. 157, 163 (1975) (holding that plaintiff's demand letter was sufficient to give defendants an opportunity to review the facts and law involved where defendants' response showed that they understood the nature of the grievance).

## THE MAGAZINE PAPER INDUSTRY

Magazine Paper includes both uncoated magazine paper and coated magazine paper. Uncoated magazine paper is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable for mass circulation TV magazines and catalogues. With respect to coated magazine paper, it is available in various matt, silk and glossy grades and is used for special interest and general interest magazines. Other end-uses include supplements, upmarket and home-shopping catalogues, and magazine covers. Each of the Respondents unfairly and deceptively engaged in the manufacture, sale and/or distribution of Magazine Paper throughout the United States and Commonwealth of Massachusetts during the class period.

Respondents Stora Enso Oyj, UPM-Kymmene Corporation, Sappi Limited and Norske Skogindustries ASA are among Europe's largest paper manufacturing groups. Respondent Stora Enso Oyj is the world's largest paper producer. Its primary markets are Europe, North America and Asia.

February 16, 2005
Page 5

Respondent UPM-Kymmene Corporation dominates the magazine paper market as the world's largest Magazine Paper maker, and is one of the top three makers in the world. UPM-Kymmene has 22 paper mills in eight countries, including the U.S., and 3,200 customers in 120 countries.

Respondent Sappi Limited is the largest producer of coated fine paper used for glossy magazines. Sappi Limited sells 43% of its products in Europe and 30% in North America.

Respondent Norske Skogindustries ASA ranks in the top three of Europe's paper business and is the world's larges producer of newspaper. Although Norway is not a part of the European Union, Norske Skogindustries ASA is subject to EU antitrust regulations through a treaty linking the Norwegian and EU markets.

Respondent International Paper Co. is the number one producer of uncoated papers worldwide and coated papers in North America. It is the top paper producer in the United States.

The acts charged in this demand letter as having been done by you and the other Respondents were authorized, ordered or done by officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of your and the other Respondents' business or affairs. All references to any corporate Respondent is intended to also include predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation.

Each Respondent acted in concert and/or as authorized agents of each other from January 1, 1990 to the present. Each Respondent conspired with each other to commit the unlawful, unfair or deceptive acts or practices referenced herein. Each Respondent so transacted business in the Commonwealth of Massachusetts, benefited from Massachusetts laws, and/or caused loss or damage though its acts or omissions.

## CLAIMANTS AND THE PUTATIVE CLASS

All Claimants are residents of the Commonwealth of Massachusetts who purchased and paid artificially inflated prices on products containing Magazine Paper, including but not limited to magazines and other printed paper. Claimants have suffered actual damages and economic harm because the Magazine Paper they indirectly purchased was artificially priced at a wrongfully increased cost as a result of your knowing and willful unfair or deceptive acts and practices. Claimants have also been economically injured because your unfair or deceptive acts and practices denied them their right to purchase consumer products containing Magazine Paper on the basis of and within a free market and open competition. Be clear that within this demand Claimants assert the claims exclusively under G.L. c. 93A, § 2 and §9(2), individually and on behalf the following putative Class:

All resident consumers who purchased for their own use and not for resale in the Commonwealth of Massachusetts, any product containing Magazine Paper

February 16, 2005
Page 6

manufactured or sold by the Respondents between January 1, 1990 and the present.

## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

**Respondents' Unfair or Deceptive Acts or Practices Were Willful and Knowing:**

At or before the beginning of the Class Period, you and the other Respondents participated in secret meetings and engaged in secret conversations to discuss the supply and sale of Magazine Paper. The focus of the conversations were acts or practices intended to unfairly and deceptively increase proposed profits. At the meetings and during those conversations, unfair or deceptive agreements or understandings were entered into by you and other Respondents to unfairly or deceptively artificially fix, raise, maintain and stabilize the prices of Magazine Paper and unfairly or deceptively allocate the market of Magazine Paper.

For the purpose of formulating and effectuating your unfair or deceptive conspiracy, you and each Respondent did those things you and other Respondents combined or conspired to do, including but not limited to:

a.    participating in meetings and conversations to discuss and further carry out unfair or deceptive pricing schemes and/or allocate the market for Magazine Paper to be sold in the Commonwealth of Massachusetts;

b.    agreeing during the meetings and conversations, to unfairly or deceptively cut production and charge prices of the Magazine Paper at certain levels in the Commonwealth of Massachusetts;

c.    issuing price announcements and price quotations in accordance with unfair or deceptive agreements reached;

d.    selling Magazine Paper to customers in the United States and Commonwealth of Massachusetts at unfair or deceptive non-competitive levels; and

e.    unfairly or deceptively agreeing to conceal and keep secret your illegal agreements.

**Concealment of Magazine Paper Conspiracy:**

In willfully and knowingly carrying out unfair or deceptive acts or practices, you and the other Respondents fraudulently, effectively and affirmatively concealed your conspiracy from the putative class representatives and the putative Class. Until recently, you and the other Respondents successfully kept hidden the unfair or deceptive price-fixing conspiracy that was by nature inherently self-concealing.

The wrongful conduct in issue was carried out in part though means and methods that were designed and intended to avoid detection. In fact, you and other Respondents did successfully avoid and preclude detection.

Although the Claimants exercised due diligence, they had no knowledge or reasonable basis for obtaining knowledge of each Respondent's unfair or deceptive acts or practices until at

February 16, 2005
Page 7

the earliest May 24, 2004. On or about that date, announcements were made that the United
States Department of Justice was investigating anti-competitive practices in the sale of Magazine
Paper in the United States and elsewhere.

**Magazine Paper Criminal Investigations:**

Claimants' allegations of unfair or deceptive acts or practices are meritorious and you and
each other Respondent have knowledge of the unfair or deceptive acts or practices for which the
Claimants lodge complaint and demand compensation.

In the spring of 2003, Respondent UPM-Kymmene Corporation initiated an internal
investigation of competitive practices in all of its business units. At the conclusion of its internal
investigation, on January 15, 2004, Respondent UPM-Kymmene Corporation contacted the
competition authorities in the European Union, the United States and Canada. It did so because the
unfair or deceptive acts forming the basis for our claim were brought to light.

On January 30, 2004, two weeks after approaching the competition authorities, UPM-
Kymmene Corporation's CEO, Juha Niemela, resigned. He did so because the unfair or deceptive
acts forming the basis for our claim were becoming clearer.

On May 25, 2004, the United States, Canadian and European authorities launched an
investigation into alleged collusion among the world's top forestry firms. Raids were carried out
by local or European antitrust authorities at UPM-Kymmene Corporation, Stora Enso Oyj,
Metsälitto Group, M-real Corporation, Sappi Limited and Norske Skogindustrier ASA. The unfair
or deceptive acts and practices prompting the raids also support our claim.

On May 25, 2004, the Reuters news agency reported the following:

> A swathe of leading global forestry firms were raided by competition enforcers on
> Tuesday as part of antitrust operations on both sides of the Atlantic regarding price-
> fixing and manipulation of markets for various paper products.

> Raids were carried out by local or European Union antitrust authorities at Finland's
> UPM-Kymmene, Stora Enso, Metsalitto and M-real and Norway's Norske Skog.
> U.S. and Canadian authorities cooperated.

> International Paper Co., the top North American forest products company, said it
> had been contacted by U.S. officials in connection with the probe.

> Later on Tuesday, the U.S. Justice Department confirmed it is investigating
> possible anti-competitive practices in the market for magazine paper. A department
> spokeswoman said the probe covers the sale of magazine paper in the United States
> and elsewhere.

> The investigation also reached South Africa, where pulp and paper maker Sappi
> said its European head office had been raided. The company, the largest producer

February 16, 2005
Page 8

of fine paper used for glossy magazines, said it had agreed to cooperate with EU officials. The reports of the raids by competition enforcers were true. The raids by the competition enforcers were justified and resulted in the forced production of evidence by you. The evidence that was forcibly produced during these raids remains in your exclusive possession and control and is not available to us. The unfair or deceptive acts and practices prompting the raids support our claim.

On May 25, 2004, the United States Department of Justice issued a subpoena for documents to Respondent Stora Enso North America Corporation. The documents that you produced to the United States Department of Justice are unavailable to us. We ask that you produce them. We also ask that you produce all of the documents that were seized in raids by competition authorities or that you otherwise produced pursuant to subpoena. We will, of course, pay the costs for such a production if you offer them to us at this time. We will also agree to enter into a confidentiality arrangement. We have no interest in publicizing your trade secrets or otherwise violating business confidences. We seek to be in a position to present you with an exact determination of the amount of money the Class is due.

On May 25, 2004, Respondent International Paper Co. disclosed that it had been contacted by the United States Department of Justice in connection with the probe into price-fixing in the Magazine Paper market. The acts or practices which are related to this probe support our claim.

Following the raids, the European Commission issued the following press release regarding the investigation:

Following press inquiries, the European Commission's spokesperson for Competition has confirmed that, on 25 May 2004, Commission inspectors, assisted by officials from the national competition authorities of the Member States concerned, launched simultaneous unannounced inspections at the premises of some of the major European producers of paper and forestry products.

The purpose of these inspections is to ascertain whether there is evidence of cartel agreements and related illegal practices concerning price fixing, fixing of other commercial terms, and/or allocation of customers. Several product markets in the European paper and forestry products sector would be affected by the alleged arrangements.

The Commission's spokesperson has also confirmed that the inspections have been carried out in close coordination with competition authorities in a number of EU countries, as well as the US and Canada. The EFTA Surveillance Authority, at the request of the Commission, participated in the inspections at premises of undertakings in the EFTA Member States.

February 16, 2005
Page 9

Surprise inspections are a preliminary step in investigations into suspected cartels. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

Commenting on the investigation, a spokeswoman for the United States Department of Justice stated that the investigation involves "anticompetitive practices in the sale of Magazine Paper in the U.S. and elsewhere."

Canada's Competition Bureau has also confirmed that it was investigating alleged price-fixing and cartel arrangements in the paper and forest products industry.

On May 25, 2004, the EFTA Surveillance Authority, an organization charged with enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and Norway, issued a press release stating:

> Following inquiries from journalists, the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices among EEA-producers of publication paper and amongst acquirers of recovered paper.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices underlying that probe support our claim.

On May 25, 2004, UPM-Kymmene Corporation's General Counsel, Reko Aalto-Setaelae, admitted that the investigation concerns "many" of the company's products and that "unfortunately many of our employees have been involved." Aalto-Setaelae also added that the practices under investigation may date back to the early 20th century. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 25, 2004, Respondent Stora Enso Oyj issued a press release in which it stated the following:

> European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.
>
> Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.
>
> In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice.

February 16, 2005
Page 10

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices related to those visits support our claim.

On May 28, 2004, it was reported that Jukka Harmala, CEO of Respondent Stora Enso Oyj, told a forest industry seminar that "[t]he time span (of the investigation)...is likely not focusing on the past few years, but can go back as far as (the) late eighties."

On May 28, 2004, it was reported that Stora Enso Oyj's CEO stated that the investigation may lead back to the late 1980s.

On May 28, 2004, it was also reported that Carl Bjomherg, CEO of Respondent Myllykoski Corporation, admitted at the same seminar that the industry had been "very much cartelized" during at least a portion of the Class Period. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 28, 2004, Respondent UPM issued a press release and stated the following:

> European Commission investigators have today visited various UPM premises in connection with a Commission investigation of alleged antitrust activities.

> In spring 2003, UPM initiated an internal investigation of competitive practices in all its units. At the same time the company also implemented additional competition law compliance programs for its employees clearly signaling zero tolerance for any antitrust activity.

> On January 15, 2004, after the internal investigation and to follow sound principles of corporate governance UPM decided to approach competition authorities in the European Union, the United States and Canada.

> The EU, several of its member states, and Canadian authorities have informed [sic] that UPM has received conditional full immunity with respect to certain conduct disclosed to the authorities. In the United States, where a grand jury investigation was already pending with respect to [sic] pressure sensitive labelstock business, UPM continues to cooperate with the US Department of Justice in its investigation.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

**Effects of Magazine Paper Conspiracy:**

As a result of Respondents' willful and knowing unfair or deceptive acts or practices:

February 16, 2005
Page 11

    a.    price competition in the sale of Magazine Paper in Massachusetts (and elsewhere) was unfairly or deceptively restrained, suppressed and eliminated;

    b.    prices for Magazine Paper sold by Respondents and their co-conspirators were unfairly or deceptively raised, fixed, maintained or stabilized at artificially high and noncompetitive levels in Massachusetts (and elsewhere); and

    c.    consumers in Massachusetts were economically harmed because they were deprived of the benefit of free and open competition. The exact economic harm is susceptible to proof. At this time, however, you remain in exclusive possession and control of the data required to reach that proof. Again, we request that you voluntarily provide it to us.

## SIMILAR INJURY SUFFERED BY ALL CLASS MEMBERS UNDER G.L. C. 93A

Respondents' willful and knowing, unfair or deceptive acts or practices described herein have caused similar economic injury and damages to Claimants. Each member of the putative Class paid higher out-of-pocket costs because the Respondents' unfair or deceptive acts or practices increased the price they paid for Magazine Paper products above supra-competitive levels. Respondents' unfair or deceptive acts or practices also caused them ascertainable economic loss because the questioned conduct denied them a free choice in a competitive market. Moreover, Claimants and the Class have been injured because their right to purchase consumer products untainted by price-fixing has been invaded.

In addition, Respondents have economically benefited in the nature of revenues from the overcharges they have been able to levy for Magazine Paper, resulting from acts alleged herein and the overpayments by Claimants and the Class for products containing Magazine Paper. Claimants demand that you and the other Respondents disgorge this unfairly or deceptively gained profit and agree in writing never to engage in such conduct again.

Claimants believe Respondents have been unjustly enriched at the expense of Massachusetts consumers and have retained monopoly profits that will also be in the tens of millions of dollars. Claimants and each member of the putative Class are entitled to their actual damages or twenty-five dollars per violation, whichever is greater, plus attorney fees and costs. *See* G.L. c. 93A, §§2 & 9(3). Each Claimant's and each Class member's individual damages do not equal or exceed $75,000. The named Claimants expressly disclaim any individual recovery equal to or in excess of $75,000.

## DEMAND FOR RELIEF

Claimants, on behalf of themselves and all others similarly situated and similarly injured, make the following demands upon each Respondent exclusively under M.G.L. c.93A §§(2) and (9)(2):

February 16, 2005
Page 12

     a.     provide Claimants with sales information, profit margins and product pricing
            information for sale of Magazine Paper in Massachusetts and the United States;

     b.     pay restitution and refunds to Claimants and members of the putative Class for all
            sums paid by them to purchase products containing Magazine Paper at a price
            which exceeds the equivalent competitive market price for such products; or

     c.     pay restitution and refunds to Claimants in the amount of twenty-five dollars a
            person; or

     d.     discharge the unjust profits made from the unfair or deceptive practices described
            herein; and

     e.     cease and desist all agreements to raise, fix, maintain or stabilize the prices of
            Magazine Paper and/or to allocate markets for Magazine Paper.

Demand is also further made that as part of your reasonable offer of settlement, you
respond directly to the following inquiries. Please state:

     a.     Whether you have engaged in communications with other Respondents
            concerning the fixing, raising, maintaining or stabilizing of prices for Magazine
            Paper;

     b.     Whether you have combined with other Respondents to enter into agreements to
            fix, raise, maintain or stabilize the prices of Magazine Paper;

     c.     Whether you engaged in, and/or have combined with others to engage in conduct
            that violates G.L. c. 93A;

     d.     Whether you admit your unfair or deceptive acts or practices have caused the
            alleged legally cognizable injury to the Claimants and putative Class, by
            increasing the prices they have paid for Magazine Paper products above the prices
            that would have prevailed in a competitive market or by limiting product choice
            to consumers in the Commonwealth;

     e.     Whether you admit that you have been unjustly enriched at the expense of
            Massachusetts consumers as a result of your unfair or deceptive acts or practices;

     f.     The nature of and duration of the unfair or deceptive acts and practices alleged
            herein;

     g.     The nature of and extent of damages you calculate were sustained by the putative
            Class; and

February 16, 2005
Page 13

h.    The appropriate measure of damages for those injuries you are willing to offer.

Claimants are willing to enter into a protective order and request that each Respondent agree to produce sales information, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States. This information, which is in each Respondent's exclusive possession, will allow Claimants' counsel to determine a more precise dollar figure on the amount of overcharge per purchase in the Commonwealth as well as the unjust profits made by each Respondent. In the alternative, each Respondent is under a statutory obligation to tender a good faith offer of class wide relief based upon the requested information that remains in your exclusive possession and control.

Please be advised that if you fail to make a reasonable offer of settlement within thirty (30) days of the receipt of this letter, Claimants shall initiate litigation exclusively under G.L. c. 93A, which permits recovery of damages, attorney's fees, and costs. Further, if the Court determines that your conduct was willfully or knowingly unfair or deceptive, the Court must award the Claimants and the Class up to three times, but not less than two times, their actual damages.

Sincerely,

Robert J. Bonsignore

RJB/jl



VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED
7004 1350 0000 3484 8696

MeadWestvaco Corporation
One Highridge Park
Stamford, CT 06905

Re    **Massachusetts Magazine Paper
Demand for Relief Pursuant to G.L.**

Dear Sir or Madam:

This office represents Claimants and putative class representatives Joan Guarino and Trisha Morrissey (hereinafter referred to as "Claimants") and other similarly situated Massachusetts consumer purchasers of products containing Magazine Paper in their claim for economic damages and equitable relief. This is a written demand for relief pursuant to Massachusetts General Laws Chapter 93A, §9(3). Claimants and each member of the putative class purchased Magazine Paper from you indirectly.

## SUMMARY DEMAND

During the period from January 1, 1990 through the present ("Class Period"), International Paper Co., Norske Skogindustrier ASA, Norske Skog North America LLC, Norske Skog (USA), Inc., Norske Skog (USA) Holdings, Inc., Norske Skog Canada Limited, Norske Skog Canada (USA), Inc., Stora Enso Oyj, Stora Enso North America Corporation, Sappi Limited, S.D. Warren Company, Metsalitto Group, Metsalitto Cooperative, M-real Corporation, M-real USA Corp., UPM-Kymmene Corporation, Myllykoski Corporation, Madison International Sales Company, and MeadWestvaco Corporation (hereinafter referred to individually as "Respondent" or "you" and/or collectively as "Respondents") willfully and knowingly engaged in unfair or deceptive acts or practices (inclusively hereinafter referred to as

March 17, 2005
Page 2

"wrongful", "unlawful" and/or "unfair") in violation of M.G.L. 93A, including but not limited to those referenced in this demand.

Claimants have only recently obtained information supporting this claim that you engaged in a self-concealing conspiracy violative of M.G.L. c. 93A(2) and (9) and caused Claimants and this class to suffer related economic loss. Many facts necessary to calculate the exact economic loss suffered by Claimants and the class remains in your exclusive possession and control. Unless and until you provide us with sales information, profit margins and product pricing information for your sale of Magazine Paper in Massachusetts and the United States sufficient to allow us to calculate the exact economic loss suffered by each Claimant, or until you provide your calculation as to the increase resultant from your practices as described herein, we are limited to demanding the statutory minimum of $25 per Claimant.

In sum, the willful and knowing purpose and effect of your unfair or deceptive conduct was to raise, fix, and maintain the prices of Magazine Paper with the result that claimants and each member of the proposed Class of consumers suffered similar economic injury. The bottom line is that your unfair or deceptive acts and practices caused each class member to suffer an economic loss that can be determined from your exclusive records. At this time and based on the information we possess, our best estimate is that each class member suffered loss and each loss is less than $25 per violation. Each class member suffered under $75,000 in damages.

The Claimants and each similarly situated Massachusetts consumer was economically harmed when they purchased products containing Magazine Paper at an unfairly or deceptively created and/or maintained supra-competitive price created by you during the period January 1, 1990 through the present. This correspondence is tendered as a demand for class wide relief. Please respond accordingly.

The Claimants on behalf of themselves and all other similarly situated Massachusetts consumers demand that Respondents pay restitution or refunds for sums paid to purchase products containing Magazine Paper at a price that exceeded equivalent competitive and fair market price for such products, or in the alternative the statutory minimum of $25, whichever is greater. See G.L c.93A §9(3).

Take note that Claimants demand that each Respondent refrain from continuing or reinstituting the unfair or deceptive acts or practices described herein. We further demand that you provide written documentation of the date that you stopped the unfair acts and practices described herein. In the alternative, we demand you now agree to this settlement term in writing.

Our position should be clear. While demand has been made on behalf of the Claimants and similarly situated Massachusetts consumers for their actual damages, the information and raw data required to calculate the exact amount of the overcharge remains exclusively in your and the other Respondent's exclusive possession and control. Likewise, the information that would allow Claimants' counsel to determine at this time the exact amount of the overcharge resulting from each Respondent's unfair or deceptive acts or practices, remains in your exclusive

March 17, 2005
Page 3

possession and control and the exclusive possession and control of the other Respondents. At this point we are requesting that you accept liability and cooperate by providing the data described herein that you have in your possession and control.

In the event that you refuse or claim you are unable to tender an offer to this demand, Claimants request, at a minimum, that you provide factual data supporting your position and refusal to tender an offer. We also request that you provide all sales, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States during the class period. As an aside, it is unnecessary for the Claimants' demand letter to state the nature of any injury that is already known to the defendant. See York v Sullivan et al., 369 Mass. 157, 163 (1975) (holding that plaintiff's demand letter was sufficient to give defendants an opportunity to review the facts and law involved where defendants' response showed that they understood the nature of the grievance).

## THE MAGAZINE PAPER INDUSTRY

Magazine Paper includes both uncoated magazine paper and coated magazine paper. Uncoated magazine paper is used mainly for periodicals and advertising material, such as inserts and flyers. It is also suitable for mass circulation TV magazines and catalogues. With respect to coated magazine paper, it is available in various matt, silk and glossy grades and is used for special interest and general interest magazines. Other end-uses include supplements, upmarket and home-shopping catalogues, and magazine covers. Each of the Respondents unfairly and deceptively engaged in the manufacture, sale and/or distribution of Magazine Paper throughout the United States and Commonwealth of Massachusetts during the class period.

Respondents Stora Enso Oyj, UPM-Kymmene Corporation, Sappi Limited and Norske Skogindustries ASA are among Europe's largest paper manufacturing groups. Respondent Stora Enso Oyj is the world's largest paper producer. Its primary markets are Europe, North America and Asia.

Respondent UPM-Kymmene Corporation dominates the magazine paper market as the world's largest Magazine Paper maker, and is one of the top three makers in the world. UPM-Kymmene has 22 paper mills in eight countries, including the U.S., and 3,200 customers in 120 countries.

Respondent Sappi Limited is the largest producer of coated fine paper used for glossy magazines. Sappi Limited sells 43% of its products in Europe and 30% in North America.

Respondent Norske Skogindustries ASA ranks in the top three of Europe's paper business and is the world's larges producer of newspaper. Although Norway is not a part of the European Union, Norske Skogindustries ASA is subject to EU antitrust regulations through a treaty linking the Norwegian and EU markets.

March 17, 2005
Page 4

Respondent International Paper Co. is the number one producer of uncoated papers worldwide and coated papers in North America. It is the top paper producer in the United States.

Respondent MeadWestvaco is one of the top producers of uncoated and coated paper in the United States.

The acts charged in this demand letter as having been done by you and the other Respondents were authorized, ordered or done by officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control, or transaction of your and the other Respondents' business or affairs. All references to any corporate Respondent is intended to also include predecessors, successors, parents, subsidiaries, affiliates, and divisions of that corporation.

Each Respondent acted in concert and/or as authorized agents of each other from January 1, 1990 to the present. Each Respondent conspired with each other to commit the unlawful, unfair or deceptive acts or practices referenced herein. Each Respondent so transacted business in the Commonwealth of Massachusetts, benefited from Massachusetts laws, and/or caused loss or damage though its acts or omissions.

## CLAIMANTS AND THE PUTATIVE CLASS

All Claimants are residents of the Commonwealth of Massachusetts who purchased and paid artificially inflated prices on products containing Magazine Paper, including but not limited to magazines and other printed paper. Claimants have suffered actual damages and economic harm because the Magazine Paper they indirectly purchased was artificially priced at a wrongfully increased cost as a result of your knowing and willful unfair or deceptive acts and practices. Claimants have also been economically injured because your unfair or deceptive acts and practices denied them their right to purchase consumer products containing Magazine Paper on the basis of and within a free market and open competition. Be clear that within this demand Claimants assert the claims exclusively under G.L. c. 93A, § 2 and §9(2), individually and on behalf the following putative Class:

All resident consumers who purchased for their own use and not for resale in the Commonwealth of Massachusetts, any product containing Magazine Paper manufactured or sold by the Respondents between January 1, 1990 and the present.

## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

**Respondents' Unfair or Deceptive Acts or Practices Were Willful and Knowing:**

At or before the beginning of the Class Period, you and the other Respondents participated in secret meetings and engaged in secret conversations to discuss the supply and sale of Magazine Paper. The focus of the conversations were acts or practices intended to unfairly

March 17, 2005
Page 5

and deceptively increase proposed profits. At the meetings and during those conversations, unfair or deceptive agreements or understandings were entered into by you and other Respondents to unfairly or deceptively artificially fix, raise, maintain and stabilize the prices of Magazine Paper and unfairly or deceptively allocate the market of Magazine Paper.

For the purpose of formulating and effectuating your unfair or deceptive conspiracy, you and each Respondent did those things you and other Respondents combined or conspired to do, including but not limited to:

a.     participating in meetings and conversations to discuss and further carry out unfair or deceptive pricing schemes and/or allocate the market for Magazine Paper to be sold in the Commonwealth of Massachusetts;

b.     agreeing during the meetings and conversations, to unfairly or deceptively cut production and charge prices of the Magazine Paper at certain levels in the Commonwealth of Massachusetts;

c.     issuing price announcements and price quotations in accordance with unfair or deceptive agreements reached;

d.     selling Magazine Paper to customers in the United States and Commonwealth of Massachusetts at unfair or deceptive non-competitive levels; and

e.     unfairly or deceptively agreeing to conceal and keep secret your illegal agreements.

**Concealment of Magazine Paper Conspiracy:**

In willfully and knowingly carrying out unfair or deceptive acts or practices, you and the other Respondents fraudulently, effectively and affirmatively concealed your conspiracy from the putative class representatives and the putative Class. Until recently, you and the other Respondents successfully kept hidden the unfair or deceptive price-fixing conspiracy that was by nature inherently self-concealing.

The wrongful conduct in issue was carried out in part though means and methods that were designed and intended to avoid detection. In fact, you and other Respondents did successfully avoid and preclude detection.

Although the Claimants exercised due diligence, they had no knowledge or reasonable basis for obtaining knowledge of each Respondent's unfair or deceptive acts or practices until at the earliest May 24, 2004. On or about that date, announcements were made that the United States Department of Justice was investigating anti-competitive practices in the sale of Magazine Paper in the United States and elsewhere.

**Magazine Paper Criminal Investigations:**

Claimants' allegations of unfair or deceptive acts or practices are meritorious and you and each other Respondent have knowledge of the unfair or deceptive acts or practices for which the Claimants lodge complaint and demand compensation.

March 17, 2005
Page 6

In the spring of 2003, Respondent UPM-Kymmene Corporation initiated an internal investigation of competitive practices in all of its business units. At the conclusion of its internal investigation, on January 15, 2004, Respondent UPM-Kymmene Corporation contacted the competition authorities in the European Union, the United States and Canada. It did so because the unfair or deceptive acts forming the basis for our claim were brought to light.

On January 30, 2004, two weeks after approaching the competition authorities, UPM-Kymmene Corporation's CEO, Juha Niemela, resigned. He did so because the unfair or deceptive acts forming the basis for our claim were becoming clearer.

On May 25, 2004, the United States, Canadian and European authorities launched an investigation into alleged collusion among the world's top forestry firms. Raids were carried out by local or European antitrust authorities at UPM-Kymmene Corporation, Stora Enso Oyj, Metsalitto Group, M-real Corporation, Sappi Limited and Norske Skogindustrier ASA. The unfair or deceptive acts and practices prompting the raids also support our claim.

On May 25, 2004, the Reuters news agency reported the following:

A swathe of leading global forestry firms were raided by competition enforcers on Tuesday as part of antitrust operations on both sides of the Atlantic regarding price-fixing and manipulation of markets for various paper products.

Raids were carried out by local or European Union antitrust authorities at Finland's UPM-Kymmene, Stora Enso, Metsalitto and M-real and Norway's Norske Skog. U.S. and Canadian authorities cooperated.

International Paper Co., the top North American forest products company, said it had been contacted by U.S. officials in connection with the probe.

Later on Tuesday, the U.S. Justice Department confirmed it is investigating possible anti-competitive practices in the market for magazine paper. A department spokeswoman said the probe covers the sale of magazine paper in the United States and elsewhere.

The investigation also reached South Africa, where pulp and paper maker Sappi said its European head office had been raided. The company, the largest producer of fine paper used for glossy magazines, said it had agreed to cooperate with EU officials. The reports of the raids by competition enforcers were true. The raids by the competition enforcers were justified and resulted in the forced production of evidence by you. The evidence that was forcibly produced during these raids remains in your exclusive possession and control and is not available to us. The unfair or deceptive acts and practices prompting the raids support our claim.

March 17, 2005
Page 7

On May 25, 2004, the United States Department of Justice issued a subpoena for documents to Respondent Stora Enso North America Corporation. The documents that you produced to the United States Department of Justice are unavailable to us. We ask that you produce them. We also ask that you produce all of the documents that were seized in raids by competition authorities or that you otherwise produced pursuant to subpoena. We will, of course, pay the costs for such a production if you offer them to us at this time. We will also agree to enter into a confidentiality arrangement. We have no interest in publicizing your trade secrets or otherwise violating business confidences. We seek to be in a position to present you with an exact determination of the amount of money the Class is due.

On May 25, 2004, Respondent International Paper Co. disclosed that it had been contacted by the United States Department of Justice in connection with the probe into price-fixing in the Magazine Paper market. The acts or practices which are related to this probe support our claim.

Following the raids, the European Commission issued the following press release regarding the investigation:

> Following press inquiries, the European Commission's spokesperson for Competition has confirmed that, on 25 May 2004, Commission inspectors, assisted by officials from the national competition authorities of the Member States concerned, launched simultaneous unannounced inspections at the premises of some of the major European producers of paper and forestry products.
>
> The purpose of these inspections is to ascertain whether there is evidence of cartel agreements and related illegal practices concerning price fixing, fixing of other commercial terms, and/or allocation of customers. Several product markets in the European paper and forestry products sector would be affected by the alleged arrangements.
>
> The Commission's spokesperson has also confirmed that the inspections have been carried out in close coordination with competition authorities in a number of EU countries, as well as the US and Canada. The EFTA Surveillance Authority, at the request of the Commission, participated in the inspections at premises of undertakings in the EFTA Member States.

Surprise inspections are a preliminary step in investigations into suspected cartels. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

Commenting on the investigation, a spokeswoman for the United States Department of Justice stated that the investigation involves "anticompetitive practices in the sale of Magazine Paper in the U.S. and elsewhere."

March 17, 2005
Page 8

Canada's Competition Bureau has also confirmed that it was investigating alleged price-fixing and cartel arrangements in the paper and forest products industry.

On May 25, 2004, the EFTA Surveillance Authority, an organization charged with enforcing competition laws with respect to EFTA Member States Iceland, Liechtenstein and Norway, issued a press release stating:

> Following inquiries from journalists, the EFTA Surveillance Authority confirms that on 25 May 2004, inspectors from the EFTA Surveillance Authority, assisted by officials from the Norwegian Competition Authority, carried out an unannounced inspection at the premises of a producer of publication paper in Norway. The purposes of the inspection is to ascertain whether there is evidence of cartel agreements and related illegal practices among EEA producers of publication paper and amongst acquirers of recovered paper.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices underlying that probe support our claim.

On May 25, 2004, UPM-Kymmene Corporation's General Counsel, Reko Aalto-Setaelae, admitted that the investigation concerns "many" of the company's products and that "unfortunately many of our employees have been involved." Aalto-Setaelae also added that the practices under investigation may date back to the early 20th century. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 25, 2004, Respondent Stora Enso Oyj issued a press release in which it stated the following:

> European Commission competition investigators have today visited Stora Enso's premises in London, Stockholm, and Dusseldorf.
>
> Representatives of the Finnish Competition Authority visited Stora Enso Forest's office at Imatra and regional offices at Summa, Joensuu, Savonlinna and Kuopio in Finland.
>
> In addition, the Company's North American division has received a subpoena for documents from the Antitrust Division of the US Department of Justice.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel. The acts or practices related to those visits support our claim.

On May 28, 2004, it was reported that Jukka Harmala, CEO of Respondent Stora Enso Oyj, told a forest industry seminar that "[t]he time span (of the investigation)...is likely not focusing on the past few years, but can go back as far as (the) late eighties."

March 17, 2005
Page 9

On May 28, 2004, it was reported that Stora Enso Oyj's CEO stated that the investigation may lead back to the late 1980s.

On May 28, 2004, it was also reported that Carl Bjornberg, CEO of Respondent Myllykoski Corporation, admitted at the same seminar that the industry had been "very much cartelized" during at least a portion of the Class Period. In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

On May 28, 2004, Respondent UPM issued a press release and stated the following:

> European Commission investigators have today visited various UPM premises in connection with a Commission investigation of alleged antitrust activities.

> In spring 2003, UPM initiated an internal investigation of competitive practices in all its units. At the same time the company also implemented additional competition law compliance programs for its employees clearly signaling zero tolerance for any antitrust activity.

> On January 15, 2004, after the internal investigation and to follow sound principles of corporate governance UPM decided to approach competition authorities in the European Union, the United States and Canada.

> The EU, several of its member states, and Canadian authorities have informed [sic] that UPM has received conditional full immunity with respect to certain conduct disclosed to the authorities. In the United States, where a grand jury investigation was already pending with respect to [sic] pressure sensitive labelstock business, UPM continues to cooperate with the US Department of Justice in its investigation.

In fact, you and the other Respondents engaged in unfair or deceptive acts and practices and operated as an unlawful cartel.

**Effects of Magazine Paper Conspiracy:**

As a result of Respondents' willful and knowing unfair or deceptive acts or practices:

a.    price competition in the sale of Magazine Paper in Massachusetts (and elsewhere) was unfairly or deceptively restrained, suppressed and eliminated;

b.    prices for Magazine Paper sold by Respondents and their co-conspirators were unfairly or deceptively raised, fixed, maintained or stabilized at artificially high and noncompetitive levels in Massachusetts (and elsewhere); and

c.    consumers in Massachusetts were economically harmed because they were deprived of the benefit of free and open competition. The exact economic harm is susceptible to proof. At this time, however, you remain in exclusive possession

March 17, 2005
Page 10

and control of the data required to reach that proof. Again, we request that you voluntarily provide it to us.

## SIMILAR INJURY SUFFERED BY ALL CLASS MEMBERS UNDER G.L. C. 93A

Respondents' willful and knowing, unfair or deceptive acts or practices described herein have caused similar economic injury and damages to Claimants. Each member of the putative Class paid higher out-of-pocket costs because the Respondents' unfair or deceptive acts or practices increased the price they paid for Magazine Paper products above supra-competitive levels. Respondents' unfair or deceptive acts or practices also caused them ascertainable economic loss because the questioned conduct denied them a free choice in a competitive market. Moreover, Claimants and the Class have been injured because their right to purchase consumer products untainted by price-fixing has been invaded.

In addition, Respondents have economically benefited in the nature of revenues from the overcharges they have been able to levy for Magazine Paper, resulting from acts alleged herein and the overpayments by Claimants and the Class for products containing Magazine Paper. Claimants demand that you and the other Respondents disgorge this unfairly or deceptively gained profit and agree in writing never to engage in such conduct again.

Claimants believe Respondents have been unjustly enriched at the expense of Massachusetts consumers and have retained monopoly profits that will also be in the tens of millions of dollars. Claimants and each member of the putative Class are entitled to their actual damages or twenty-five dollars per violation, whichever is greater, plus attorney fees and costs. *See* G.L. c. 93A, §§2 & 9(3). Each Claimant's and each Class member's individual damages do not equal or exceed $75,000. The named Claimants expressly disclaim any individual recovery equal to or in excess of $75,000.

## DEMAND FOR RELIEF

Claimants, on behalf of themselves and all others similarly situated and similarly injured, make the following demands upon each Respondent exclusively under M.G.L. c.93A §§(2) and (9)(2):

   a.   provide Claimants with sales information, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and the United States;

   b.   pay restitution and refunds to Claimants and members of the putative Class for all sums paid by them to purchase products containing Magazine Paper at a price which exceeds the equivalent competitive market price for such products; or

March 17, 2005
Page 11

c.  pay restitution and refunds to Claimants in the amount of twenty-five dollars a person; or

d.  discharge the unjust profits made from the unfair or deceptive practices described herein; and

e.  cease and desist all agreements to raise, fix, maintain or stabilize the prices of Magazine Paper and/or to allocate markets for Magazine Paper.

Demand is also further made that as part of your reasonable offer of settlement, you respond directly to the following inquiries. Please state:

a.  Whether you have engaged in communications with other Respondents concerning the fixing, raising, maintaining or stabilizing of prices for Magazine Paper;

b.  Whether you have combined with other Respondents to enter into agreements to fix, raise, maintain or stabilize the prices of Magazine Paper;

c.  Whether you engaged in, and/or have combined with others to engage in conduct that violates G.L. c. 93A;

d.  Whether you admit your unfair or deceptive acts or practices have caused the alleged legally cognizable injury to the Claimants and putative Class, by increasing the prices they have paid for Magazine Paper products above the prices that would have prevailed in a competitive market or by limiting product choice to consumers in the Commonwealth;

e.  Whether you admit that you have been unjustly enriched at the expense of Massachusetts consumers as a result of your unfair or deceptive acts or practices;

f.  The nature of and duration of the unfair or deceptive acts and practices alleged herein;

g.  The nature of and extent of damages you calculate were sustained by the putative Class; and

h.  The appropriate measure of damages for those injuries you are willing to offer.

Claimants are willing to enter into a protective order and request that each Respondent agree to produce sales information, profit margins and product pricing information for sale of Magazine Paper in Massachusetts and throughout the United States. This information, which is in each Respondent's exclusive possession, will allow Claimants' counsel to determine a more precise dollar figure on the amount of overcharge per purchase in the Commonwealth as well as

March 17, 2005
Page 12

the unjust profits made by each Respondent. In the alternative, each Respondent is under a statutory obligation to tender a good faith offer of class wide relief based upon the requested information that remains in your exclusive possession and control.

Please be advised that if you fail to make a reasonable offer of settlement within thirty (30) days of the receipt of this letter, Claimants shall initiate litigation exclusively under G.L. c. 93A, which permits recovery of damages, attorney's fees, and costs. Further, if the Court determines that your conduct was willfully or knowingly unfair or deceptive, the Court must award the Claimants and the Class up to three times, but not less than two times, their actual damages.

Sincerely,

Robert J. Bonsignore

RJB/jl

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

NOTICE TO DEFENDANT.— You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

MIDDLESEX...., ss
[seal]

**SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION**

No.

## 05–0539

.Barbara.Aceto,..et.al.,...... .Plaintiff(s)

v.

International
Paper Co., et al. .Defendant(s)

Attn: Heikki Malinen or Treasurer, Clerk, Secretary or Other Officer in
Charge
UPM-Kymmene Inc.
999 Oakmont Plaza Drive, Suite 200
Westmont, IL 60559         **SUMMONS**

Robert Bonsignore, Esq.
23 Forest Street
Medford, MA 02155

**To the above-named Defendant:**

You are hereby summoned and required to serve upon .................................................

........................................, plaintiff's attorney, whose address is ..................................

.................................................................... .an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at .....360...........

.Gorham.St,.Lowell,.MA..01852.. either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness,   **Barbara J. Rouse**   Esquire, at ......................................................

the ...................................................... day of .......................................

........................ in the year of our Lord one thousand nine hundred and

*Edward J Sullivan*
**Clerk**

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.

COMMONWEALTH OF MASSACHUSETTS

......MIDDLESEX.....ss.

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

No.

.................... Plff.

v.

.................... Deft.

SUMMONS
(Mass. R. Civ. P. 4)

(—————————————)
(········ 61 ································)
(—————————————)

N.B. TO PROCESS SERVER:

PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX
ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

Dated:·········································· 19········

·························································
·························································
·························································
·························································

upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

19········ I served a copy of the within summons, together with a copy of the complaint in this action,

I hereby certify and return that on ······························································

PROOF OF SERVICE OF PROCESS

**CT** CORPORATION
A WoltersKluwer Company

**Service of Process
Transmittal**
05/13/2005
Log Number 510210807

**TO:**  Sarah Manchester
S. D. Warren Company
225 Franklin Steet
Boston, MA, 02110-

**RE:**  **Process Served in Massachusetts**

**FOR:**  S.D. Warren Company (Domestic State: PA)

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

**TITLE OF ACTION:**  Barbara Aceto, et al., Pltfs. vs. International Paper Co., et al., including S.D. Warren Company Dfts.

**DOCUMENT(S) SERVED:**  Summons, Civil Action

**COURT/AGENCY:**  Middlesex County Superior Court House, MA
Case # 05-0539

**NATURE OF ACTION:**  The plaintiff states, the defendants' conspiracy has involved unfair and deceptive conduct by an international cartel that has economically harmed consumers and other indirect purchasers in Mass.

**ON WHOM PROCESS WAS SERVED:**  C T Corporation System, Boston, MA

**DATE AND HOUR OF SERVICE:**  By Regular Mail on 05/12/2005

**APPEARANCE OR ANSWER DUE:**  Within 20 Days

**ATTORNEY(S) / SENDER(S):**  Robert J. Bonsignore, Esq.
Bonsignore & Brewer
23 Forest Street
Medford, MA, 02155
781-391-9400

MAY 1 8 2005

**ACTION ITEMS:**  SOP Papers with Transmittal, via Fed Ex 2 Day, 791072371232

**SIGNED:**  C T Corporation System
**PER:**  Dahriena Mitchell
**ADDRESS:**  101 Federal Street
Boston, MA, 02110
**TELEPHONE:**  617-757-6403

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action.

TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —
TORT — MOTOR VEHICLE TORT — CONTRACT —
EQUITABLE RELIEF — OTHER

## COMMONWEALTH OF MASSACHUSETTS

........MIDDLESEX........ ss.
          [seal]

.....Barbara..Aceto,..et..al........ Plaintiff(s)

v.

International
Paper Co., et al. ............... Defendant(s)

S.D. Warren Company
C/O CT Corporation System
101 Federal Street
Boston, MA 02110

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

No.
05-0539

### SUMMONS

To the above-named Defendant:

Robert Bonsignore, Esq.
23 Forest Street
Medford, MA 02155

   You are hereby summoned and required to serve upon ..................................................

.............................., plaintiff's attorney, whose address is ......................................

.......................................................... an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at .....360...........

Gorham..St...Lowell,..MA..01852.. either before service upon plaintiff's attorney or within a

reasonable time thereafter.

   Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

   Witness,  Barbara J. Rouse  Esquire, at ..................................................

the ................................................... day of ........................................

......................, in the year of our Lord one thousand nine hundred and

Edward J Sullivan
                                                                        Clerk

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used
   for each defendant, each should be addressed to the particular defendant.

NOTICE TO DEFENDANT - You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ....................................................................

19 ........,I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

....................................................................................................................

....................................................................................................................

....................................................................................................................

.........................................................................

Dated: ...................................................................... 19 ........

## N.B. TO PROCESS SERVER:
### PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

( ————————————————— )
( ...................................,19 ....... )
( ————————————————— )

COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION
No.

......MIDDLESEX...,ss.

........................................, Plff.

v.

........................................, Deft.

SUMMONS
(Mass. R. Civ. P. 4)

## Commonwealth of Massachusetts
### County of Middlesex
### The Superior Court

CIVIL DOCKET# **MICV2005-00539-L**

RE:   **Aceto, On Behalf Of Itself And All Others Similalry Situtate v International Paper Company et al**

TO:Robert Bonsignore, Esquire
    23 Forest Street
    Medford, MA 02155

### TRACKING ORDER - F TRACK

You are hereby notified that this case is on the **fast (F) track** as per Superior Court Standing Order 1-88. The order requires that the various stages of litigation described below must be completed not later than the deadlines indicated.

| STAGES OF LITIGATION | DEADLINE |
|---|---|
| Service of process made and return filed with the Court | 05/16/2005 |
| Response to the complaint filed (also see MRCP 12) | 07/15/2005 |
| All motions under MRCP 12, 19, and 20 filed | 07/15/2005 |
| All motions under MRCP 15 filed | 07/15/2005 |
| All discovery requests and depositions completed | 12/12/2005 |
| All motions under MRCP 56 served and heard | 01/11/2006 |
| Final pre-trial conference held and firm trial date set | 02/10/2006 |
| Case disposed | 04/11/2006 |

The final pre-trial deadline is **not the scheduled date of the conference**.  You will be notified of that date at a later time.
**Counsel for plaintiff must serve this tracking order on defendant before the deadline for filing return of service.**
This case is assigned to session L sitting in **Cv CrtRm (Lowell) at Middlesex Superior Court.**

Dated: 05/09/2005

Edward J. Sullivan
Clerk of the Courts
BY: Michael Brennan
Assistant Clerk

Location: Cv CrtRm (Lowell)
Telephone: 978-453-0201

**TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED: —**
**TORT — MOTOR VEHICLE TORT — CONTRACT —**
**EQUITABLE RELIEF — OTHER**

## COMMONWEALTH OF MASSACHUSETTS

<div style="text-align:right">

**SUPERIOR COURT**
**DEPARTMENT**
**OF THE**
**TRIAL COURT**
**CIVIL ACTION**

No. **05-0539**

</div>

...... **MIDDLESEX** ...... ,
[seal]

...Barbara Aceto, et al...... Plaintiff(s)

v.

International
Paper Co., et al. ............ Defendant(s)

Meadwestvaco Corporation
C/O CT Corporation System
101 Federal Street
Boston, MA 02110

### SUMMONS

Robert Bensignore, Esq.
23 Forest Street
Medford, MA 02155

**To the above-named Defendant:**

You are hereby summoned and required to serve upon ................................................

....................................... plaintiff's attorney, whose address is ....................................

..................................................................... , an answer to the complaint which is herewith

served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you

fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also

required to file your answer to the complaint in the office of the Clerk of this court at ....360............

.Gorham St. Lowell, MA 01852... either before service upon plaintiff's attorney or within a

reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may

have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's

claim or you will thereafter be barred from making such claim in any other action.

Witness,   **Barbara J. Rouse**   Esquire, at ..........................................................

the ......................................................... day of ...........................................

...................... , in the year of our Lord one thousand nine hundred and

*Edward J Sullivan*
**Clerk**

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office

**NOTES.**
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used
for each defendant, each should be addressed to the particular defendant.

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ...........................................................................

19 ........ ,I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

...................................................................................................................

...................................................................................................................

...................................................................................................................

...................................................................................

Dated: ...................................................................... 19 ........

## N.B. TO PROCESS SERVER:
### PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.

( ─────────────────── )
(            ................................. 19 ....... )
( ─────────────────── )

COMMONWEALTH OF MASSACHUSETTS

SUPERIOR COURT
DEPARTMENT
OF THE
TRIAL COURT
CIVIL ACTION

No.

MIDDLESEX ... ss.

.......................... , Plff.

v.

.......................... , Deft.

SUMMONS
(Mass. R. Civ. P. 4)

Exhibit D

PUBLIC LAW 109–2—FEB. 18, 2005

CLASS ACTION FAIRNESS ACT OF 2005

119 STAT. 4          PUBLIC LAW 109–2—FEB. 18, 2005

## Public Law 109–2
## 109th Congress

### An Act

Feb. 18, 2005

[S. 5]

To amend the procedures that apply to consideration of interstate class actions to assure fairer outcomes for class members and defendants, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Class Action Fairness Act of 2005.

28 USC 1 note.

### SECTION 1. SHORT TITLE; REFERENCE; TABLE OF CONTENTS.

(a) SHORT TITLE.—This Act may be cited as the "Class Action Fairness Act of 2005".

(b) REFERENCE.—Whenever in this Act reference is made to an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of title 28, United States Code.

(c) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title; reference; table of contents.
Sec. 2. Findings and purposes.
Sec. 3. Consumer class action bill of rights and improved procedures for interstate class actions.
Sec. 4. Federal district court jurisdiction for interstate class actions.
Sec. 5. Removal of interstate class actions to Federal district court.
Sec. 6. Report on class action settlements.
Sec. 7. Enactment of Judicial Conference recommendations.
Sec. 8. Rulemaking authority of Supreme Court and Judicial Conference.
Sec. 9. Effective date.

28 USC 1711 note.

### SEC. 2. FINDINGS AND PURPOSES.

(a) FINDINGS.—Congress finds the following:

(1) Class action lawsuits are an important and valuable part of the legal system when they permit the fair and efficient resolution of legitimate claims of numerous parties by allowing the claims to be aggregated into a single action against a defendant that has allegedly caused harm.

(2) Over the past decade, there have been abuses of the class action device that have—

(A) harmed class members with legitimate claims and defendants that have acted responsibly;

(B) adversely affected interstate commerce; and

(C) undermined public respect for our judicial system.

(3) Class members often receive little or no benefit from class actions, and are sometimes harmed, such as where—

(A) counsel are awarded large fees, while leaving class members with coupons or other awards of little or no value;

(B) unjustified awards are made to certain plaintiffs at the expense of other class members; and

PUBLIC LAW 109–2—FEB. 18, 2005          119 STAT. 5

(C) confusing notices are published that prevent class members from being able to fully understand and effectively exercise their rights.

(4) Abuses in class actions undermine the national judicial system, the free flow of interstate commerce, and the concept of diversity jurisdiction as intended by the framers of the United States Constitution, in that State and local courts are—

(A) keeping cases of national importance out of Federal court;

(B) sometimes acting in ways that demonstrate bias against out-of-State defendants; and

(C) making judgments that impose their view of the law on other States and bind the rights of the residents of those States.

(b) PURPOSES.—The purposes of this Act are to—

(1) assure fair and prompt recoveries for class members with legitimate claims;

(2) restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction; and

(3) benefit society by encouraging innovation and lowering consumer prices.

### SEC. 3. CONSUMER CLASS ACTION BILL OF RIGHTS AND IMPROVED PROCEDURES FOR INTERSTATE CLASS ACTIONS.

(a) IN GENERAL.—Part V is amended by inserting after chapter 113 the following:

## "CHAPTER 114—CLASS ACTIONS

"Sec.
"1711. Definitions.
"1712. Coupon settlements.
"1713. Protection against loss by class members.
"1714. Protection against discrimination based on geographic location.
"1715. Notifications to appropriate Federal and State officials.

### "§ 1711. Definitions

"In this chapter:

"(1) CLASS.—The term 'class' means all of the class members in a class action.

"(2) CLASS ACTION.—The term 'class action' means any civil action filed in a district court of the United States under rule 23 of the Federal Rules of Civil Procedure or any civil action that is removed to a district court of the United States that was originally filed under a State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representatives as a class action.

"(3) CLASS COUNSEL.—The term 'class counsel' means the persons who serve as the attorneys for the class members in a proposed or certified class action.

"(4) CLASS MEMBERS.—The term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(5) PLAINTIFF CLASS ACTION.—The term 'plaintiff class action' means a class action in which class members are plaintiffs.

PUBLIC LAW 109–2—FEB. 18, 2005

"(6) PROPOSED SETTLEMENT.—The term 'proposed settlement' means an agreement regarding a class action that is subject to court approval and that, if approved, would be binding on some or all class members.

## "§ 1712. Coupon settlements

"(a) CONTINGENT FEES IN COUPON SETTLEMENTS.—If a proposed settlement in a class action provides for a recovery of coupons to a class member, the portion of any attorney's fee award to class counsel that is attributable to the award of the coupons shall be based on the value to class members of the coupons that are redeemed.

"(b) OTHER ATTORNEY'S FEE AWARDS IN COUPON SETTLEMENTS.—

"(1) IN GENERAL.—If a proposed settlement in a class action provides for a recovery of coupons to class members, and a portion of the recovery of the coupons is not used to determine the attorney's fee to be paid to class counsel, any attorney's fee award shall be based upon the amount of time class counsel reasonably expended working on the action.

"(2) COURT APPROVAL.—Any attorney's fee under this subsection shall be subject to approval by the court and shall include an appropriate attorney's fee, if any, for obtaining equitable relief, including an injunction, if applicable. Nothing in this subsection shall be construed to prohibit application of a lodestar with a multiplier method of determining attorney's fees.

"(c) ATTORNEY'S FEE AWARDS CALCULATED ON A MIXED BASIS IN COUPON SETTLEMENTS.—If a proposed settlement in a class action provides for an award of coupons to class members and also provides for equitable relief, including injunctive relief—

"(1) that portion of the attorney's fee to be paid to class counsel that is based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (a); and

"(2) that portion of the attorney's fee to be paid to class counsel that is not based upon a portion of the recovery of the coupons shall be calculated in accordance with subsection (b).

"(d) SETTLEMENT VALUATION EXPERTISE.—In a class action involving the awarding of coupons, the court may, in its discretion upon the motion of a party, receive expert testimony from a witness qualified to provide information on the actual value to the class members of the coupons that are redeemed.

"(e) JUDICIAL SCRUTINY OF COUPON SETTLEMENTS.—In a proposed settlement under which class members would be awarded coupons, the court may approve the proposed settlement only after a hearing to determine whether, and making a written finding that, the settlement is fair, reasonable, and adequate for class members. The court, in its discretion, may also require that a proposed settlement agreement provide for the distribution of a portion of the value of unclaimed coupons to 1 or more charitable or governmental organizations, as agreed to by the parties. The distribution and redemption of any proceeds under this subsection shall not be used to calculate attorneys' fees under this section.

PUBLIC LAW 109–2—FEB. 18, 2005          119 STAT. 7

### "§ 1713. Protection against loss by class members

"The court may approve a proposed settlement under which any class member is obligated to pay sums to class counsel that would result in a net loss to the class member only if the court makes a written finding that nonmonetary benefits to the class member substantially outweigh the monetary loss.

### "§ 1714.   Protection  against  discrimination  based  on geographic location

"The court may not approve a proposed settlement that provides for the payment of greater sums to some class members than to others solely on the basis that the class members to whom the greater sums are to be paid are located in closer geographic proximity to the court.

### "§ 1715. Notifications to appropriate Federal and State officials

"(a) DEFINITIONS.—

"(1) APPROPRIATE FEDERAL OFFICIAL.—In this section, the term 'appropriate Federal official' means—

"(A) the Attorney General of the United States; or

"(B) in any case in which the defendant is a Federal depository institution, a State depository institution, a depository institution holding company, a foreign bank, or a nondepository institution subsidiary of the foregoing (as such terms are defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) APPROPRIATE STATE OFFICIAL.—In this section, the term 'appropriate State official' means the person in the State who has the primary regulatory or supervisory responsibility with respect to the defendant, or who licenses or otherwise authorizes the defendant to conduct business in the State, if some or all of the matters alleged in the class action are subject to regulation by that person. If there is no primary regulator, supervisor, or licensing authority, or the matters alleged in the class action are not subject to regulation or supervision by that person, then the appropriate State official shall be the State attorney general.

"(b) IN GENERAL.—Not later than 10 days after a proposed   Deadline. settlement of a class action is filed in court, each defendant that is participating in the proposed settlement shall serve upon the appropriate State official of each State in which a class member resides and the appropriate Federal official, a notice of the proposed settlement consisting of—

"(1) a copy of the complaint and any materials filed with the complaint and any amended complaints (except such materials shall not be required to be served if such materials are made electronically available through the Internet and such service includes notice of how to electronically access such material);

"(2) notice of any scheduled judicial hearing in the class action;

119 STAT. 8          PUBLIC LAW 109–2—FEB. 18, 2005

"(3) any proposed or final notification to class members of—

"(A)(i) the members' rights to request exclusion from the class action; or

"(ii) if no right to request exclusion exists, a statement that no such right exists; and

"(B) a proposed settlement of a class action;

"(4) any proposed or final class action settlement;

"(5) any settlement or other agreement contemporaneously made between class counsel and counsel for the defendants;

"(6) any final judgment or notice of dismissal;

"(7)(A) if feasible, the names of class members who reside in each State and the estimated proportionate share of the claims of such members to the entire settlement to that State's appropriate State official; or

"(B) if the provision of information under subparagraph (A) is not feasible, a reasonable estimate of the number of class members residing in each State and the estimated proportionate share of the claims of such members to the entire settlement; and

"(8) any written judicial opinion relating to the materials described under subparagraphs (3) through (6).

"(c) DEPOSITORY INSTITUTIONS NOTIFICATION.—

"(1) FEDERAL AND OTHER DEPOSITORY INSTITUTIONS.—In any case in which the defendant is a Federal depository institution, a depository institution holding company, a foreign bank, or a non-depository institution subsidiary of the foregoing, the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the person who has the primary Federal regulatory or supervisory responsibility with respect to the defendant, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person.

"(2) STATE DEPOSITORY INSTITUTIONS.—In any case in which the defendant is a State depository institution (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)), the notice requirements of this section are satisfied by serving the notice required under subsection (b) upon the State bank supervisor (as that term is defined in section 3 of the Federal Deposit Insurance Act (12 U.S.C. 1813)) of the State in which the defendant is incorporated or chartered, if some or all of the matters alleged in the class action are subject to regulation or supervision by that person, and upon the appropriate Federal official.

"(d) FINAL APPROVAL.—An order giving final approval of a proposed settlement may not be issued earlier than 90 days after the later of the dates on which the appropriate Federal official and the appropriate State official are served with the notice required under subsection (b).

"(e) NONCOMPLIANCE IF NOTICE NOT PROVIDED.—

"(1) IN GENERAL.—A class member may refuse to comply with and may choose not to be bound by a settlement agreement or consent decree in a class action if the class member demonstrates that the notice required under subsection (b) has not been provided.

"(2) LIMITATION.—A class member may not refuse to comply with or to be bound by a settlement agreement or consent

PUBLIC LAW 109–2—FEB. 18, 2005          119 STAT. 9

decree under paragraph (1) if the notice required under subsection (b) was directed to the appropriate Federal official and to either the State attorney general or the person that has primary regulatory, supervisory, or licensing authority over the defendant.

"(3) APPLICATION OF RIGHTS.—The rights created by this subsection shall apply only to class members or any person acting on a class member's behalf, and shall not be construed to limit any other rights affecting a class member's participation in the settlement.

"(f) RULE OF CONSTRUCTION.—Nothing in this section shall be construed to expand the authority of, or impose any obligations, duties, or responsibilities upon, Federal or State officials.".

(b) TECHNICAL AND CONFORMING AMENDMENT.—The table of chapters for part V is amended by inserting after the item relating to chapter 113 the following:

"114. Class Actions ............................................................................................ 1711".

### SEC. 4. FEDERAL DISTRICT COURT JURISDICTION FOR INTERSTATE CLASS ACTIONS.

(a) APPLICATION OF FEDERAL DIVERSITY JURISDICTION.—Section 1332 is amended—

> (1) by redesignating subsection (d) as subsection (e); and
> (2) by inserting after subsection (c) the following:

"(d)(1) In this subsection—

"(A) the term 'class' means all of the class members in a class action;

"(B) the term 'class action' means any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action;

"(C) the term 'class certification order' means an order issued by a court approving the treatment of some or all aspects of a civil action as a class action; and

"(D) the term 'class members' means the persons (named or unnamed) who fall within the definition of the proposed or certified class in a class action.

"(2) The district courts shall have original jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and is a class action in which—

"(A) any member of a class of plaintiffs is a citizen of a State different from any defendant;

"(B) any member of a class of plaintiffs is a foreign state or a citizen or subject of a foreign state and any defendant is a citizen of a State; or

"(C) any member of a class of plaintiffs is a citizen of a State and any defendant is a foreign state or a citizen or subject of a foreign state.

"(3) A district court may, in the interests of justice and looking at the totality of the circumstances, decline to exercise jurisdiction under paragraph (2) over a class action in which greater than one-third but less than two-thirds of the members of all proposed plaintiff classes in the aggregate and the primary defendants are citizens of the State in which the action was originally filed based on consideration of—

"(A) whether the claims asserted involve matters of national or interstate interest;

"(B) whether the claims asserted will be governed by laws of the State in which the action was originally filed or by the laws of other States;

"(C) whether the class action has been pleaded in a manner that seeks to avoid Federal jurisdiction;

"(D) whether the action was brought in a forum with a distinct nexus with the class members, the alleged harm, or the defendants;

"(E) whether the number of citizens of the State in which the action was originally filed in all proposed plaintiff classes in the aggregate is substantially larger than the number of citizens from any other State, and the citizenship of the other members of the proposed class is dispersed among a substantial number of States; and

"(F) whether, during the 3-year period preceding the filing of that class action, 1 or more other class actions asserting the same or similar claims on behalf of the same or other persons have been filed.

"(4) A district court shall decline to exercise jurisdiction under paragraph (2)—

"(A)(i) over a class action in which—

"(I) greater than two-thirds of the members of all proposed plaintiff classes in the aggregate are citizens of the State in which the action was originally filed;

"(II) at least 1 defendant is a defendant—

"(aa) from whom significant relief is sought by members of the plaintiff class;

"(bb) whose alleged conduct forms a significant basis for the claims asserted by the proposed plaintiff class; and

"(cc) who is a citizen of the State in which the action was originally filed; and

"(III) principal injuries resulting from the alleged conduct or any related conduct of each defendant were incurred in the State in which the action was originally filed; and

"(ii) during the 3-year period preceding the filing of that class action, no other class action has been filed asserting the same or similar factual allegations against any of the defendants on behalf of the same or other persons; or

"(B) two-thirds or more of the members of all proposed plaintiff classes in the aggregate, and the primary defendants, are citizens of the State in which the action was originally filed.

"(5) Paragraphs (2) through (4) shall not apply to any class action in which—

"(A) the primary defendants are States, State officials, or other governmental entities against whom the district court may be foreclosed from ordering relief; or

"(B) the number of members of all proposed plaintiff classes in the aggregate is less than 100.

"(6) In any class action, the claims of the individual class members shall be aggregated to determine whether the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs.

PUBLIC LAW 109–2—FEB. 18, 2005          119 STAT. 11

"(7) Citizenship of the members of the proposed plaintiff classes shall be determined for purposes of paragraphs (2) through (6) as of the date of filing of the complaint or amended complaint, or, if the case stated by the initial pleading is not subject to Federal jurisdiction, as of the date of service by plaintiffs of an amended pleading, motion, or other paper, indicating the existence of Federal jurisdiction.

"(8) This subsection shall apply to any class action before or after the entry of a class certification order by the court with respect to that action.

"(9) Paragraph (2) shall not apply to any class action that solely involves a claim—

"(A) concerning a covered security as defined under 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(B) that relates to the internal affairs or governance of a corporation or other form of business enterprise and that arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(C) that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).

"(10) For purposes of this subsection and section 1453, an unincorporated association shall be deemed to be a citizen of the State where it has its principal place of business and the State under whose laws it is organized.

"(11)(A) For purposes of this subsection and section 1453, a mass action shall be deemed to be a class action removable under paragraphs (2) through (10) if it otherwise meets the provisions of those paragraphs.

"(B)(i) As used in subparagraph (A), the term 'mass action' means any civil action (except a civil action within the scope of section 1711(2)) in which monetary relief claims of 100 or more persons are proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact, except that jurisdiction shall exist only over those plaintiffs whose claims in a mass action satisfy the jurisdictional amount requirements under subsection (a).

"(ii) As used in subparagraph (A), the term 'mass action' shall not include any civil action in which—

"(I) all of the claims in the action arise from an event or occurrence in the State in which the action was filed, and that allegedly resulted in injuries in that State or in States contiguous to that State;

"(II) the claims are joined upon motion of a defendant;

"(III) all of the claims in the action are asserted on behalf of the general public (and not on behalf of individual claimants or members of a purported class) pursuant to a State statute specifically authorizing such action; or

"(IV) the claims have been consolidated or coordinated solely for pretrial proceedings.

"(C)(i) Any action(s) removed to Federal court pursuant to this subsection shall not thereafter be transferred to any other court

PUBLIC LAW 109–2—FEB. 18, 2005

pursuant to section 1407, or the rules promulgated thereunder, unless a majority of the plaintiffs in the action request transfer pursuant to section 1407.

"(ii) This subparagraph will not apply—

"(I) to cases certified pursuant to rule 23 of the Federal Rules of Civil Procedure; or

"(II) if plaintiffs propose that the action proceed as a class action pursuant to rule 23 of the Federal Rules of Civil Procedure.

"(D) The limitations periods on any claims asserted in a mass action that is removed to Federal court pursuant to this subsection shall be deemed tolled during the period that the action is pending in Federal court.".

(b) CONFORMING AMENDMENTS.—

(1) Section 1335(a)(1) is amended by inserting "subsection (a) or (d) of" before "section 1332".

(2) Section 1603(b)(3) is amended by striking "(d)" and inserting "(e)".

## SEC. 5. REMOVAL OF INTERSTATE CLASS ACTIONS TO FEDERAL DISTRICT COURT.

(a) IN GENERAL.—Chapter 89 is amended by adding after section 1452 the following:

### "§ 1453. Removal of class actions

"(a) DEFINITIONS.—In this section, the terms 'class', 'class action', 'class certification order', and 'class member' shall have the meanings given such terms under section 1332(d)(1).

"(b) IN GENERAL.—A class action may be removed to a district court of the United States in accordance with section 1446 (except that the 1-year limitation under section 1446(b) shall not apply), without regard to whether any defendant is a citizen of the State in which the action is brought, except that such action may be removed by any defendant without the consent of all defendants.

"(c) REVIEW OF REMAND ORDERS.—

Applicability.

"(1) IN GENERAL.—Section 1447 shall apply to any removal of a case under this section, except that notwithstanding section 1447(d), a court of appeals may accept an appeal from an order of a district court granting or denying a motion to remand a class action to the State court from which it was removed if application is made to the court of appeals not less than 7 days after entry of the order.

"(2) TIME PERIOD FOR JUDGMENT.—If the court of appeals accepts an appeal under paragraph (1), the court shall complete all action on such appeal, including rendering judgment, not later than 60 days after the date on which such appeal was filed, unless an extension is granted under paragraph (3).

"(3) EXTENSION OF TIME PERIOD.—The court of appeals may grant an extension of the 60-day period described in paragraph (2) if—

"(A) all parties to the proceeding agree to such extension, for any period of time; or

"(B) such extension is for good cause shown and in the interests of justice, for a period not to exceed 10 days.

"(4) DENIAL OF APPEAL.—If a final judgment on the appeal under paragraph (1) is not issued before the end of the period

described in paragraph (2), including any extension under paragraph (3), the appeal shall be denied.

"(d) EXCEPTION.—This section shall not apply to any class action that solely involves—

"(1) a claim concerning a covered security as defined under section 16(f)(3) of the Securities Act of 1933 (15 U.S.C. 78p(f)(3)) and section 28(f)(5)(E) of the Securities Exchange Act of 1934 (15 U.S.C. 78bb(f)(5)(E));

"(2) a claim that relates to the internal affairs or governance of a corporation or other form of business enterprise and arises under or by virtue of the laws of the State in which such corporation or business enterprise is incorporated or organized; or

"(3) a claim that relates to the rights, duties (including fiduciary duties), and obligations relating to or created by or pursuant to any security (as defined under section 2(a)(1) of the Securities Act of 1933 (15 U.S.C. 77b(a)(1)) and the regulations issued thereunder).".

(b) TECHNICAL AND CONFORMING AMENDMENTS.—The table of sections for chapter 89 is amended by adding after the item relating to section 1452 the following:

"1453. Removal of class actions.".

## SEC. 6. REPORT ON CLASS ACTION SETTLEMENTS.

(a) IN GENERAL.—Not later than 12 months after the date of enactment of this Act, the Judicial Conference of the United States, with the assistance of the Director of the Federal Judicial Center and the Director of the Administrative Office of the United States Courts, shall prepare and transmit to the Committees on the Judiciary of the Senate and the House of Representatives a report on class action settlements.

(b) CONTENT.—The report under subsection (a) shall contain—

(1) recommendations on the best practices that courts can use to ensure that proposed class action settlements are fair to the class members that the settlements are supposed to benefit;

(2) recommendations on the best practices that courts can use to ensure that—

(A) the fees and expenses awarded to counsel in connection with a class action settlement appropriately reflect the extent to which counsel succeeded in obtaining full redress for the injuries alleged and the time, expense, and risk that counsel devoted to the litigation; and

(B) the class members on whose behalf the settlement is proposed are the primary beneficiaries of the settlement; and

(3) the actions that the Judicial Conference of the United States has taken and intends to take toward having the Federal judiciary implement any or all of the recommendations contained in the report.

(c) AUTHORITY OF FEDERAL COURTS.—Nothing in this section shall be construed to alter the authority of the Federal courts to supervise attorneys' fees.

## SEC. 7. ENACTMENT OF JUDICIAL CONFERENCE RECOMMENDATIONS.

28 USC 2074 note.

Notwithstanding any other provision of law, the amendments to rule 23 of the Federal Rules of Civil Procedure, which are

set forth in the order entered by the Supreme Court of the United States on March 27, 2003, shall take effect on the date of enactment of this Act or on December 1, 2003 (as specified in that order), whichever occurs first.

28 USC 2071 note.

**SEC. 8. RULEMAKING AUTHORITY OF SUPREME COURT AND JUDICIAL CONFERENCE.**

Nothing in this Act shall restrict in any way the authority of the Judicial Conference and the Supreme Court to propose and prescribe general rules of practice and procedure under chapter 131 of title 28, United States Code.

28 USC 1332 note.

**SEC. 9. EFFECTIVE DATE.**

The amendments made by this Act shall apply to any civil action commenced on or after the date of enactment of this Act.

Approved February 18, 2005.

LEGISLATIVE HISTORY—S. 5:

CONGRESSIONAL RECORD, Vol. 151 (2005):
    Feb. 7–10, considered and passed Senate.
    Feb. 17, considered and passed House.
WEEKLY COMPILATION OF PRESIDENTIAL DOCUMENTS, Vol. 41 (2005):
    Feb. 18, Presidential remarks.

○

# UNITED STATES OF AMERICA
## JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

CHAIRMAN:
Judge Wm. Terrell Hodges
United States District Court
Middle District of Florida

MEMBERS:
Judge John F. Keenan
United States District Court
Southern District of New York

Judge D. Lowell Jensen
United States District Court
Northern District of California

Judge J. Frederick Motz
United States District Court
District of Maryland

Judge Robert L. Miller, Jr.
United States District Court
Northern District of Indiana

Judge Kathryn H. Vratil
United States District Court
District of Kansas

Judge David R. Hansen
United States Court of Appeals
Eighth Circuit

DIRECT REPLY TO:

Michael J. Beck
Clerk of the Panel
One Columbus Circle, NE
Thurgood Marshall Federal
Judiciary Building
Room G-255, North Lobby
Washington, D.C. 20002

Telephone: [202] 502-2800
Fax:        [202] 502-2888

http://www.jpml.uscourts.gov

November 12, 2004

TO INVOLVED COUNSEL

Re:  MDL-1631-- In re Publication Paper Antitrust Litigation

(See Attached Schedule A of Order)

Dear Counsel:

I am enclosing a copy of a Panel order filed today in the above-referenced matter.

The Rules of Procedure of the Judicial Panel on Multidistrict Litigation, 199 F.R.D. 425 (2001), and specifically, Rules 1.1, 7.4 and 7.5, refer to "tag-along" actions. Please familiarize yourself with these Rules for your future reference. With regard to Rule 7.5, you need only provide this office with a copy of the complaint which you feel qualifies as a "tag-along" action and informally request that our "tag-along" procedures be utilized in transferring the action to the transferee district. If you have any questions regarding procedures used by the Panel, please telephone this office.

Very truly,

Michael J. Beck
Clerk of the Panel

By _____
Deputy Clerk

Enclosure

JPML Form 35

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

NOV 1 2 2004

## *RELEASED FOR PUBLICATION*

FILED
CLERK'S OFFICE

## *DOCKET NO. 1631*

## *BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION*

## *IN RE PUBLICATION PAPER ANTITRUST LITIGATION*

## *BEFORE WM. TERRELL HODGES, CHAIRMAN, JOHN F. KEENAN, D. LOWELL JENSEN, J. FREDERICK MOTZ, ROBERT L. MILLER, JR., KATHRYN H. VRATIL AND DAVID R. HANSEN, JUDGES OF THE PANEL*

### *TRANSFER ORDER*

This litigation currently consists of the three actions in the District of Connecticut, two actions in the Southern District of Illinois and one action each in the Northern District of California, the District of Minnesota, the Western District of Washington, and the Eastern District of Wisconsin as listed on the attached Schedule A.[1]  Before the Panel is a motion, pursuant to 28 U.S.C. § 1407, brought by plaintiff in one District of Connecticut action for coordinated or consolidated pretrial proceedings of the actions in that district. All responding defendants[2] and nearly all responding plaintiffs now support the motion for transfer to the District of Connecticut. Initially, plaintiff in the Western District of Washington action and plaintiff in the Eastern District of Wisconsin action each moved for centralization in the district in which its action is pending. Plaintiff in the Western District of Washington action subsequently withdrew its motion and added its support to the motion for transfer to the District of Connecticut. Plaintiff in the Eastern District of Wisconsin action first offered the District of Connecticut as an alternative choice for transferee forum, but, at oral argument, also supported the motion for transfer to the District of Connecticut. Plaintiffs in the two Southern District of Illinois actions agree that transfer is warranted, but propose the Southern District of Illinois as transferee district.

---

[1]  The parties have notified the Panel of fifteen related actions pending as follows: eight actions in the District of Connecticut; two actions each in the Northern District of Illinois and the District of New Jersey; and one action each in the District of Massachusetts, the Northern District of Ohio and the Eastern District of Pennsylvania. These actions and any other related actions will be treated as potential tag-along actions. *See* Rules 7.4 and 7.5, R.P.J.P.M.L., 199 F.R.D. 425, 435-36 (2001).

[2]  Responding defendants are International Paper Company; MeadWestvaco Corporation; Norske Skog North America, LLC; Norske Skog (USA), Inc.; Norske Skog Canada Limited; Norske Skog Canada (USA), Inc.; Stora Enso North America Corporation; M-real USA Corporation; Madison International Sales Company; Bowater, Inc.; and S.D. Warren Company.

- 2 -

On the basis of the papers filed and hearing session held, the Panel finds that these nine actions involve common questions of fact, and that centralization under Section 1407 in the District of Connecticut will serve the convenience of the parties and witnesses and promote the just and efficient conduct of this litigation. The actions share allegations that the defendants and their co-conspirators engaged in a continuing contract, combination or conspiracy in restraint of trade to artificially raise, fix, maintain or stabilize prices for publication paper in violation of federal antitrust laws. Centralization under Section 1407 is thus necessary in order to eliminate duplicative discovery; prevent inconsistent pretrial rulings, including those with respect to class certification; and conserve the resources of the parties, their counsel and the judiciary.

We are persuaded that the District of Connecticut is an appropriate transferee forum for this docket. We note that the District of Connecticut has 1) the largest number of pending actions; 2) the support of plaintiffs in nearly all actions and potential tag-along actions pending in this district and elsewhere; 3) the endorsement of all responding defendants; 4) a strong nexus to the litigation with the presence of many defendants, including the largest domestic defendant, in the state; and 5) the resources that this complex antitrust docket is likely to require. We also observe that this district is a geographically convenient location, given the location of principal defendants and potential defendants and witnesses in the eastern part of the United States and in Europe.

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. § 1407, the actions listed on Schedule A and pending outside the District of Connecticut are transferred to the District of Connecticut and, with the consent of that court, assigned to the Honorable Stefan R. Underhill for coordinated or consolidated pretrial proceedings with the actions pending in that district and listed on Schedule A.

FOR THE PANEL:

Wm. Terrell Hodges
Chairman

**SCHEDULE A**

MDL-1631 -- In re Publication Paper Antitrust Litigation

Northern District of California

*T&W Printing, Inc. v. International Paper Co., et al.*, C.A. No. 4:04-2428

District of Connecticut

*Charles J. Gardella, Jr., etc. v. International Paper Co., et al.*, C.A. No. 3:04-935
*Larry Weiss, etc. v. International Paper Co., et al.*, C.A. No. 3:04-974
*Acorn/Parliament Paper Inc. v. International Paper Co., et al.*, C.A. No. 3:04-1077

Southern District of Illinois

*Nies Artcraft Co., Inc. v. International Paper Co., et al.*, C.A. No. 3:04-455
*Three Z Printing Co. v. International Paper Co., et al.*, C.A. No. 3:04-4110

District of Minnesota

*Newtown Business Forms Corp. v. International Paper Co.*, C.A. No. 0:04-3035

Western District of Washington

*MMP BALA, Inc. v. International Paper Co., et al.*, C.A. No. 2:04-1496

Eastern District of Wisconsin

*Austin Printing Co., Inc. v. International Paper Co., et al.*, C.A. No. 2:04-668

JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Barbara Aceto, et al.

**DEFENDANTS**
International Paper Co., et al.

**(b)** County of Residence of First Listed Plaintiff    Middlesex
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Fairfield County, CT
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)
Robert Bonsignore, Esq., 23 Forest St., Medford, MA 02155

Attorneys (If Known)
See attachment.

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☐ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**05    11127 GAO**

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury – | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury – | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☒ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities – | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities – | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☐ 1 Original Proceeding
☒ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. s. 1332
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY
(See instructions):
JUDGE  Judge George A. O'Toole, Jr.
DOCKET NUMBER 1:04-CV-11583 (transferred)

DATE  5/31/05

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1.  Title of case (name of first party on each side only)____Barbara Aceto, et al v. International Paper Co., et al.

2.  Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local
    rule 40.1(a)(1)).

    [ ]  I.    160, 410, 470, 535, R.23, REGARDLESS OF NATURE OF SUIT.

    [X]  II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
               740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.          for patent, trademark or copyright cases

    [ ]  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
               315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
               380, 385, 450, 891.

    [ ]  IV.   220, 422, 423, 430, 460, 480, 490, 510, 530, 610, 620, 630, 640, 650, 660,   **05 - 11127 GAO**
               690, 810, 861-865, 870, 871, 875, 900.

    [ ]  V.    150, 152, 153.

3.  Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this
    district please indicate the title and number of the first filed case in this court.
    Custom Printing of Willmar, Inc., et al. v. International Paper Co., et al., 1:04-CV-11583 (transferred to D. Conn.)

4.  Has a prior action between the same parties and based on the same claim ever been filed in this court?
                                                           YES  [ ]        NO   [X]

5.  Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC
    §2403)
                                                           YES  [ ]        NO   [X]
    If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
                                                           YES  [ ]        NO   [ ]

6.  Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
                                                           YES  [ ]        NO   [X]

7.  Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of
    Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
                                                           YES  [ ]        NO   [ ]

    A.   If yes, in which division do all of the non-governmental parties reside?

         Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

    B.   If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies,
         residing in Massachusetts reside?

         Eastern Division  [ ]        Central Division  [ ]        Western Division  [ ]

8.  If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes,
    submit a separate sheet identifying the motions)
                                                           YES  [ ]        NO   [X]

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME   Jane E. Willis
ADDRESS   Ropes & Gray LLP, One International Place, Boston, MA 02110-2624
TELEPHONE NO.   (617) 961-7000